FILED
2012 Jan-27  AM 09:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | |
|---|---|
| PETER J. RUSH, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civil Action No. |
| Plaintiff, ) ) | CLASS ACTION COMPLAINT |
| vs. ) ) | |
| WALTER ENERGY, INC., KEITH CALDER, WALTER J. SCHELLER, and NEIL WINKELMANN, ) ) ) ) | |
| Defendants. ) ) ) | |

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Walter Energy, Inc. ("Walter" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the common stock of Walter between April 20, 2011 and September 21, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.    Plaintiff Peter J. Rush, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Walter during the Class Period and has been damaged thereby.

7.    Defendant Walter, through its consolidated subsidiaries, mines and exports hard coking coal for the global steel industry. The Company is headquartered in Birmingham, Alabama.

8.    Defendant Keith Calder ("Calder"), became the Chief Executive Officer ("CEO") of Walter on April 1, 2011. Prior thereto, Defendant Calder was the President and CEO of Western Coal Corp. ("Western Coal"). Effective July 31, 2011, Defendant Walter "resigned" from his position as Walter's CEO because of "differences of opinion concerning management philosophy."

9.    Defendant Walter J. Scheller ("Scheller"), served as the President of Walter's U.S. Operations until September 12, 2011 when he was appointed as Walter's CEO and elected to the Company's Board of Directors.

10.    Defendant Neil Winkelmann ("Winkelmann"), at all relevant times, served as the President of Walter's Canadian and European operations.

11.    Defendants Calder, Scheller, and Winkelmann are collectively referred to herein as the "Individual Defendants."

12.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Walter, were privy to confidential and proprietary information concerning Walter, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Walter, as discussed in detail below. Because of their positions with Walter, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and

connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Walter's business.

14. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

15. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Walter's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and

future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Walter common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Walter common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Walter's business, operations and management and the intrinsic value of Walter common stock; and (ii) caused Plaintiff and members of the Class to purchase Walter common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Walter between April 20, 2011 and September 21, 2011, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

18. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Walter common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Walter or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Walter;

        (c)     whether the price of Walter common stock was artificially inflated during the Class Period; and

        (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

23.     Defendant Walter is a producer and exporter of metallurgical coal for the global steel industry and also produces steam coal, coal bed methane gas (natural gas), metallurgical coke and other related products.

24.     On April 1, 2011, Walter completed the acquisition of all the outstanding common shares of Western Coal.  Thereafter, beginning with the second calendar quarter of 2011, Walter began managing its business operations geographically. via three principal business segments: U.S. Operations, Canadian and U.K. Operations and Other.

25.     The Company reports all of its operations located in the U.S. under the U.S. Operations segment, which includes the Company's previous operating segments of Underground Mining, Surface Mining and Walter Coke.  The U.S. Operations segment also includes the West Virginia mining operations acquired through the acquisition of Western Coal.

26.     The Company's mining operations acquired through the Western Coal acquisition located in Northeast British Columbia (Canada) and South Wales (United Kingdom) are reported under the Canadian and U.K. Operations segment.

27.     The Other segment primarily consists of Corporate activities and expenditures.

28.     The Class Period begins on April 20, 2011.  On that date, Walter issued a press release announcing its financial results for its 2011 fiscal first quarter, the period ended March 31, 2011.  For the quarter, the Company reported earnings of $81.8 million, or $1.53 per diluted common share.  The press release also included Defendant Calder's comments, including those about Walter's strong growth and its outlook for 2011, stating, in pertinent part, as follows:[1]

Walter Energy Announces First Quarter 2011 Results

---

[1]     Unless otherwise noted, all emphasis is added.

Company Reports Earnings of $1.53 per Diluted Share and Net Income of $81.8 Million, **Both Almost Double Compared to First Quarter 2010**

EBITDA of $148.1 Million, Up 58 Percent

**Underground Mining Segment Nearly Doubles Operating Income**

*     *     *

2011 Full-Year Business Outlook

As previously announced, Walter Energy acquired Western Coal on April 1, 2011. Sales volume expectations for both legacy Walter Energy and legacy Western Coal are as follows:

**The Company expects full year metallurgical coal sales from the Walter Energy Alabama underground operations of 7.5 million to 8.0 million short tons.** In addition, the Walter Energy Alabama surface operations expect to sell between 1.4 million and 1.6 million short tons of thermal coal for the full year.

From the legacy Western Coal operations, **the Company expects metallurgical coal sales of between 4.9 million and 5.3 million metric tons for the period of April 1, 2011 to Dec. 31, 2011.** The Company expects thermal coal sales of 1.0 million to 1.2 million metric tons for the same period from these operations.

*     *     *

Defendant Calder commented on the Company's results, stating, in pertinent part:

We generated strong year-over-year growth in revenues and income **driven primarily by the third highest coking coal pricing we have ever achieved.** Now that our acquisition of Western Coal is complete, we can turn our attention to delivering on our promises, executing integration activities and framing future growth opportunities.

29.     Following the Company's 2011 fiscal first quarter earnings announcement, on April 21, 2011, Walter held a conference call with analysts and investors to discuss the Company's earnings and opportunities (the "April 21st Conference Call"). Prior to such conference call, Defendants provided investors with financial information about the Company, including, in part, Walter's recent operating performance, coal sales, coal pricing and coal production. In the materials, Defendants represented that Walter was able to realize significant increases in the average, per ton, sales price of coal during the quarter:

 **Q1-2011 Financial Highlights**

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenues | $408.7 | $312.0 | +31.0% |
| EBITDA | $148.1 | $93.5 | +58.4% |
| Operating Income | $119.8 | $71.3 | +68.0% |
| Net Income | $81.8 | $41.6 | +96.6% |
| Diluted earnings/share ($) | $1.53 | $0.77 | +98.7% |

Comment: Q1 2011 results also included $9.9 million in transaction costs related to the Western Coal acquisition

First Quarter 2011 Earnings Conference Call | 4/21/11 | 11

 **Q1-2011 Financial Summary
Underground Mining**

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenue | $343.2 | $240.3 | +42.8% |
| Operating Income | $123.9 | $64.8 | +91.2% |
| % Op Margin | 36.1% | 27.0% | +33.7% |
| Capital Expenditures | $37.5 | $12.7 | +195.3% |
| Sales (tons in millions) | 1.7 | 1.8 | -6.4% |
| Average Sales Price per Ton | $193.51 | $127.05 | +52.3% |
| Production (tons in millions) | 1.6 | 1.7 | -5.9% |
| Average Mine Production Cost per Ton | $69.20 | $58.19 | +18.9% |

First Quarter 2011 Earnings Conference Call | 4/21/11 | 13

*       *       *

 **WALTER ENERGY** Q1-2011 Business Summary
Surface Mining

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenues | $ 40.8 | $ 31.3 | +30.4% |
| Operating Income | $ 6.7 | $ 7.3 | -8.2% |
| % Op Margin | 16.4% | 23.3% | -29.7% |
| Sales (tons in 000s) | 426 | 375 | +13.6% |
| Average Sales Price per Ton | $ 92.75 | $ 78.89 | +17.6% |
| Production (tons in 000s) | 369 | 345 | + 6.8% |
| Average Production Cost per Ton | $ 69.01 | $ 58.32 | +18.3% |

First Quarter 2011 Earnings Conference Call | 4/21/11 | 15

 **WALTER ENERGY** Q1-2011 Business Summary
Walter Coke

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenue | $47.3 | $51.2 | -7.6% |
| Operating Income | $8.0 | $7.6 | +5.3% |
| % Op Margin | 16.9% | 14.8% | +14.2% |
| Sales (tons in 000s) | 104 | 139 | -25.2% |
| Average Sales Price per Ton | $409.85 | $327.37 | +25.2% |
| Production (tons in 000s) | 99.4 | 82.0 | +21.2% |

First Quarter 2011 Earnings Conference Call | 4/21/11 | 16

30.     In addition, Defendants indicated that "markets remain strong" and that "Q2 - 2011

prices at record levels", as follows:

 **Markets remain strong**

### Seaborne metallurgical coal

- Slow recovery of Australian supply
- Demand steady
- Q2-2011 prices at record levels
    - HCC > US$300 per tonne; LV PCI > US$270 per tonne

### Steel industry

- Increasing finished steel prices during Q1



31.     On the April 21st conference call, Defendant Scheller made positive statements about the average coal sales prices and the reasons for reduced production volumes, which Defendant Sheller indicated were "moving forward" and "progressing" at "improved" and "more normal" rates, stating, in pertinent part:

Sales volumes of 1.8 million tons for Q1 were down 6.4% compared to the same period last year.  The lower sales volume reflects lower production and inventory levels.  **Our average coal sales price at the underground segment in the quarter was $194 a ton, up 52% over the same quarter last year.  Benchmark prices in the first quarter of 2011 were higher than those in the first quarter of 2010 and we sold carryover tonnage from the previous year in the first quarter which somewhat reduced the increase and average sales price and percentage increase.**

Average production cost for the underground mining segment was $69 per ton, a 19% increase over last year.  The higher costs primarily were due to higher labor costs as we increased manpower to run more continuous miner sections and also resulted from reduced production volumes as a result of weak roof conditions, ventilation and construction projects, and a two week squeeze on the lower wall at the number four mine in January.

Moving on to the quarterly coking coal production volumes on slide 14, **we are positioned to expand production for an 8 million ton annual run rate as we move forward**.  We had two long wall moves and produced 1.6 million tons in the first quarter, which was 4.6% less than the same period a year ago.  **This quarter's**

**long wall moves and improved continuous miner advance rates establish a foundation to moving forward at production at improved rates**.

Mine four production was impacted in Q1 by a couple of issues. The ventilation and construction issues were due to delayed completion of a new ventilation shaft which encountered several disturb zones due to sub surface faulting which has caused considerable delay. **The shaft development is now progressing at a more normal daily rate and should be operational in Q2.**

The long wall performance was a challenge throughout the N19 panel which began in Q4 and was completed in March of this year. A two-week shield squeeze followed by continued roof leak conditions slowed production rates. We moved from the N19 panels to the S2 panel which began in late March. **This will eliminate the roof control issues we encountered in N19**. At mine seven, **the number one long wall had had difficult cutting conditions which required reduced cutting rates** and increased maintenance to keep tools adequate for the task. These conditions impacted both Q4 and Q1.

**The long wall was moved from the J panel to the K panel in February and the cutting conditions are improved**. Additionally, both long walls at mine seven were impacted due to the need to address ventilation issues during the first part of the long wall panel. These issues resulted in reduced production rates. The changes which have been completed coupled with those that are planned will continue to protect our miners.

As indicated on slide 15, our surface mining operations experienced a record sales quarter with revenues higher by 30% year-over-year. This strong percentage was tempered to some extent by higher ratios as well as increases in diesel fuel and blasting costs. Now to Walter Coke. On slide 16 you will see Walter Coke's operating margin was strongly positive as a result of solid production increases and favorable pricing in its primary market.

32.    Also on the April 21st conference call, Defendant Winkelmann made positive statements about the Company's coal production and its on-going capital improvement efforts to further increase production at Walter's Canadian mines, stating, in pertinent part as follows:

Capital expenditure continues to focus on the development of the metallurgical coal assets. **The mines have ramped to be producing at a total rate of 6 million tons per annum, with two of the past three quarters in excess of 1.5 million tons, and the recent quarter of 1.4 million tons in spite of operational and logistics issues.**

Moving on to slide 19, I will first discuss our Wolverine mine in northeast British Columbia, our flagship operation in Canada. **It's a mature steady state open pit mine that produces more than 2 million metric tons per year of high quality for (inaudible) coking coal from multiple complex seams**. Over the past year the focus at Wolverine has put into place new, larger and more productive equipment. In parallel we have implemented productivity improvement programs to offset cost

pressures and to improve operating efficiency. The images on the slide show our existing mine site as well as the coal processing plant and rail load out facilities. **These facilities are potentially able to process and load out more than 3 million tons per year of clean coal**.

Also on the slide is one of the new Hitachi EX5500 27 cubic meter hydraulic shovels that we commissioned during the past year. **We are now evaluating a major extension of the mine life whilst also potentially further increasing production rates**. In summary, this mine has become a model for the development of our other two mines in northeast British Columbia.

Moving on to slide 20 and to our Brule mine. This mine produces one of the best quality, highest coke replacement ratio low volatile PCI product in the world for our Asian customers. **Over the past year are the [SIC] focus has been to expand the mining operation into a new larger pit. The mine production rate will grow to 2 million metric tons per year of production, utilizing equipment and newer onsite infrastructure**. The capital investment in this mine is approximately 70% complete. The mine does not have its own processing or load-out facility and prior to Q1 2011, the quote at commissioning of the new Falling Creek connector road, Brule's coal was being trucked by highway to the facilities at either Wolverine, Willow Creek, or to a third party load-out.

**With the newly commissioned road, the majority of the coal from Brule can go directly to Willow Creek's production and load-out facilities without highway travel, thus reducing transportation costs and enabling Brule to increase production to the targeted 2 million metric tons per year run rate by middle of this year**. It is worth noting that the majority of coal from this mine is shipped to customers without the need for beneficiation other than mine-site crushing. The pictures on this slide show the mine site in the summer of 2010 as well as the EX8000 shovel and the 793 haul trucks in which they have deployed several.

Moving on to slide 21 and our Willow Creek mine. We restarted this mine in June 2010 and to date it's been a very successful startup. The open pit mine produces a mix of top quality low volatile PCIs and a very high quality hard coking from complex geology. Willow Creek has a preparation plant and rail load-out. **We are expanding production to 1.7 million metric tons her year and expect to receive the relevant permits shortly**. The capital program in 2011 will be to expand the mine bringing in new, larger equipment and to expand the processing plant and coal handling facilities to handle increased tonnage. Overall the capital program is 20% complete with substantial completion by the end of Q1 2012.

Further exploration and evaluation will be undertaken this summer in Willow Creek South, potentially increasing mine life in reserve. **Overall the performance at the northeast British Columbian assets has improved significantly throughout the year resulting in production of under 4 million metric tons for the 12-month period to the end of March 2011**. This has been a great start to an ambitious expansion program that will continue throughout 2011 and beyond.

33.     In addition, on the April 21st conference call, Defendant Calder made positive statements about existing market fundamentals and the Company's outlook for 2011 and its second fiscal quarter, stating, in part:

I would like to first make a few comments about the coal market and refer you to slide number 28. **The market fundamentals for internationally traded met coal remain very strong in Q1, 2011**, largely due to continued rains in Queensland, where about 15 million to 20 million tons of export production was lost. **In addition, the fundamentals on the demand side of the equation look strong as well.** For example, the World Steel Association recorded that crude steel production for February was 117 million tons or 8.8% higher than February of the previous year. And **the full year of 2011 appears to be on track to at least match 1.4 billion tons produced in 2010, which itself was up 15% over 2009**.

Looking closer at specific economic reasons we sell into, let me first say our thoughts go out to those in Japan who are continuing to deal with the terrible tragedy of the earthquake and tsunami of March 11th. The long-term economic impact for Japan are slowly emerging, and it appears that the automotive sector appears to be hardest hit due to its structure of plants and manufacturing specialty parts. Japanese economists expect a short recession, lasting from one to two quarters are followed by growth fueled by rebuilding in 2012. **However at this stage we are not seeing any impact on our shipments**.

GDP growth **in China and India**, two key sectors for the metallurgical coal supply, is forecasted to be 9.6% and 8.2% representatively. As GDP directly correlates to the use of steel products, **these forecasts are positive for the future demand for met coal**.

**In Europe and South America, crude steel production continues to be strong**. Germany, for example, continues to lead and reached its highest quarterly product in the summer of 2008.

**Looking at the current quarter, second quarter 2011, hard coking coal prices, we settled in line with markets -- $326 to $330 per ton**, which is a reflection of the high quality coal we are producing. This increase is nearly 50% higher than the previous quarter.

With regard to the low-vol PCI coal we produce in northeastern British Columbia, **Q2 prices have been in the area of $275 per ton, which represents 83% of the hard coking coal settlement. This is the high end of historic ratio levels.** In short, worldwide demand for metallurgical coal remains strong throughout January and March and the longer term outlook is firm and as the economic recovery continues in developed economies and expands in the major growth regions of China, India and Brazil. **Q2 pricing is very strong and we continue to see exceptional interest in a demand for all of our coal products.**

Moving on to slide 30, this illustrates our expected coal sales growth for 2012. **For 2011 the Company expects full year met coal sales from our Alabama underground operations of 7.5 to 8 million short tons including up to 500,000 tons of purchase coal.**

In addition, **the Alabama surface operation is expected to sell between 1.4 and 1.6 million short tons of thermal coal for the full year. From the legacy Western Coal operations, the Company expects metallurgical coal sales of between 4.9 million and 5.3 million metric tons for the period of April 1st to December 31st, 2011. The Company expects thermal coal sales of 1 million to 1.2 million metric tons for the same period from our operations.**

But this is only part of the story. The growth shown here only reflects current operations and does not include the depth of our project portfolio. Over the coming months our team will be meeting and developing the Company's long-term strategy and over time will be in a position to share with you more details about our extensive pipeline of projects.

34.    These statements by Defendants, and others like them, left investors with only one conclusion: the outlook for Walter's operations - - from coal demand, to coal prices, to coal production - - was very positive. Indeed, on the conference call with securities analysts, Defendants reiterated their positive statements about the Company's prospects during the question and answer session.

35.    Significantly, on the April 21st conference call Defendant Calder explained that Walter's coal production was "priced and sold" through the second quarter and that, as a seaborne coal producer, a vast majority of its coal pricing is established in the month immediately preceding a given quarter (*i.e.*, the pricing for the June 2011 quarter is established in March 2011) stating, in pertinent part, as follows:

<u>Jim Rollyson-Raymond James, Analyst</u>:

That's very helpful and Keith maybe you can provide a little color across the spectrum of the combined companies now for where your contract position was. I think in the last quarter you were pretty well sold for the first half at the Walter operations, some of that because of carryover coal that bled into this year. **But maybe a little color on how to -- where the second quarter, the rest of the year is from a contract standpoint and a pricing standpoint and what is open on the Western side as well.**

<u>Defendant Calder</u>:

**The scenario for both old Walter and old Western is very similar. That is that obviously through the second quarter, our production is priced and sold.** As we go into the second half of the year, all of the materials committed going forward, but only 10% is priced. So we're about 90% open on pricing going forward and I think it really just demonstrates the commonality or the philosophical approach of how we see marketing, both before the integration of the two companies and now going forward.

Jim Rollyson-Raymond James, Analyst:

When we think about pricing metals, particularly on the met side, for Q2, do you think of that somewhere bridging the gap between where pricing was in Q1 and previously where the bench marks have been set somewhere in the middle, maybe?

Defendant Calder:

That's a very good way of looking at it. Because as you know we did sell some material both from the old Western and legacy Walter board for half the year. So some of that will be a little carryover in both areas coming out of Alabama. So that's a good way of looking at it. It's sort of a combination of middle ground between the two.

Jim Rollyson-Raymond James, Analyst:

And just a last one --

Defendant Calder:

One thing I think is important to note -- sorry for interrupting but just to finish that. **It is important to note that all of our products tend to lean toward the higher end of the benchmark pricing range whenever we place those contracts - just a reflection of the high quality of the product that we sell.**

\*      \*      \*

Lucas Pipes - Brean Murray, Analyst:

That's fair. As a followup, as you mentioned, you still have to price a good amount of coal in the second half of the year. Could you tell us about when you want to price these volumes? Are you trying to get them out now? The pushback from your customers -- how are they seeing things? Are they trying to maybe hold off a little bit and then price more in the second half of the year? What is your strategy there?

Defendant Calder:

Well, I think it's important to note that **Walter Energy is first and foremost a seaborne met coal producer so we sit well in the seaborne met coal pricing mechanisms. The bulk of that, vast majority is done on a quarterly basis -- so pricing for Q3 would be executed in June. So that pricing would be established in June. The pricing for the following quarter, obviously in the last month of**

**the third quarter.** There are -- **sometimes we find there's an opportunity and a desire on the part of our customers to establish a six monthly contract or nine monthly contract, we do that occasionally.** But first and foremost and overall, because we are a seaborne met coal producer we are for the most part in the quarterly pricing stage.

Now, on the other hand, **we do have long-term contracts with the vast majority of our customers. And that means that the volumes are contracted two and three and four years out. So we know where our volumes are going for Q2 and Q3.** It is now a question of defining that price and hence the seaborne bench mark is what we work on.

*       *       *

Mitesh Thakkar - FBR Capital Markets, Analyst:

Will stay about the same. Okay. And one final question. And this is just in general, about the pricing side. I know you talked about a strategy going forward on the quarterly and -- you know, on a case by case basis, maybe a six-month contract but will you follow the same strategy in terms of your low-vol PCI side?

Defendant Calder:

Low-vol PCI -- this is Keith speaking again -- **low-vol PCI also trades on a seaborne market and it trades exactly the same way. It is quarterly pricing, the bulk of it. Last month in the quarter is when we establish the pricing for the next quarter.** But the totality of our production is all long-term contracts to well established customers on a multi-year basis. So volumes and long-term contracts, pricing on a quarterly basis, with some exceptions.

36.     In addition, on the April 21st conference call Defendants made positive comments

about transportation and production related issues experienced during the first quarter of 2011,

stating, in part:

Brian Gamble -Simmons and Co., Analyst:

Good morning, guys. A couple of things. **I wanted to start with transport and port operations, specifically in Mobile and through Canada. Maybe you can give us trend on how both regions have been performing year to date and expectations moving forward in the year.**

Defendant Calder:

Fortunately I have both Jim Griffin and Mike Madden with me. So I'll hand this over. Maybe Jim you can tackle northeast BC and ports out of Ridley and Mike can follow up within the McDuffie terminal.

Jim Griffin, Walter's Global Head of Business Development:

Thank you, Keith. **At Ridley what a we really experienced was seasonal weather related issues. We did not have production issues.** Our problems in the first quarter were getting our stockpiles from the mine to the port at Ridley. We worked extensively with CM through this, the combination of, too much detail to go into on the phone, but of shifting to steel cars, scheduling and commitment of cars and as we worked with them and Ridley and come out of the cold winner [SIC] season. Because also a lot of it was freezing that occurs in bars, **we are experiencing much improved traffic to the tune of twice the daily train traffic. And we are not letting up on this, but Ridley assisted us and we are currently running at the kind of rate we require and Ridley is performing very well in addition.**

Defendant Calder:

Mike?

Mike Madden, Walter's VP of Sales and Marketing:

Yes, brought in on McDuffie we are seeing, on our side of vessel loadings, mainly lack of coal. We went into January with very low inventory in Mobile and that became further compounded with the mining problems we developed over the quarter. We have made some adjustments on shipping to spread the cargoes out to avoid any serious demerge issues. We also did find another exporter in [M]obile. Their business has come on fairly stronger than we anticipated. So that's caused delays in vessel loadings as well. But all in all, the terminal is operating at a pretty good loading rate. We also entered into an agreement in March with another exporter at McDuffie with the state to go ahead and convert the berth number 1 to an outbound as well. Today it's only an inbound facility. We won't see the benefits of that until sometime second half next year. But **that will definitely alleviate any congestion issues going forward**.

\*       \*       \*

Shneur Gershuni - UBS, Analyst:

Thank you for that clarification. I was wondering if Walt could give us a little color as to the change or the issues that we saw -- you know at that point in the first quarter continuing and expand? Or are we going to get to the point where the second quarter will look like the whatever is the baseline quarter of what the mine should actually operate like and how we should be modeling that on a going forward basis when we talk about 2012 and 2013.

Defendant Scheller:

I think we will see the second quarter -- performance in the second quarter start to be much more indicative of what we should expect moving forward. We need to remember, we still have several long wall moves toward the end of the year this year. But the problems which we encountered, again, were some of the more located -- at our mine 4, at the long wall panel. So we have moved out of that area of the mine

and are now operating actually a few miles away from there.  **So we don't anticipate having those same issues.  And the problems we were encountering on the -- on both long walls with ventilation, we believe we have made adjustments and changes to equipment and done things to help to alleviate that problem.  And we should be able to operate in a more productive mode as we move forward.**

*         *         *

<u>Shneur Gershuni - UBS – Analyst</u>:

One final question, if I may -- you mentioned Walter Coke.  There's been a lot of talk about a coke battery shortage, and so forth.  Is that an opportunity for Walter Coke to take advantage of?  Or are you at your limits with respect to your operation?

<u>Chuck Stewart, President, Walter Coke</u>:

This is Chuck.  We are pretty well running at capacity now.  So the markets are pretty strong.  Without additional resources being added someplace, we are pretty well at capacity.

<u>Defendant Calder</u>:

Just to add a little to that, it does mean **that coke pricing is attractive right now**, and we are getting more opportunities to diversify our customer base if it is attractive to us financially.  And that was demonstrated -- I think it's been announced.  **We placed two shipments of coke overseas in the last quarter.  So coke side of the business is very healthy and similar to the coking coal, the metallurgical side of things, there is strong demand going forward.**

37.     On April 28, 2011, Walter issued a press release announcing the impact of several

large storms near its Alabama mining operations, stating, in pertinent part. as follows:

"We experienced several large tornadoes near our Alabama operations over the past 24 hours.  We had one injury at a surface mining operation which required first aid treatment, but thankfully, we have no other reports of injuries to our employees at this time," Scheller said.  "While both the No. 4 and No. 7 mines avoided direct impact by the tornadoes, they experienced power outages which have temporarily impacted production.  We expect production to resume as soon as all power is restored and any related underground issues are resolved.  Our surface mining operations suffered varying degrees of damage, mostly superficial with the exception of our Taft Choctaw mine, where storm-related damage cut power to the mine and its electrically operated dragline.  At this time, we are uncertain how long it will take to restore power to this facility.  Our metallurgical coke plant in North Birmingham was unaffected by the storms and is operating normally."

38.     On May 9, 2011, Walter issued a press release announcing the completion of

transactions with Chevron mining, stating, in pertinent part, as follows:

- 18 -

Walter Energy (NYSE: WLT) (TSX: WLT), the world's leading, publicly traded "pure play" producer of metallurgical coal for the global steel industry, announced today the execution of mineral leases for approximately 75 million tons of recoverable Blue Creek coking coal reserves in Tuscaloosa County, Ala. from a subsidiary of Chevron Corporation (NYSE: CVX) ("Chevron"). Terms of the leases include royalty rates consistent with existing coal lease agreements.

*     *     *

The Company also announced the completion of Jim Walter Resources' acquisition of Chevron's North River steam coal mine in Fayette County and Tuscaloosa County, Ala. Total consideration for the purchase of the North River mine included a small cash payment and the assumption of certain liabilities, not material to the Company. The transaction is expected to be neutral to slightly accretive to earnings in the first year.

39.     On June 30, 2011, Walter issued a press release announcing the resignation of Defendant Calder, stating, in pertinent part, as follows:

Walter Energy (NYSE: WLT) (TSX: WLT), the world's leading, publicly traded "pure play" producer of metallurgical coal for the global steel industry, announced today that Keith Calder has tendered his resignation as Chief Executive Officer and a director, effective July 31, 2011. The Board has named Board member Joseph B. Leonard to succeed Mr. Calder as Interim Chief Executive Officer at that time.

Mr. Leonard served as Walter Energy's Interim Chief Executive Officer from March 2010 through March 2011. The Board has engaged Spencer Stuart to initiate a search, within Walter Energy and externally, for a permanent Chief Executive Officer.

**Mr. Calder informed the Board in his letter of resignation that he is resigning due to differences of opinion concerning management philosophy.** Said Mr. Calder, "I do believe Walter Energy has immense potential and I am sure it will be realized. That said, it is now time for me to move on and pursue other interests."

Michael T. Tokarz, the non-executive Chairman of the Board, said, "We accept Keith's decision to resign and appreciate his desire to move on. We thank him for helping us through the transition and integration of Walter Energy and Western Coal into one company -- the new Walter Energy. Most important, we are confident that the company, under the direction of Joe Leonard, will continue its current momentum."

40.     The statements referenced above in ¶¶ 28-33, 35-39 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)      that the Company was experiencing so-called "squeeze" events in Alabama and lower coal transportation rates in Canada that significantly reduced Walter's coal production;

(b)      that the Company's commitment to ship more than 700,000 tons of coal in the second quarter at first quarter sales prices would result in a material adverse effect on Walter's average sales prices and operating results during the second quarter;

(c)      that, as a result of the foregoing, Walter was experiencing a significant decline in its margins and profitability; and

(d)      that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its business prospects during the Class Period.

41.      On August 3, 2011, Walter issued a press release announcing its operating results for its 2011 fiscal second quarter, the period ended June 30, 2011.  For the quarter, the Company announced net income of $107.4 million, or $1.71 per diluted common share, significantly less than Wall Street estimates.  Walter's interim CEO, Joe Leonard, commented on the results, stating, in part:

> Walter Energy continues to execute on its long-term strategic plan to grow its met coal production base, highlighted by the acquisition of Western in April and our execution of lease agreements on 68 million metric tons of Blue Creek coal reserves in May.  Those initiatives are beginning to show positive results as we increased met coal sales to a record 2.7 million metric tons in the quarter, and we expect to grow total met coal sales volumes by an additional 50 percent by the end of 2013.  In addition, we have further organic and bolt-on growth opportunities in our pipeline to continue increasing and diversifying our metallurgical coal production footprint over the course of this decade to carry on our outstanding track record of creating value for our shareholders.
>
> **During the quarter, we experienced difficult geology in Alabama and weather-related challenges at both our Alabama and Northeast British Columbia operations, which adversely affected production and sales results.  We are putting these production issues behind us and expect to finish 2011 with second half met coal sales of approximately 5.9 million metric tons.**

42.     Following the Company's 2011 fiscal second quarter earnings announcement, Walter held a conference call for investors with securities analysts. Thereafter, securities analysts who follow Walter were alarmed by the Company's results.  For example:

BB&T Capital Markets:

**WLT: ABYSMAL QUARTER; DISCLOSURE LACKING**

Key Points

- **TERRIBLE QUARTER; WORSE DISCLOSURE**.  We suspected it would be a challenging, below consensus quarter.  What we got was something far worse.  Last night after the bell, WLT reported Q2 adjusted EPS of $2.36 versus our estimate of $3.90 and consensus of $3.98.  EBITDA was equally poor at $276.6M (BB&T=$400.8M; consensus=$424.4M).  **The miss was all over the place, but we highlight the top line, where revenues of $773.0M compared to our forecast of $868.4M and consensus of $914.5M.  Production was challenged by a myriad of issues, including geological issues in Alabama** and weather-related disruptions in both Alabama and Northeast British Columbia.  This affected costs, which appeared to blow out in Canada.  From our vantage point, neither the geological issues nor the weather-related disruptions were shocking.  **What was shocking was the magnitude of the miss**.  Moreover, the complete revamping of how WLT discloses its financial results (i.e. no more Mine No. 4 and Mine No. 7 production and cost results) was a big surprise and a major disappointment from our perspective.  We thought the company took a step backward in that regard.

- **COMPANY REDUCES 2H'11 SHIPMENT GUIDANCE**. In conjunction with the Q2 release, management also lowered 2H'11 met coal shipment guidance.  Total met sales for the back half of the year are now expected to be 5.9M metric tons.  We were modeling the equivalent of 7.8M metric tons.

Scotia Capital:

**Q2/11 - Significant Miss Can Be Attributed to Carryover Tonnes**

- Walter Energy reported adjusted Q2/11 earnings of EPS of US$2.46, well below both our estimate of US$4.21 and consensus at US$3.98/share.  Reported earnings of US$1.71 per share included a number of non-recurring items, mostly related to the Western Coal acquisition which closed early in the quarter.

- **Production was below estimates**, sales volumes were in line.  Walter reported production of 3.4Mt coal in the quarter, slightly below our estimate of 3.7 Mt.  Sales were 3.7Mt in Q2, in line with our expectations.

- **Selling prices were well below expected levels.   Although Walter Energy typically sells hard coking coal at about the Australian prime hard coking coal**

benchmark price, realized prices in the current quarter were well below the
Q2/11 US$325/t benchmark.

- **U.S. Operations suffered from significant carryover tonnage at Q1
  prices. Hard coking coal from the Alabama Underground Operations
  sold at an average price of US$236/t, versus the benchmark of US$325/t
  and our estimate of US$308/t.** Management commented on the
  conference call that ~700,000 tonnes were brought forward from Q1/11,
  noting the benchmark price in Q1 was US$225/t. As illustrated in
  Exhibit 2, Walter Energy U.S. Underground Operations realized prices
  have historically been at or near the benchmark price; the low realized
  prices in the current quarter are uncharacteristic for the operations.

- **Canadian and U.K. Operations were also weaker than expected.**
  Metallurgical coal (hard coking coal + PCI coal) from the Canadian and
  U.K. Operations **sold at US$232/t, versus our estimate of US$288/t.** We
  believe the variance to our estimates is likely attributable to both product mix
  (i.e., a higher percentage of sales were PCI coal) and due to carryover
  tonnage obligations.

43.    In response to the Company's announcement, the price of Walter common stock

plummeted *30%*, from $110.48 per share on August 3, 2011 to $77.89 on August 4, 2011, as a

portion of the artificial inflation came out of the Company's stock price.

44.    Then on September 21, 2011, Walter issued a press release announcing its attempt to

"enhance" its disclosure and its revision to its 2011 second half sales expectations, stating, in part:

> To help investors better understand Walter Energy, the Company has expanded its
> historical statistical disclosure and reformatted it to better describe its current
> business segments and to provide information by product for the second quarter
> forward. For the third and fourth quarters of 2011, the Company is also providing
> specific guidance for operating income, net income and earnings per share, on a one-
> time basis.
>
> Walter Energy's consolidated operating income is expected to be between $125
> million and $145 million for the third quarter of 2011 and between $255 million and
> $295 million for the fourth quarter. Consolidated net income is expected to be
> between $63 million and $73 million for the third quarter and between $165 million
> and $185 million for the fourth quarter of 2011. Earnings per share is expected to be
> between $1.00 and $1.16 in the third quarter and between $2.63 and $2.95 for the
> fourth quarter of 2011

The Company's newly appointed CEO, Defendant Scheller, commented as follows:

> Walter Energy is making solid operational progress despite a slower than expected
> recovery from the 100-year record rainfall experienced in Northeast British

Columbia during the second quarter as well as recovery from the difficult geology at Mine No. 7 in Alabama. These events will cause a delay in the Company's anticipated growth in production and associated improvement in costs. However we see early recovery today and expect clear improvement beginning in 2012. Longer term, Walter continues to target strong growth in metallurgical production by the end of 2013.

In the first half of 2011, Walter Energy and Western Coal sold just under 5.2 million metric tons of metallurgical coal (including pre-acquisition sales of Western in the first quarter 2011) and, even with the delayed recovery, we still anticipate a similar level of metallurgical coal sales in the second half of the year of slightly over 5.2 million metric tons. The previous metallurgical coal sales guidance for the second half of 2011 was 5.9 million metric tons.

*       *       *

In Alabama at Mine No. 7 we are pleased that we continue to progress through the area of difficult geology, albeit at a slower pace than first anticipated, and we have not encountered further squeeze conditions. However, our cutting rate over the last 30 days has only averaged approximately 20 feet per day, which is less than the 35 feet per day estimate we had previously assumed. We currently expect to advance through this area and return to normal cutting rates of 45-50 feet per day by mid-October. In addition, we are simultaneously installing a new set of 1,350 ton shields in the new E panel of the mine that are 50% stronger than the current shields in operation. This new E panel of the mine is now scheduled to add production beginning in November.

In addition, Defendant Winkelmann, commented as follows:

In Northeast British Columbia we continue to increase production, but at a rate below our previous expectations. The expansion of the shared wash plant facility that supports the Brule and Willow Creek mines is now scheduled to coincide with the Ridley Terminal rail-car dumping system upgrade. Therefore, we now expect slightly less production in the second half of 2011 than in our previous forecast. We have also experienced a slower than anticipated improvement in hauling rates along the now operational Falling Creek Connector Road. But, we expect to see further improvement in hauling rates over the remainder of the year.

45.     In response to this announcement, the price of Walter common stock declined *12%*, from $75.00 per share on September 20, 2011 to $66.25 on September 21, 2011.

46.     The market for Walter common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Walter common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Walter common stock relying upon

the integrity of the market price of Walter common stock and market information relating to Walter, and have been damaged thereby.

47.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Walter common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

48.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Walter's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Walter and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## Additional Scienter Allegations

49.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Walter, their control over, and/or receipt and/or modification of Walter's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

50.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

51.     Individual Defendants, because of their positions with Walter, controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of these Defendants is responsible for the accuracy of Walter's corporate statements and are therefore responsible and liable for the representations contained therein.

52.     The scienter of the Defendants is underscored by the Sarbanes-Oxley mandated certification of Defendant Calder, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Walter was made known to them and that the Company's disclosure related controls were operating effectively.

53.     Defendants were further motivated to engage in this fraudulent course of conduct in order to allow high-level Company officers to sell shares of their personally-held Walter common stock at inflated prices that yielded them proceeds in excess of $2.5 million during the Class Period.

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Honnold (Lisa A) | Chief Financial Officer | 26-Apr-2011 | 3,764 | $135.42 | $509,721 |
| Madden (Michael T) | Officer | 29-Apr-2011 | 14,543 | $138.23 | $2,010,279 |
| | | | **18,307** | | **$2,520,000** |

### Loss Causation/Economic Loss

54.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Walter common stock and operated as a fraud or deceit on Class Period purchasers of Walter common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Walter common stock fell precipitously as the prior artificial inflation came out.

55.     As a result of their purchases of Walter common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Walter common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $141.50 per share on May 2, 2011, more than double the price at the end of the Class Period.

56.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Walter's business and prospects. When the truth about the Company was revealed to the market, the price of Walter common stock fell precipitously. These declines removed the inflation from the price of Walter common stock, causing real economic loss to investors who had purchased Walter common stock during the Class Period.

57.   The declines in the price of Walter common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Walter common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Walter common stock and the subsequent significant decline in the value of Walter common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

58.   At all relevant times, the market for Walter common stock was an efficient market for the following reasons, among others:

(a)   Walter common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)   as a regulated issuer, Walter filed periodic public reports with the SEC and the NYSE;

(c)   Walter regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Walter was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their

respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

59.     As a result of the foregoing, the market for Walter common stock promptly digested current information regarding Walter from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Walter common stock during the Class Period suffered similar injury through their purchase of Walter common stock at artificially inflated prices and a presumption of reliance applies.

<strong>No Safe Harbor</strong>

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Walter who knew that those statements were false when made.

<strong>COUNT I</strong>

<strong>Violation of Section 10(b) of<br>the Exchange Act and Rule 10b-5<br>Promulgated Thereunder Against All Defendants</strong>

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

64.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Walter common stock.  Plaintiff and the Class would not have purchased Walter common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

65.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Walter common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of Walter within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Walter, and their ownership of Walter common stock, the Individual Defendants

had the power and authority to cause Walter to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: January 26, 2012

WARD & WILSON, LLC
PATRICK C. COOPER

_____
PATRICK C. COOPER

2100 Southbridge Parkway, Suite 580
Birmingham, Alabama 35209
Telephone: 205/871-5404
205/871-5758 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

HOLZER HOLZER & FISTEL LLC
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, Colorado 80203
Telephone: 303/861-1764
303/395-0393 (fax)

*Attorneys for Plaintiff*