FILED

2012 Aug-20  PM 07:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE WALTER ENERGY, INC. SECURITIES LITIGATION | ) ) ) ) | Master File No. 2:12-cv-00281-VEH  CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| This Document Relates to: ALL ACTIONS | ) ) ) ) | |

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION .................................................................................1

II.   JURISDICTION AND VENUE ..........................................................................6

III.  PARTIES ...........................................................................................................7

IV.   OVERVIEW AND SUMMARY OF DEFENDANTS' FRAUD.........................9

      A.    Walter Energy and Its Operations..........................................................9

      B.    Defendants Misled Investors About the Price at Which Walter's 2Q11
            Coal Sales Would Be Realized ..............................................................11

      C.    Defendants Misrepresented and Failed to Disclose Ongoing Production
            Issues at Walter's Flagship Mine No. 7................................................13

      D.    Defendants Misrepresented and Concealed Material Facts Concerning
            Production Problems at Walter's Newly-Acquired Canadian Operations.............18

V.    CLASS PERIOD EVENTS AND MATERIALLY FALSE AND MISLEADING
      STATEMENTS AND OMISSIONS OF MATERIAL FACT .........................23

      A.    Walter Announces Its 1Q11 Results .....................................................23

      B.    Defendants' Misrepresentations and Omissions of Material Fact
            Concerning Coal Pricing.......................................................................24

      C.    Defendants' Misrepresentations and Omissions of Material Fact
            Concerning U.S. Coal Production..........................................................31

      D.    Defendants' Misrepresentations and Omissions of Material Fact
            Concerning Coal Production in Canada.................................................36

      E.    Walter's April 28, 2011 Press Release ..................................................40

      F.    Walter's First Quarter 2011 Form 10-Q ...............................................40

      G.    Defendant Calder Resigns as Walter's Chief Executive Officer ..........43

VI.   DEFENDANTS BEGIN TO DISCLOSE THE TRUTH.................................44

      A.    Defendants Report Walter's 2Q11 Results, but Continue to Misrepresent
            and Conceal Material Facts...................................................................44

      B.    Walter Belatedly Lowers Its Guidance For the Remainder of 2011 Based
            Upon 2Q11 Coal Production Issues.......................................................56

VII.    ADDITIONAL SCIENTER ALLEGATIONS ................................................................. 60

VIII.   LOSS CAUSATION ......................................................................................................... 66

IX.     THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE APPLIES .......... 67

X.      THE STATUTORY SAFE HARBOR IS INAPPLICABLE ............................................. 68

XI.     CLASS ACTION ALLEGATIONS .................................................................................. 69

XII.    CAUSES OF ACTION ..................................................................................................... 71

XIII.   PRAYER FOR RELIEF ................................................................................................... 76

XIV.    JURY TRIAL DEMANDED ............................................................................................ 76

Lead Plaintiffs, the Government of Bermuda Contributory Pension Plan, Public Service Superannuation Pension Plan and Stephen C. Beaulieu, as Trustee of the Stephen C. Beaulieu Revocable Trust ("Lead Plaintiffs" or "Plaintiffs") make the following allegations against defendants Walter Energy, Inc. ("Walter" or the "Company"), Keith Calder ("Calder"),Walter J. Scheller ("Scheller"), Neil Winkelmann ("Winkelmann"), and Joseph B. Leonard ("Leonard") (collectively, "Defendants").  Except as to allegations specifically pertaining to Lead Plaintiffs and Lead Plaintiffs' counsel, the allegations herein are based upon an investigation undertaken by Lead Plaintiffs' counsel, which included reviewed analysis of:  (1) publicly available news articles, documents and reports; (2) Walter's public filings with the United States Securities and Exchange Commission ("SEC"); (3) securities analysts' reports and advisories about Walter; (4) information from former Walter employees; (5) press releases and other public statements issued by the Company; (6) media reports about the Company; and (7) documents and information obtained from the United States Department of Labor, Mine Safety and Health Administration ("MSHA") and from the British Columbia, Ministry of Forests, Lands and Natural Resource Operations ("Ministry of Forests").  Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## I.       NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of all persons who purchased Walter common stock between April 20, 2011 and September 21, 2011, inclusive (the "Class Period"), and were damaged thereby (the "Class") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Walter is a leading producer and exporter of metallurgical coal for the global steel industry and also a producer of steam coal, coal bed methane gas, metallurgical coke, and other related products, with its U.S. operations headquartered in Birmingham, Alabama.  Walter's common stock trades on the New York Stock Exchange ("NYSE") under the symbol:  WLT.

3.      During the Class Period, Walter represented that it was poised to take advantage of, among other things:  (1) a strong coal market based upon favorable tonnage pricing trends in the second quarter of 2011; (2) its U.S. operations' production of high quality coal, in particular the production capabilities of its flagship number 7 mine ("Mine No. 7") in Alabama; and (3) benefits that it would achieve through its newly-acquired and expanding Canadian operations, including the use of the Falling Creek connector road (the "Connector Road") between Walter's Brule and Willow Creek coal mines in British Columbia that would allow for more efficient transport of coal to the Willow Creek facility for processing.

4.      The Company's positive statements, however, were materially false and misleading because Defendants knowingly and/or recklessly misrepresented and failed to disclose the following material facts, among others:  (1) during 2Q11, Walter was obligated to sell more than 700,000 tons of high quality coal at 1Q11 prices that were well below the benchmark 2Q11 prices that Defendants said would drive the Company's results upward in 2Q11; (2) before and during the Class Period, the Company's flagship mine in the U.S., Mine No. 7 had been cited for more than 20 safety violations, and was experiencing "squeeze events" that caused the mine to close for multiple days, resulting in material delays and coal production shortages; and (3) Walter's Canadian operations were plagued with production problems resulting from, among other things:  (i) the inability of the Connector Road to accommodate large coal transport trucks, thereby decreasing the volume of coal that could be processed at

- 2 -

Willow Creek; and (ii) the failure to obtain expansion-related permits for Walter's Willow Creek facilities despite Defendants' April 21, 2011 representation that these required permits were expected "soon" and "shortly."

5.      On June 30, 2011, less than three months into Defendant Calder's tenure as Walter's Chief Executive Officer ("CEO"), the Company unexpectedly announced that he would be resigning effective July 31, 2011 due to "differences of opinion concerning management philosophy."  Specific reasons for Defendant Calder's resignation haves never been disclosed.

6.      However, it appears that there was an internal struggle within Walter concerning whether to disclose certain material information that adversely impacted Walter's 2Q11 coal production and financial results.  In this regard, prior to Defendant Calder's July 31, 2011 resignation, Defendant Scheller and Walter's Board of Directors, including Defendant Leonard, became aware of a 500,000 ton 2Q11 coal production shortfall at the Company.  Despite urgings from personnel within the Company's Corporate Communications Department, Defendants deliberately decided not to disclose the known production shortfall at that time.

7.      According to a former Walter employee, Confidential Witness No. 1 ("CW-1"), who served as the Director of the Company's Communications Department from early 2005 to mid-September 2011:

- •      On or before July 10, 2011, CW-1 learned, by receiving and reviewing mine-by-mine production and financial information from Walter's Accounting Department, that Walter suffered a 2Q11 production shortfall that was approximately 500,000 tons below previous estimates for 2Q11.

- •      Upon learning of the approximately 500,000 ton production shortfall for 2Q11, CW-1 reviewed a press release that he prepared and Walter issued on Form 8-K on September 2, 2010, which alerted the market of an anticipated 200,000 ton production shortfall for 3Q10.  Upon reviewing this prior press release, CW-1 concluded that immediate public disclosure of the far larger production shortfall for 2Q11 was required.

- On or about July 10, 2011, CW-1 contacted Defendant Scheller (President of Walter's U.S. Operations and a member of the Company's Board of Directors) via telephone and informed Defendant Scheller that Walter should publicly disclose the 2Q11 production shortfall by issuing a press release.  After being provided with details on Walter's 2Q11 production results and the 500,000 ton shortfall, Defendant Scheller revealed that he was already aware of the 2Q11 production shortfall *and* that a decision not to disclose the 2Q11 production shortfall had already been made at a higher level of the Company.  Accordingly, no press release was issued at that time to alert the market of the 2Q11 production shortfall.

- Shortly thereafter, CW-1 brought the known and significant 2Q11 production shortfall to the attention of the Company's recently-appointed VP of Investor Relations, Paul Blalock ("Blalock").  Like Defendant Scheller, Blalock also did not determine to disclose the 2Q11 production shortfall publicly.

- Thereafter, CW-1 drafted a press release concerning Walter's 2Q11 results that was to be issued in early August 2011.  The draft press release included details about the Company's 2Q11 production shortfall due, in part, to squeeze events at Walter's mines.  CW-1 then e-mailed this draft press release to Walter's Board of Directors for review and approval.  Walter's Board of Directors rejected the draft press release as too negative, however, and re-drafted the press release to de-emphasize the role that the squeeze events played in the production shortfall.

8.      On August 3, 2011, the Company issued the revised version of the press release announcing Walter's 2Q11 results approved by Walter's Board of Directors.  Notwithstanding the cleansing by Walter, the press release revealed, in part, the 2Q11 tonnage pricing and production shortfall issues that were concealed from investors during the quarter.

9.      On August 4, 2011, the Company conducted a conference call to discuss Walter's 2Q11 results (the "August 4 Conference Call").  During this conference call, Defendant Scheller conceded, among other things, that Defendants should have earlier disclosed details concerning the 2Q11 tonnage pricing issues and production shortfalls.  In stark contrast to the Company's refusal to update the market regarding Walter's 2Q11 production shortfall in July 2011, Defendant Scheller stated, in relevant part, "**as far as the updates go, I think in retrospect we**

- 4 -

**should have come out with a mid-quarter update.  … [U]nder my watch which started**

**today, if we have misses or productions [sic], I can assure you we will do that**."[1]

10.  Walter's 2Q11 results missed analyst consensus estimates by such a dramatic

amount and were such a shock, that analysts condemned the Company for not being more

forthcoming during 2Q11.

11.  For example, on August 4, 2011, an analyst from the Branch Banking & Trust

Company ("BB&T") issued a report entitled "Abysmal Quarter; Disclosure Lacking" that stated,

in part:

> **TERRIBLE QUARTER; WORSE DISCLOSURE.**  We suspected it would be
> a challenging, below consensus quarter.  What we got was something far worse.
> … **Production was challenged by a myriad of issues**, including geological
> issues in Alabama and weather-related disruptions in both Alabama and Northeast
> British Columbia.  This affected costs, which appeared to blow out in Canada.
> **From our vantage point, neither the geological issues nor the weather-related
> disruptions were shocking.  What was shocking was the magnitude of the
> miss.  Moreover, the complete revamping of how WLT discloses its financial
> results (i.e. no more Mine No. 4 and Mine No. 7 production and cost results)
> was a big surprise and a major disappointment from our perspective.  We
> thought the company took a step backward in that regard**.

12.  In response to this information, Walter's common stock price plummeted ***30%***,

from $110.48 per share on August 3, 2011 to $77.89 on August 4, 2011, causing Lead Plaintiffs

and other Class members to suffer damages.

13.  As stated above, and as alleged in detail herein, Defendants knew of or recklessly

disregarded the tonnage pricing issues and production shortfalls during the Class Period.

Defendants, nevertheless, failed to disclose material facts relating to these issues to investors,

causing them to suffer damages when the truth was eventually revealed.  As alleged herein, the

August 3, 2011 press release and Defendants' statements during the August 4 Conference Call

---

[1]     Unless otherwise noted, all emphasis is added to quoted documents.

concealed the full extent to which the production problems in Alabama and Canada plagued Walter throughout the Class Period.

14.     Indeed, Defendants did not disclose the full impact of the production issues that Walter experienced in 2Q11 until September 21, 2011.  At this time, Defendants disclosed that the production problems, including the magnitude and effects of the squeeze events at Mine No. 7 in Alabama, and the inability of the Connector Road to accommodate high-tonnage trucks in Canada, would lower Walter's production rates and resulting income and earnings per share for the remainder of the year.  Upon this disclosure, through which the risks of Walter's continued production problems materialized, the price of Walter common stock declined ***11.7%***, from $75.00 per share on September 20, 2011 to $66.25 on September 21, 2011, causing Lead Plaintiffs and other Class Members to suffer additional damages.

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

16.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

17.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  Walter maintains its executive offices in this District, and many of the acts and conduct complained of herein occurred in substantial part in this District.

18.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NYSE, a national securities exchange.

**III.      PARTIES**

19.     Lead Plaintiffs, as set forth in their respective certifications previously filed in this action (Docket No. 12-2, Ex. B) and incorporated herein by reference, purchased Walter common stock during the Class Period and have been damaged thereby.

20.     Defendant Walter is engaged in the mining and exporting of metallurgical coal for the global steel industry.

21.     Defendant Calder became the CEO of Defendant Walter on April 1, 2011.  Prior thereto, Defendant Calder was the President and CEO of Western Coal Corp. ("Western Coal"). After serving for only four months as Walter's CEO, Defendant Calder "resigned" because he and Walter's Board of Directors had "differences of opinion concerning management philosophy."

22.     Defendant Scheller served as the President of Walter's U.S. Operations until September 12, 2011, when he was appointed as Walter's CEO and elected to the Company's Board of Directors.

23.     Defendant Winkelmann served as the President of Walter's Canadian and European operations at all relevant times.

24.     Defendant Leonard served as a member of Walter's Board of Directors at all relevant times and became Walter's interim CEO following Defendant Calder's July 31, 2011 resignation from that position.  Defendant Leonard served as Walter's interim CEO until he was replaced by Defendant Scheller on September 12, 2011.

25.     Defendants Calder, Scheller, Winkelmann, and Leonard are collectively referred to herein as the "Individual Defendants."

26.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Walter common stock by

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (1) deceived the investing public regarding Walter's business, operations and management and the intrinsic value of Walter common stock; and (2) caused Lead Plaintiffs and other members of the Class to purchase Walter common stock at artificially inflated prices.

27. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Walter, were privy to confidential and proprietary information concerning Walter, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Walter, as alleged below in detail. Because of their positions at Walter, the Individual Defendants had access to material non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

28. The Individual Defendants, because of their positions at the Company, controlled and/or possessed the authority to control the contents of Walter's reports, press releases and presentations to securities analysts and to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. In this regard, senior executives, including Defendant Scheller, met one to two days before the Company released its quarterly financials to finalize

- 8 -

them.  Thus, the Individual Defendants had the opportunity to commit and prevent the fraudulent acts alleged herein.

29.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Walter's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Walter common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions of material fact during the Class Period violated these specific requirements and obligations.

## IV.     OVERVIEW AND SUMMARY OF DEFENDANTS' FRAUD

### A.     Walter Energy and Its Operations

30.     Defendant Walter is primarily a producer and exporter of metallurgical coal for the global steel industry.  The Company also produces thermal coal, industrial coal, anthracite, metallurgical coke, coal bed methane gas and other related products.

31.     On April 1, 2011, Walter completed the acquisition of all the outstanding common shares of Western Coal, which owned metallurgical coal mines in Northeast British Columbia, Canada, metallurgical coal and compliant thermal coal mines in West Virginia, and anthracite coal mines in South Wales, United Kingdom.  That same day, Defendant Calder, Western Coal's President and CEO, became the CEO of Walter.

32.     Walter's primary business, the mining and exporting of metallurgical coal for the steel industry, is conducted via two business segments:  its U.S. Operations segment and its

Canadian and U.K. Operations segment.  During the Class Period, Walter's U.S. Operations segment and its Canadian and U.K. Operations segment accounted for approximately $168.7 million and $12.5 million of its operating income, respectively.

33.     The Company utilizes both underground and surface mining methodologies. During 2011, underground mining accounted for approximately 60% of Walter's coal production, with surface mining accounting for the remaining 40%.

34.     **Underground mining.**  Walter typically employs two different underground mining techniques when coal reserves are located deep beneath the surface:  room-and-pillar mining and longwall mining.

35.     In room-and-pillar mining, "rooms" are excavated, and pillars of coal are left in place between the rooms to support the mine roof.

36.     In longwall mining, a rectangular longwall panel is typically "blocked out" by excavating passageways via room-and-pillar mining around its perimeter.  Working under the steel canopies of hydraulic, movable roof supports, a coal cutting machine runs back and forth along the coal face, removing anywhere from a few inches to 42 inches of material during each pass.  The cut coal spills into an armored chain conveyor running along the entire length of the face of the panel for transport out of the mine.  The steel canopies of the roof supports, which protect the workers and equipment located along the face, are then moved to enable the roof to collapse behind the supports as they are advanced.  The mining continues in this manner until the entire panel of coal is removed.

37.     **Surface mining.**  When coal reserves are located close to the surface, Walter employs surface mining methods whereby topsoil, earth and rock covering the coal bed are freed with drilling and blasting techniques.  This material is then removed with heavy earth-moving

equipment such as draglines, power shovels, excavators and loaders.  Once exposed, the coal

seam is extracted and loaded into haul trucks for transportation to a preparation plant or load out

facility.

     **B.**     **Defendants Misled Investors About the Price at Which Walter's 2Q11**
                      **Coal Sales Would Be Realized**

     38.     As alleged herein, during the Class Period, Defendants misrepresented and failed

to disclose that Walter had committed to sell 706,000 tons of coal during its 2Q11 at 1Q11 prices

that were well below the 2Q11 benchmark, leading the Company to report lower earnings than

the market was anticipating for 2Q11.

     39.     Walter's financial performance depends, in large part, on the prices at which it

sells coal to its customers.  Walter's earnings during its 1Q11 (the quarter ended March 31,

2011) were nearly double the earnings it reported during 1Q10.  When the Company announced

its earnings for its 1Q11, its senior management represented that the rising price of coal had a

dramatically positive effect on Walter's operating results.  In this regard, Lisa Honnold

("Honnold"), Walter's Senior Vice President and Interim Chief Financial Officer ("CFO"), noted

that the Company's first quarter 2011 "[r]evenues and operating income benefited from

significantly higher coking coal prices which averaged $193.51 per short ton in the first quarter,

a 52% increase compared to the first quarter last year."  Similarly, Defendant Calder noted that

"[w]e generated strong year-over-year growth in revenues and income driven primarily by the

third highest coking coal pricing we have ever achieved."

     40.     As alleged herein, the Company announced positive 1Q11 financial results on

April 20, 2011.  Defendants represented during a conference call conducted on April 21, 2011

(the "April 21 Conference Call") that the price of coal for 2Q11, the three months ended June 30,

2011, was increasing beyond 1Q11 pricing and would benefit the Company in 2Q11.  For

example, among other things, Defendants stated:

- "Q2 – 2011 prices at record levels";

- "Looking at the current quarter, second quarter 2011, hard coking coal prices, we settled in line with markets -- $326 to $330 per ton, which is a reflection of the high quality coal we are producing.  **This increase is nearly 50% higher than the previous quarter**;" and

- "Q2 pricing is very strong and we continue to see exceptional interest in a demand for all of our coal products."

41.     While Defendants were representing that the price of coal in 2Q11 was "nearly

50% higher" than the average selling price during 1Q11, they knew, but failed to disclose, that

Walter had committed to sell 706,000 tons of coal during its 2Q11 at significantly lower 1Q11

prices.  The 706,000 tons of coal that Walter had committed to sell exceeded ***more than 30%*** of

the coal it sold during its ***entire 2Q11***.  In addition, this commitment was at prices around $223

per ton ***or 30% less*** than the $326 to $330 per ton benchmark price at which Defendants led

investors to believe Walter's contracts would be settled at during 2Q11.  As alleged herein, when

Defendants made positive statements about the then-current selling price of coal and the benefits

to Walter's financial results that would ensue therefrom, they also represented that Walter's

2Q11 coal sales had been "priced and sold" by no later than March 2011.  Accordingly,

Defendants knew or were reckless in not knowing that Walter's 2Q11 earnings would materially

deteriorate because Walter had committed to sell a very significant amount of coal during 2Q11

at substantially lower coal prices.

42.     Nonetheless, Defendants failed to disclose that Walter's commitment to sell a

very significant amount of coal during 2Q11 at substantially lower coal prices would have a

material adverse effect on the Company's 2Q11 earnings.  In fact, Defendants failed to make

such disclosure *even after*, as alleged below, a securities analyst specifically asked about the likelihood of any such occurrence during the April 21 Conference Call.

   **C.   Defendants Misrepresented and Failed to Disclose Ongoing Production Issues at Walter's Flagship Mine No. 7**

   43.   As alleged above, the Company's U.S. Operations segment includes the operation of metallurgical coal and thermal coal mines in both Alabama and West Virginia and a coke plant in Alabama.  With respect to its mining activities in Alabama, Walter operates two underground metallurgical coal mines, Mine No. 7 and the number 4 mine ("Mine No. 4").  Also in Alabama, the Company operates one underground thermal coal mine, one surface metallurgical coal mine, one surface metallurgical and thermal coal mine, and one surface thermal coal mine.

   44.   The allegations included in this section relate to Defendants' false and misleading statements associated with the Company's Mine No. 7.

   45.   Mine No. 7 is Walter's flagship coal mine.  Highlighting its importance to Walter's operations, the Company's 2010 Form 10-K filed with the SEC on February 28, 2011 (the "2010 Form 10-K") states that Mine No. 7 is the largest producer of low-volatility metallurgical coal in the United States and that it accounted for more than *47% of the Company's entire coal production* during 2010.

   46.   Walter's 2010 Form 10-K also notes that Mine No. 7 is one of the deepest underground coal mines in North America and that its coal is mined using two longwall units, each of which is capable of producing 4,000 raw tons of coal per hour.  Mine No. 7 also utilizes 5 to 6 continuous miner units, each of which is capable of producing 1,980 raw tons of coal per hour.

47.     Generally, continuous miner units, which are typically used in room-and-pillar mining operations, are mining machines that continuously extract and load coal with a cutting steel drum and conveyor system.

48.     As alleged below, the Company announced its 1Q11 results on April 20, 2011. During the April 21 Conference Call, Defendants explained that, while Walter reported strong operating results for the quarter, its sales volumes were down 6.4% on a year-over-year basis due to lower coal production and inventory levels.  The Company's lower coal production primarily resulted from a nearly 26% year-over-year decline in production at Walter's Mine No. 4.

49.     After the Company announced its 1Q11 results, Defendants issued numerous positive statements that reassured investors about Walter's ongoing coal production, including assurances that production delays encountered at Mine No. 4 and Mine No. 7 in 1Q11 had been resolved.  For example, during the April 21 Conference Call, Defendants stated, among other things:

- "Production growth profile on track";

- "We remain on track with our production profile with our first quarter run rate on pace for record production at our [No. 7] mine";

- "This quarter's long wall moves and improved continuous miner advance rates establish a foundation to moving forward at production [sic] at improved rates";

- "A two-week shield squeeze followed by continued roof leak conditions slowed production rates.  We moved from the N19 panels to the S2 panel which began in late March.  This will eliminate the roof control issues we encountered in N19";

- **"The production issues we've had, I believe we have them well in hand. Some of** those issues – for instance, the N19 panel was simply working our way through some very difficult geology in a panel once we got started.  So I'm confident that **we are putting these issues behind us and that we will see improvement as we roll forward**"; and

- **"I think we will see the second quarter -- performance in the second quarter start to be much more indicative of what we should expect moving forward. . . . So we don't anticipate having those same issues.  And the problems we**

- 14 -

were encountering on the -- on both long walls with ventilation, we believe we have made adjustments and changes to equipment and done things to help to alleviate that problem.  And we should be able to operate in a more productive mode as we move forward."

50.     These positive statements by Defendants, and others like them, assured investors that Walter's coal production "issues" were "behind" it and "well in hand."

51.     At the same time that Defendants were making positive statements about Walter's coal production, they knew or recklessly disregarded that the Company's highest producing mine during 2010, Mine No. 7, was experiencing ongoing squeeze events and mine ventilation problems, which caused the mine to undergo repeated shutdowns in production.

52.     Generally, a squeeze event is a condition where the weight of the strata surrounding a mine causes the mine roof or walls to squeeze into the mine, thereby diminishing the mine's integrity, making the mine unsafe and delaying production activities.

53.     During 2011, Walter's Mine No. 7 was divided into two sections:  the Number One longwall on the west side of the mine (the "West longwall"); and the Number Two longwall on the east side of the mine (the "East longwall").

54.     During early 2011, squeeze events caused the East longwall of Mine No. 7 to experience numerous shutdowns in production.  These shutdowns occurred repeatedly, sometimes lasting days, weeks, and, at one point, almost an entire month.

55.     The first squeeze event at Mine No. 7 occurred in either March 2011 or April 2011.  This event caused the East longwall to be shut down for approximately two weeks.  Thereafter, production along the East longwall resumed for a *single shift* before another squeeze event occurred, which caused production to be shut down on the East longwall for a period of time believed to cover almost the entire month of April 2011.

56.     The longwall crews were eventually able to get back under the protective metal shields and resume production for about a week, but additional squeeze events continued to occur.  As a result of these repeated occurrences, production at the East longwall was shut down for a substantial portion of 2Q11.

57.     Even when production resumed along the East longwall, it was at a reduced rate of speed, causing the East longwall to lag several months behind its 2011 production schedule.

58.     In addition to the foregoing squeeze issues, Walter also experienced undisclosed ventilation issues at Mine No. 7 during 2Q11.  During the August 4 Conference Call discussing Walter's 2Q11 results, the Company admitted that ventilation issues negatively impacted its 2Q11 production.

59.     These repeated squeeze and ventilation occurrences during the Class Period caused unsafe mining conditions, leading to shutdowns and a significant decline in the coal production at Walter's flagship Mine No. 7 during 2Q11.  Indeed, while it typically takes about nine to twelve months to cut a longwall, adverse squeeze and ventilation conditions slowed production to the point that it took Walter approximately 18 to 19 months to cut the longwalls at Mine No. 7.

60.     Defendants knew or recklessly disregarded that their representations during the Class Period about the Company's coal production generally, and Mine No. 7 specifically, were each materially false and misleading when made because, in addition to ongoing squeeze-based shutdowns, Walter had been repeatedly sanctioned by the MSHA for unsafe roof and ventilation conditions at Mine No. 7.  In fact, from January 1, 2011 through April 21, 2011 alone, Walter received eight roof-related MSHA citations on Mine No. 7, five of which were designated as being "significant and substantial," for violations associated with existing hazards related to

"falls" of the roof and coal or rock bursts.  During this same short time period, MSHA issued 14

ventilation-related MSHA citations on Mine No. 7, five of which were designated as being

significant and substantial.

61.     Regarding the roof-related violations that MSHA inspectors found in Mine No. 7,

the MSHA noted the following in its reports to the Company:

> April 21, 2011:  "Standard 75.220(a)(1) [governing roof control plans] was cited
> **26 times** in two years at mine 0101401 [Mine No. 7] (26 to the operator, 0 to the
> contractor)."

> February 19, 2011:  "The mine roof where persons work or travel was not being
> supported or otherwise controlled to protect a person from a fall of the roof on the
> outby corner" and "[t]his condition in this area, if allowed to exist, is reasonably
> likely to cause permanently disabling injuries.  The mine has been cited 20 times
> in 2 years.  This mine has experienced a fatal injury from falling rock."

> January 4, 2011:  "An area of unsupported roof was found adjacent to the travel
> way at the end of the track on the No. 2 longwall section.  This area measured
> approximately 6'6" by 6'8" and has a slab of rock approximately 10" thick
> beginning to break loose from the top.  Standard 75.202(a) was cited 18 times in
> two years at mine 0101401 (18 to the operator, 0 to the contractor)."

62.     Conceding that Defendants knew of the production problems at Mine No. 7

before they eventually disclosed them, Defendant Scheller admitted that the Company's

decreased production should have been disclosed to investors during 2Q11, stating, during the

August 4 Conference Call:  "[y]es, as far as the updates go, I think in retrospect we should have

come out with a mid-quarter update. … [U]nder my watch which started today, if we have

misses or productions [sic], I can assure you we will do that."

63.     As noted above, Defendant Scheller and Walter's Board of Directors were told

about the production problems during the Class Period, but refused to publicly disclose the truth

about Walter's dismal 2Q11 performance.  According to CW-1:

- On or before July 10, 2011, CW-1 learned, by receiving and reviewing
  mine-by-mine production and financial information from Walter's

Accounting Department, that Walter suffered a 2Q11 production shortfall that was approximately 500,000 tons below previous estimates for 2Q11.

• Upon learning of the approximately 500,000 ton production shortfall for 2Q11, CW-1 reviewed a press release that he prepared and Walter issued on Form 8-K on September 2, 2010, which alerted the market of an anticipated 200,000 ton production shortfall for 3Q10. Upon reviewing this prior press release, CW-1 concluded that immediate public disclosure of the far larger production shortfall for 2Q11 was required.

• On or about July 10, 2011, CW-1 contacted Defendant Scheller via telephone and informed Defendant Scheller that Walter should publicly disclose the 2Q11 production shortfall by issuing a press release. After being provided with details of Walter's 2Q11 production results and the 500,000 ton shortfall, Defendant Scheller revealed that he was already aware of the 2Q11 production shortfall *and* that a decision not to disclose the 2Q11 production shortfall had already been made at a higher level of the Company. Accordingly, no press release was issued at this time to alert the market of the 2Q11 production shortfall.

• Shortly thereafter, CW-1 brought the known and significant 2Q11 production shortfall to the attention of the Company's VP of Investor Relations, Blalock. Like Defendant Scheller, Mr. Blalock also did not determine to disclose the 2Q11 production shortfall publicly.

• Thereafter, CW-1 drafted a press release concerning Walter's 2Q11 results that was to be issued in early August 2011. The draft press release included details about the Company's 2Q11 production shortfall due, in part, to squeeze events at Walter's mines. CW-1 then e-mailed this draft press release to Walter's Board of Directors for review and approval. Walter's Board of Directors rejected the draft press release as too negative, however, and re-drafted the press release to de-emphasize the role that the squeeze events played in the production shortfall.

### D. Defendants Misrepresented and Concealed Material Facts Concerning Production Problems at Walter's Newly-Acquired Canadian Operations

64. As noted above, on April 1, 2011, the Company acquired Western Coal and its coal mines in Canada, West Virginia, and the United Kingdom.

65. In its April 1, 2011 press release announcing the completion of the acquisition of Western Coal through a court-approved plan of arrangement, Walter celebrated the transaction as

- 18 -

presenting shareholders with a unique opportunity to share in the growth and market potential of

the combined company.  For example, Defendant Calder stated:

> This is an exciting time for shareholders and other stakeholders of both
> companies. The combined company has an unrivaled growth profile in the
> industry, which ensures we are well positioned to meet the world's growing
> demand for our high quality metallurgical coal products.

66.     During the April 21 Conference Call discussing Walter's 1Q11 results,

Defendants similarly praised the putative strategic benefits of the transaction, claiming:

> Walter Energy is truly poised to be the leading publicly traded met coal producer
> in the world.  The combination of the assets of Walter and Western is a very
> powerful strategic fit.  We now have an expanded global operational footprint.
> We operate 15 mines across three countries and have access to high-growth
> steelmaking customers on four continents.  We've also added diversity to our
> production mix and reserve base, at a time when demand for premium products
> such as ours is pressing scarce supply.  We are extremely well-positioned for
> long-term sustained growth and continued value creation.

67.     As alleged herein, the Canadian mining operations that Walter acquired from

Western Coal were besieged by undisclosed production delays, the extent of which was only

fully disclosed at the end of the Class Period.

68.     Walter's newly-acquired Canadian mining operations consisted primarily of three

surface metallurgical coal mines in Northeast British Columbia:  the Wolverine mine; the Brule

mine; and the Willow Creek mine.  As alleged herein, during the Class Period, Defendants

represented that:  (1) Walter's Wolverine mine produced more than 2 million metric tons of coal

per year; (2) new equipment and on-site infrastructure would allow Walter's Brule mine to

produce approximately 2 million metric tons of coal per year; and (3) upon receiving the permits

necessary for expansion, which Walter represented were expected "soon" and "shortly," the

Willow Creek mine would produce approximately 1.7 million metric tons per year.

69.     With respect to the on-site infrastructure supposedly enabling the Brule mine to

produce 2 million metric tons of coal per year, the Company was continuing to pursue the

Connector Road project to join the Brule mine with the Willow Creek mine.  Walter represented that the Connector Road was an important project as the Brule mine did not have its own processing and loading operations, and coal produced at the Brule mine was required to be transported to a processing and loading facility like Willow Creek.

70.     When Walter discussed its 1Q11 earnings during the April 21 Conference Call, Defendants represented that the Connector Road was "newly commissioned" and "in service." In addition, Defendant Winkelmann made positive statements about the Company's coal production in Canada and its ongoing capital improvement efforts to further increase production at Walter's Canadian mines.  In particular, Defendant Winkelmann stated that Walter's "newly commissioned" Connector Road reduced transportation costs and increased coal production rates for the Company's Brule mine as it eliminated the need to truck coal produced at the Brule mine over highways for processing and loading.

71.     Defendants failed to disclose, however, that while the Connector Road reduced the distance over which the Brule mine's coal needed to be transported from just over 62 miles to 37 miles, the 110-ton trucks with 55-ton trailers that Walter had planned to use to haul Brule mine coal to Willow Creek for processing were unable to traverse the Connector Road's very steep corners and turns.  As a result, Walter was forced to use smaller trucks to haul coal from the Brule mine, which decreased the size of the loads, thereby minimizing the benefits associated with the Connector Road's shorter hauling distance, including any increase in the volume of coal Walter could produce from its Brule mine.

72.     Defendants knew of or recklessly disregarded the inability of the Connector Road to accommodate Walter's fleet of larger trucks – and therefore of the diminished hauling capacity at the Connector Road – at the beginning of the Class Period.

73.     According to information obtained from the Ministry of Forests, Western Coal (prior to its acquisition by Walter Energy) had to obtain a special use permit ("SUP") to begin constructing the Connector Road.  The SUP that Western Coal obtained for the Connector Road was for a specific corridor that crossed certain Ministry of Forests service roads.  As such, the Ministry of Forests was privy to Western Coal's plans for the Connector Road and made suggestions for the development of the Connector Road to minimize its interference with roads operated by the Ministry of Forests.

74.     In or about early 2010, the Ministry of Forests informed Western Coal that it should reroute the Connector Road because, as planned, the road would be on a twelve to thirteen degree grade, which would render impossible the use of large, 110-ton trucks.  The Company did not reroute the Connector Road.

75.     Despite its Class Period representations that the Connector Road was in service, Walter admitted after the end of the Class Period that the Connector Road project was not substantially commissioned until near the end of the Company's 2011 third quarter, the period ended September 30, 2011.

76.     Defendants' positive statements concerning the Connector Road project were also materially false and misleading because, in addition to the fact that the Connector Road could only accommodate smaller vehicles carrying less coal, it could not otherwise deliver the benefits that Defendants represented.  Namely, the Willow Creek facility to which the Brule coal was being transported did not have the permits needed to expand its operations as required to perform the processing and load-out services that Walter touted.

77.     During the April 21 Conference Call, the Company represented that the majority of the coal from Brule was to travel the Connector Road and "go directly to Willow Creek's

production and load-out facilities without highway travel, thus reducing transportation costs and enabling Brule to increase production to the targeted 2 million metric tons per year run rate by middle of this year [*i.e.*, the end of 2Q11]."  Defendants also represented on the April 21 Conference Call that the permits that the Willow Creek facility would need to process the coal from Brule were expected "soon" and "shortly."

78.     In reality, however, Walter did not obtain the necessary permits timely enough to operate Willow Creek's production and load-out facilities in a manner that would result in increased efficiencies during the Class Period.  Defendants were aware of these facts as the status of mine projects, including the permit delays, were discussed at weekly meetings attended by department heads.  After each meeting, Defendant Winkelmann's assistant, Melodie Chant, would update a task log concerning the ongoing projects at each Canadian mine.  The task logs were kept on a shared drive.

79.     Defendants also knew or recklessly disregarded that their representations about the Connector Road were each materially false and misleading when made because, among other things, Defendant Winkelmann participated on weekly conference calls during which general operational issues pertaining to each Canadian mine were discussed, including the use of smaller trucks on the Connector Road to haul coal mined from the Brule mine.

80.     As noted above, during the August 4 Conference Call, Defendant Scheller conceded that the Company's production issues should have been disclosed to investors during the quarter, stating "[y]es, as far as the updates go, I think in retrospect we should have come out with a mid-quarter update. . . . U]nder my watch which started today, if we have misses or productions [sic], I can assure you we will do that."

V.    **CLASS PERIOD EVENTS AND MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT**

A.    **Walter Announces Its 1Q11 Results**

81.    The Class Period begins on April 20, 2011.  On that date, Walter issued a press release announcing its financial results for 1Q11, ended March 31, 2011.  For the quarter, the Company reported earnings of $81.8 million, or $1.53 per diluted common share.  Walter's earnings for 1Q11 were nearly double the earnings it reported during the first quarter of the prior year.  Defendant Calder commented on the Company's impressive earnings results, stating, in pertinent part, that Walter's revenue and income were driven by high coal prices:

> We generated strong year-over-year growth in revenues and income driven primarily by the third highest coking coal pricing we have ever achieved. . .  Now that our acquisition of Western Coal is complete, we can turn our attention to delivering on our promises, executing integration activities and framing future growth opportunities.

82.    With regard to the Company's outlook for 2011, Defendant Calder stated, in pertinent part:

> As previously announced, Walter Energy acquired Western Coal on April 1, 2011.  Sales volume expectations for both legacy Walter Energy and legacy Western Coal are as follows:
>
> The Company expects full year metallurgical coal sales from the Walter Energy Alabama underground operations of 7.5 million to 8.0 million short tons.  In addition, the Walter Energy Alabama surface operations expect to sell between 1.4 million and 1.6 million short tons of thermal coal for the full year.
>
> From the legacy Western Coal operations, the Company expects metallurgical coal sales of between 4.9 million and 5.3 million metric tons for the period of April 1, 2011 to Dec. 31, 2011.  The Company expects thermal coal sales of 1.0 million to 1.2 million metric tons for the same period from these operations.

**B.** **Defendants' Misrepresentations and Omissions of Material Fact
Concerning Coal Pricing**

83.    Following the Company's 1Q11 earnings announcement, on April 21, 2011,

Walter held the April 21 Conference Call for analysts and investors to discuss the Company's

earnings and prospects.

84.    Prior to the April 21 Conference Call, Walter provided investors with financial

information about the Company (the "April 21 Conference Call Materials"), which included the

following charts concerning Walter's recent operating performance, coal sales, coal pricing and

coal production:



## Q1-2011 Financial Highlights

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenues | $408.7 | $312.0 | +31.0% |
| EBITDA | $148.1 | $93.5 | +58.4% |
| Operating Income | $119.8 | $71.3 | +68.0% |
| Net Income | $81.8 | $41.6 | +96.6% |
| Diluted earnings/share ($) | $1.53 | $0.77 | +98.7% |

Comment: Q1 2011 results also included $9.9 million in transaction costs
related to the Western Coal acquisition

First Quarter 2011 Earnings Conference Call  |  4/21/11 | 11

- 24 -

 **Q1-2011 Financial Summary Underground Mining**

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenue | $343.2 | $240.3 | +42.8% |
| Operating Income | $123.9 | $64.8 | +91.2% |
| % Op Margin | 36.1% | 27.0% | +33.7% |
| Capital Expenditures | $37.5 | $12.7 | +195.3% |
| Sales (tons in millions) | 1.7 | 1.8 | -6.4% |
| Average Sales Price per Ton | $193.51 | $127.05 | +52.3% |
| Production (tons in millions) | 1.6 | 1.7 | -5.9% |
| Average Mine Production Cost per Ton | $69.20 | $58.19 | +18.9% |

First Quarter 2011 Earnings Conference Call  |  4/21/11  |  13

\* \* \*

 **Q1-2011 Business Summary Surface Mining**

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenues | $ 40.8 | $ 31.3 | +30.4% |
| Operating Income | $ 6.7 | $ 7.3 | -8.2% |
| % Op Margin | 16.4% | 23.3% | -29.7% |
| Sales (tons in 000s) | 426 | 375 | +13.6% |
| Average Sales Price per Ton | $ 92.75 | $ 78.89 | +17.6% |
| Production (tons in 000s) | 369 | 345 | + 6.8% |
| Average Production Cost per Ton | $ 69.01 | $ 58.32 | +18.3% |

First Quarter 2011 Earnings Conference Call  |  4/21/11  |  15



## Q1-2011 Business Summary
## Walter Coke

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenue | $47.3 | $51.2 | -7.6% |
| Operating Income | $8.0 | $7.6 | +5.3% |
| % Op Margin | 16.9% | 14.8% | +14.2% |
| Sales (tons in 000s) | 104 | 139 | -25.2% |
| Average Sales Price per Ton | $409.85 | $327.37 | +25.2% |
| Production (tons in 000s) | 99.4 | 82.0 | +21.2% |



First Quarter 2011 Earnings Conference Call | 4/21/11 | 16

85.     The April 21 Conference Call Materials referenced above make clear that Walter's impressive 1Q11 revenues and earnings resulted, in large part, from the significant year-over-year increase in the average sales price of coal, which increased by more than 52%, 17% and 25% for underground mining, surface mining and Walter Coke, respectively.

86.     Consistent with the above-referenced April 21 Conference Call Materials, during the April 21 Conference Call, Walter's Interim CFO, Honnold, noted that higher coal prices were a significant driver of the Company's performance during 1Q11, stating, in pertinent part:

> **Revenues and operating income benefited from significantly higher coking coal prices** which averaged $193.51 per short ton in the first quarter, a 52% increase compared to the first quarter last year.

87.     In addition, during the April 21 Conference Call, Defendant Scheller commented that carryover tonnage from the 2010 fourth quarter adversely impacted the average price at which Walter sold coal during 1Q11, stating, in pertinent part:

> Sales volumes of 1.8 million tons for Q1 were down 6.4% compared to the same period last year.  The lower sales volume reflects lower production and inventory

levels.  Our average coal sales price at the underground segment in the quarter was $194 a ton, up 52% over the same quarter last year.  **Benchmark prices in the first quarter of 2011 were higher than those in the first quarter of 2010 and we sold carryover tonnage from the previous year in the first quarter which somewhat reduced the increase and average sales price and percentage increase**.

88.     With respect to Walter's 2Q11, the April 21 Conference Call Materials represented that "markets remain strong," demand was "steady" and that 2Q11 coal prices were at "record levels":



**Markets remain strong**

**Seaborne metallurgical coal**
- Slow recovery of Australian supply
- Demand steady
- Q2-2011 prices at record levels
    – HCC > US$300 per tonne; LV PCI > US$270 per tonne

**Steel industry**
- Increasing finished steel prices during Q1

First Quarter 2011 Earnings Conference Call  |  4/21/11  |  28

89.     Also with respect to Walter's 2Q11, during the April 21 Conference Call, Defendant Calder indicated that coal "pricing is very strong" and that Walter had "settled" its contracts at coal prices that were nearly 50% higher than those during 1Q11, stating, in pertinent part:

> **Looking at the current quarter, second quarter 2011, hard coking coal prices, we settled in line with markets -- $326 to $330 per ton, which is a reflection of the high quality coal we are producing.  This increase is nearly 50% higher than the previous quarter.**

With regard to the low-vol PCI coal we produce in northeastern British Columbia, **Q2 prices have been in the area of $275 per ton, which represents 83% of the hard coking coal settlement. This is the high end of historic ratio levels.**  In short, worldwide demand for metallurgical coal remains strong throughout January and March and the longer term outlook is firm and as the economic recovery continues in developed economies and expands in the major growth regions of China, India and Brazil.  **Q2 pricing is very strong and we continue to see exceptional interest in a demand for all of our coal products.**

90.     Later, during the question and answer session of the April 21 Conference Call,

Defendant Calder reiterated that the pricing and demand for coking and metallurgical coal was

strong, stating, in pertinent part:

Just to add a little to that, **it does mean that coke pricing is attractive right now**, and we are getting more opportunities to diversify our customer base if it is attractive to us financially.  And that was demonstrated -- I think it's been announced.  We placed two shipments of coke overseas in the last quarter.  **So coke side of the business is very healthy and similar to the coking coal, the metallurgical side of things, there is strong demand going forward**.

91.     During the April 21 Conference Call, Defendant Calder also explained that

Walter's coal sales "tend to lean toward the higher end of the benchmark pricing range" when it

enters into sales contracts, and that Walter's coal production was "priced and sold" through

2Q11, with a vast majority of its sold coal being priced in the month immediately preceding a

given quarter (*i.e.*, the pricing for 2Q11 was established in March 2011):

Jim Rollyson - Raymond James, Analyst:

That's very helpful and Keith maybe you can provide a little color across the spectrum of the combined companies now for where your contract position was.  I think in the last quarter you were pretty well sold for the first half at the Walter operations, some of that because of carryover coal that bled into this year.  **But maybe a little color on how to -- where the second quarter, the rest of the year is from a contract standpoint and a pricing standpoint and what is open on the Western side as well**.

Defendant Calder:

**The scenario for both old Walter and old Western is very similar.  That is that obviously through the second quarter, our production is priced and sold.**  As we go into the second half of the year, all of the materials committed going

forward, but only 10% is priced.  So we're about 90% open on pricing going forward and I think it really just demonstrates the commonality or the philosophical approach of how we see marketing, both before the integration of the two companies and now going forward.

Jim Rollyson - Raymond James, Analyst:

When we think about pricing metals, particularly on the met side, for Q2, do you think of that somewhere bridging the gap between where pricing was in Q1 and previously where the bench marks have been set somewhere in the middle, maybe?

Defendant Calder:

That's a very good way of looking at it.  Because as you know we did sell some material both from the old Western and legacy Walter board for half the year.  So some of that will be a little carryover in both areas coming out of Alabama.  So that's a good way of looking at it.  It's sort of a combination of middle ground between the two.

Jim Rollyson - Raymond James, Analyst:

And just a last one --

Defendant Calder:

One thing I think is important to note -- sorry for interrupting but just to finish that.  **It is important to note that all of our products tend to lean toward the higher end of the benchmark pricing range whenever we place those contracts - just a reflection of the high quality of the product that we sell.**

*       *       *

Lucas Pipes - Brean Murray, Analyst:

That's fair.  As a follow up, as you mentioned, you still have to price a good amount of coal in the second half of the year.  Could you tell us about when you want to price these volumes?  Are you trying to get them out now?  The pushback from your customers -- how are they seeing things?  Are they trying to maybe hold off a little bit and then price more in the second half of the year?  What is your strategy there?

Defendant Calder:

Well, I think it's important to note that **Walter Energy is first and foremost a seaborne met coal producer so we sit well in the seaborne met coal pricing mechanisms.  The bulk of that, vast majority is done on a quarterly basis -- so pricing for Q3 would be executed in June.  So that pricing would be**

established in June.  **The pricing for the following quarter, obviously in the last month of the third quarter.  There are -- sometimes we find there's an opportunity and a desire on the part of our customers to establish a six monthly contract or nine monthly contract, we do that occasionally.**  But first and foremost and overall, because we are a seaborne met coal producer we are for the most part in the quarterly pricing stage.

Now, on the other hand, **we do have long-term contracts with the vast majority of our customers.  And that means that the volumes are contracted two and three and four years out.  So we know where our volumes are going for Q2 and Q3**.  It is now a question of defining that price and hence the seaborne bench mark is what we work on.

*      *      *

Mitesh Thakkar - FBR Capital Markets, Analyst:

Will stay about the same.  Okay.  And one final question.  And this is just in general, about the pricing side.  I know you talked about a strategy going forward on the quarterly and -- you know, on a case by case basis, maybe a six-month contract but will you follow the same strategy in terms of your low-vol PCI side?

Defendant Calder:

Low-vol PCI -- this is Keith speaking again -- **low-vol PCI also trades on a seaborne market and it trades exactly the same way.  It is quarterly pricing, the bulk of it.  Last month in the quarter is when we establish the pricing for the next quarter**.  But the totality of our production is all long-term contracts to well established customers on a multi-year basis.  So volumes and long-term contracts, pricing on a quarterly basis, with some exceptions.

92.     The statements referenced in ¶¶ 88-91 above were materially false and misleading when made because each statement misrepresented and failed to disclose that Walter had committed to sell more than 706,000 tons of coal during 2Q11 at prices that were well below the 2Q11 benchmark price.  As alleged herein, Defendants represented that coal pricing for 2Q11 was "at record levels" and "very strong."  Moreover, when asked specifically about existing contracts for 2Q11 and the balance of 2011, Defendant Calder represented that "obviously through the second quarter, our production is priced and sold" and that it "is important to note that all of our products tend to lean toward the higher end of the benchmark pricing range

whenever we place those contracts."  The foregoing statements were materially misleading because Defendants failed to disclose that Walter had committed to sell 706,000 tons of its 2Q11 coal production at 1Q11 prices that were significantly lower than the 2Q11 benchmark.

93.     Defendants knew or recklessly disregarded that Walter had committed to sell 706,000 tons of coal during 2Q11 (an amount exceeding *more than 30%* of the coal that Walter sold during all of 1Q11) at prices *30% less* than the $326 to $330 per ton 2Q11 benchmark price that Defendants led investors to believe Walter's contracts would be settled at during 2Q11. Indeed, Defendants knew of Walter's commitment to sell a significant amount of coal during 2Q11 at prices substantially lower than those it touted because, as Defendant Calder explained on the April 21 Conference Call, the "[l]ast month in the quarter is when we establish the pricing for the next quarter" and "obviously through the second quarter, our production is priced and sold."  Accordingly, Defendants knew that Walter's 2Q11 coal sales had been "priced and sold" by no later than March 2011 and that, as a result of the Company's commitment to sell a significant amount of coal at substantially lower prices, Walter's 2Q11 earnings would be adversely affected.

**C.      Defendants' Misrepresentations and Omissions of Material Fact Concerning U.S. Coal Production**

94.     The April 21 Conference Call Materials also highlighted the positive year-over-year coal production at Walter's Mine No. 7, stating, in pertinent part:



### Q1-2011 Operational Summary
### Underground Mining Production

| Short tons in millions | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| No. 4 Mine | 0.522 | 0.703 | -25.7% |
| No. 7 Mine | 1.059 | 0.955 | +10.9% |
| Total | 1.581 | 1.658 | -4.6% |

95.     The April 21 Conference Call Materials further represented that Walter's

production growth profile, which increased in 1Q11 for Mine No. 7, was "on track":



### First Quarter 2011 Highlights

- Strong year-over-year financial performance
- Production growth profile on track
- Operational excellence
- Challenges remain

96.     During the April 21 Conference Call, Defendant Scheller acknowledged that

adverse mine roof and ventilation conditions could have a material adverse effect on the

Company's operating results and explained that ventilation and squeeze conditions at Walter's

Mine No. 4 caused it to experience lower production rates and higher coal production costs

during 1Q11, stating, in pertinent part:

Average production cost for the underground mining segment was $69 per ton, a 19% increase over last year.  The higher costs primarily were due to higher labor costs as we increased manpower to run more continuous miner sections and also resulted from reduced production volumes as a result of weak roof conditions, ventilation and construction projects, and a two week squeeze on the lower wall at the number four mine in January.

\* \* \*

Mine four production was impacted in Q1 by a couple of issues.  The ventilation and construction issues were due to delayed completion of a new ventilation shaft which encountered several disturb zones due to sub surface faulting which has caused considerable delay.

97.     During the April 21 Conference Call, Defendant Scheller then noted that Walter had taken actions to establish a foundation for improved production rates, stating, in pertinent part:

Moving on to the quarterly coking coal production volumes on slide 14, **we are positioned to expand production for an 8 million ton annual run rate as we move forward**.  We had two long wall moves and produced 1.6 million tons in the first quarter, which was 4.6% less than the same period a year ago.  **This quarter's long wall moves and improved continuous miner advance rates establish a foundation to moving forward at production [sic] at improved rates**.

\* \* \*

**At mine 7, the number one long wall had had difficult cutting conditions which required reduced cutting rates and increased maintenance to keep tools adequate for the task.  These conditions impacted both Q4 and Q1.**

98.     In addition, Defendant Calder reiterated Defendants' coal production claims for the Company, noting that Walter's Mine No. 7, production from which had increased in 1Q11, was on pace for "record" coal production, stating, in pertinent part:

[W]e posted strong financial results for the quarter, with net income and earnings per share almost doubled compared to the first quarter last year, and an EBITDA increase of 58% compared to last year.  **We remain on track with our production profile with our first quarter run rate on pace for record production at our [No. 7] mine.**

- 33 -

99.     Defendant Calder also announced Walter's 2011 expected coal sales, stating, in pertinent part:

> For 2011 the Company expects full year met coal sales from our Alabama underground operations of 7.5 to 8 million short tons including up to 500,000 tons of purchase coal.  In addition the Alabama surface operation is expected to sell between 1.4 and 1.6 million short tons of thermal coal for the full year.  From the legacy Western Coal operations, the Company expects metallurgical coal sales of between 4.9 million and 5.3 million metric tons for the period of April 1st to December 31st, 2011.  The Company expects thermal coal sales of 1 million to 1.2 million metric tons for the same period from our operations.

100.    During the Q&A session of the April 21 Conference Call, when Defendants were specifically asked about any ongoing geology problems Walter might be experiencing, Defendant Scheller proclaimed that the Company's production issues were "well in hand" and "behind us" and that investors would see improvement going forward, stating, in pertinent part:

> Jim Rollyson - Raymond James, Analyst:
>
> Keith or maybe Walt.  **On the Walter underground operations, it sounds like you are maybe getting past some of the geology issues you've had that have been ongoing for the last couple of quarters.**  I want to get your thought on, [(a)], **is that a correct assessment** and [(b)] do you still feel good about heading towards that 9 million tons type of number as we head into 2012 at this point?
>
> Defendant Calder:
>
> I will head [sic] that over to Walt.  I think he is well positioned to answer that.
>
> Defendant Scheller:
>
> We are definitely still playing [sic] the move towards that 9 million tons rate.  In exactly what quarter that will occur or when we will hit that full rate, I'm not exactly sure whether it will be -- you know, the 4th quarter of 2012 or the 1st quarter of 2013 but we certainly intend to get there.  **The production issues we've had, I believe we have them well in hand**.  Some of those issues -- for instance, the N19 panel was simply working our way through some very difficult geology in a panel once we got started.  So I'm confident that **we are putting these issues behind us and that we will see improvement as we roll forward.**

101.    Later during the Q&A session of the April 21 Conference Call, Defendant Scheller reiterated that the Company took action to alleviate issues it had encountered on the longwalls and with ventilation that impaired its coal production, stating, in pertinent part:

Shneur Gershuni – UBS, Analyst:

Thank you for that clarification.  I was wondering if Walt could give us a little color as to the change or the issues that we saw -- you know at that point in the first quarter continuing and expand?  Or are we going to get to the point where the second quarter will look like the whatever is the baseline quarter of what the mine should actually operate like and how we should be modeling that on a going forward basis when we talk about 2012 and 2013.

Defendant Scheller:

I think we will see the second quarter -- **performance in the second quarter start to be much more indicative of what we should expect moving forward**. We need to remember, we still have several long wall moves toward the end of the year this year.  But the problems which we encountered, again, were some of the more located -- at our mine 4, at the long wall panel.  So we have moved out of that area of the mine and are now operating actually a few miles away from there.  **So we don't anticipate having those same issues.  And the problems we were encountering on the -- on both long walls with ventilation, we believe we have made adjustments and changes to equipment and done things to help to alleviate that problem.  And we should be able to operate in a more productive mode as we move forward**.

102.    The statements referenced above in ¶¶ 95 and 97-101 were materially false and misleading when made because in each statement, Defendants failed to disclose that Walter's Mine No. 7 was then experiencing ongoing adverse squeeze and ventilation conditions that were having a material adverse effect on the Company's coal production rates, and consequently, the Company's 2Q11 operating results.  In fact, a squeeze event occurred at Mine No. 7 in either March or April 2011, which caused the mine's East longwall to be shut down for approximately two weeks.  Thereafter, production along the East longwall of Mine No. 7 resumed for a ***single shift*** before another squeeze event occurred, which caused production to be shut down on the East longwall for a period believed to has lasted for almost the entire month of April 2011.

Moreover, on the same day as the April 21 Conference Call, the MSHA cited Mine No. 7 for its *twenty-sixth violation* for failing to follow its filed roof plan.  The inspector noted, among other things, that an injury resulting from the violation, if not corrected, would be fatal.  Accordingly, Defendants' statements addressing Walter's near-term coal production and sales were materially false and misleading and made without a reasonable basis.

### D.   Defendants' Misrepresentations and Omissions of Material Fact Concerning Coal Production in Canada

103.   The April 21 Conference Call Materials also represented that the Connector Road in British Columbia was "in service" and that permits enabling the Company's expansion plans for Willow Creek were expected "soon" and "shortly":



104.   On the April 21 Conference Call, Defendant Winkelmann made positive statements about the Company's coal production in Canada and its ongoing capital improvement

efforts to further increase production at Walter's Canadian mines.  In particular, Defendant

Winkelmann stated that Walter's "newly commissioned" Connector Road reduced transportation

costs and increased coal production rates, as it eliminated the need to truck coal produced at the

Brule mine over highways to the Wolverine mine, the Willow Creek mine, or to a third-party

facility for processing and load-out, stating, in pertinent part:

> Capital expenditure continues to focus on the development of the metallurgical coal assets.  **The mines have ramped to be producing at a total rate of 6 million tons per annum, with two of the past three quarters in excess of 1.5 million tons, and the recent quarter of 1.4 million tons in spite of operational and logistics issues.**
>
> *       *       *
>
> Moving on to . . . our Brule mine.  This mine produces one of the best quality, highest coke replacement ratio low volatile PCI product in the world for our Asian customers.  Over the past year are the [sic] focus has been to expand the mining operation into a new larger pit.  The mine production rate will grow to 2 million metric tons per year of production, utilizing equipment and newer onsite infrastructure.  The capital investment in this mine is approximately 70% complete.  **The mine does not have its own processing or load-out facility and prior to Q1 2011, the quote at commissioning of the new Falling Creek connector road, Brule's coal was being trucked by highway to the facilities at either Wolverine, Willow Creek, or to a third party loadout.**
>
> **With the newly commissioned road, the majority of the coal from Brule can go directly to Willow Creek's production and loadout facilities without highway travel, thus reducing transportation costs and enabling Brule to increase production to the targeted 2 million metric tons per year run rate by middle of this year.**  It is worth noting that the majority of coal from this mine is shipped to customers without the need for beneficiation other than mine-site crushing.  The pictures on this slide show the mine site in the summer of 2010 as well as the EX8000 shovel and the 793 haul trucks in which they have deployed several.

105.    During the April 21 Conference Call, Defendant Winkelmann also commented on

the status of the Company's Willow Creek mine and the highly-touted expansion project

purportedly moving forward at the site, stating:

> Moving on to slide 21 and our Willow Creek mine.  We restarted this mine in June 2010 and to date **it's been a very successful startup**.  The open pit mine

- 37 -

produces a mix of top quality low volatile PCIs and a very high quality hard coking from complex geology.  Willow Creek has a preparation plant and rail loadout.  **We are expanding production to 1.7 million metric tons per year and expect to receive the relevant permits shortly.**

106.    The statements referenced in ¶¶ 103-105 above were each materially false and misleading when made because, as Walter later admitted, the Connector Road project was not substantially commissioned until near the close of the Company's 2011 third quarter, ended September 30, 2011.  In addition, the statements referenced ¶¶ 103-105 above were each materially false and misleading when made because Defendant Winkelmann misrepresented that the Connector Road project reduced transportation costs and increased the Brule mine's production rates.  In fact, while the Connector Road reduced the hauling distance by 25 miles, from just over 62 miles to 37 miles, Defendants knew or recklessly disregarded that, because of its very steep corners and turns, the Connector Road could not accommodate the large 110-ton trucks with 55-ton trailers that Walter had planned to use to haul Brule mine coal.  As a result, Walter was forced to use smaller trucks to haul Brule mine coal, which minimized the benefits associated with the Connector Road's shorter hauling distance, including any increase in the volume of coal Walter could produce from its Brule mine.  Furthermore, Defendant Winkelmann's statement that Walter expected the "relevant permits" pursuant to which the Willow Creek mine could be utilized for increased production and load-out services "shortly," was materially misleading because he failed to disclose the continuing delays in receiving those permits, as the Company admitted in August 2011.

107.    Defendants knew or recklessly disregarded that their representations about the Connector Road were each materially false and misleading when made because, among other things, Defendant Winkelmann participated on weekly conference calls during which general

operational issues pertaining to each Canadian mine were discussed, including the use of smaller

trucks on the Connector Road to haul coal mined from the Brule mine.

108.    In its 2011 Form 10-K filed with the SEC after the Class Period on or about

February 29, 2012, Walter admitted that the Connector Road project was not substantially

commissioned until the end of Company's 3Q11, stating, in pertinent part:

> **Our Falling Creek connector road project was substantially commissioned**
> **near the end of the 2011 third quarter** and truck hauling volumes on the road
> have continued to increase into the 2012 first quarter.  The road connects the
> Brule mine to the Willow Creek mine where Brule's coal is processed and loaded
> at the rail load out facility.  The new road reduces the hauling distance as
> compared to the previous route from just over 62 miles down to 37 miles.

109.    The foregoing admission demonstrates that Defendants statements during the

Class Period representing that the Connector Road was "commissioned" and "in service" in

2Q11, and that it would it would benefit the Company in 2Q11, were materially false and

misleading when made.

110.    Moreover, Defendants' April 20 and 21, 2011 statements set forth above

concerning, among other things:  (1) the likely positive effect of strong pricing trends on

Walter's 2Q11 results; (2) the purportedly unfettered production from Mine No. 7 and the

Company's Canadian operations; (3) the status of production permitting at Willow Creek; and

(4) the purported advantages and increased efficiencies allegedly associated with Willow Creek's

expansion and the Connector Road required updating as the Class Period progressed.  Indeed, the

706,000 tons dedicated to be sold at materially lower 1Q11 prices; the "squeeze" events and

associated shutdowns at Mine No. 7; the inability of the Connector Road to accommodate large

tonnage trucks; and the multiple-month delay in obtaining permits at Willow Creek imposed a

duty upon Defendants to update their prior statements, as the foregoing undisclosed facts

rendered Defendants' prior statements materially false or misleading.

### E.   Walter's April 28, 2011 Press Release

111.   On April 28, 2011, Walter issued a press release announcing that several large

storms temporarily impacted production at Walter's Mine No. 7, stating, in pertinent part:

> 'We experienced several large tornadoes near our Alabama operations over the
> past 24 hours.  We had one injury at a surface mining operation which required
> first aid treatment, but thankfully, we have no other reports of injuries to our
> employees at this time,' Scheller said.  **'While both the No. 4 and No. 7 mines
> avoided direct impact by the tornadoes, they experienced power outages
> which have temporarily impacted production**.  We expect production to
> resume as soon as all power is restored and any related underground issues are
> resolved.  Our surface mining operations suffered varying degrees of damage,
> mostly superficial with the exception of our Taft Choctaw mine, where storm-
> related damage cut power to the mine and its electrically operated dragline.  At
> this time, we are uncertain how long it will take to restore power to this facility.
> Our metallurgical coke plant in North Birmingham was unaffected by the storms
> and is operating normally.'

112.   The statements referenced in ¶ 111 above were each materially false and

misleading when made because Defendants failed to disclose, among other things, that Mine No.

7 was experiencing contemporaneous squeeze events and related production delays, and thus not

producing the volume of coal represented in earlier Class Period disclosures.

### F.   Walter's First Quarter 2011 Form 10-Q

113.   On May 9, 2011, Walter filed its Form 10-Q for the quarter ended March 31, 2011

(the "2011 Q1 Form 10-Q") with the SEC, which was signed by Defendant Calder.  The 2011

Q1 Form 10-Q repeated the financial results that the Company set forth in its April 20, 2011

press release.  In the 2011 Q1 Form 10-Q, Walter also made the following statements regarding

pricing trends for 2Q11 and the Company's sales volume for the remainder of the year:

> Worldwide demand for metallurgical coal remained strong during the first quarter
> of 2011 and the longer term outlook is firm as the economic recovery continues in
> developed economies and demand expands in the major growth regions of China,
> India, and Brazil.  **Prices during the second quarter of 2011 are very strong
> and we continue to see exceptional interest in, and demand for, all of our
> metallurgical coal products**.

\*      \*      \*

Coking coal sales totaled 1.7 million short tons in the first quarter, down 6.4% compared to the same period last year due to lower production volumes despite strong customer demand.  The average selling price in the first quarter of 2011 was $193.51 per short ton, a 52.3% increase over the average selling price of $127.05 per short ton for the same period in 2010.  **Our sales volume expectation for 2011 ranges from 7.5 million to 8.0 million short tons including up to 500,000 short tons of purchased coal.**

114.    The statement in ¶ 113 above concerning coal prices for the second quarter of 2011 was materially false and misleading when made because it misrepresented and failed to disclose that Walter had committed to sell more than 706,000 tons of coal during 2Q11 (an amount exceeding more than 30% of the coal that Walter sold during the entirety of 1Q11) at prices that were 30% less than the 2Q11 benchmark price.

115.    The statement in ¶ 113 above concerning coal production and sales volumes for the remainder of 2011 was materially false and misleading when made because it failed to disclose, among other things, that:  (1) Mine No. 7 was experiencing contemporaneous squeeze events and related production delays, and thus not producing the volume of coal as represented in earlier Class Period disclosures; (2) the design of the Connector Road forced the Company to use smaller transport vehicles and did not enable Walter to move the significant volumes of coal from the Brule mine that Defendants had earlier represented; (3) the Connector Road project was not substantially commissioned and was not contributing to increased coal production as represented in earlier Class Period disclosures; and (4) the Willow Creek mine was not processing or producing coal to the extent represented in earlier Class Period disclosures because of continued delays in obtaining necessary expansion permits.

116.    The 2011 Q1 Form 10-Q also failed to disclose material information required to be disclosed pursuant to controlling SEC rules and regulations.

117.    The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC.  SEC Regulation S-K requires that every Form 10-Q filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §§ 229.303.  The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and other users to assess the financial condition and results of operations of a company, with particular emphasis on that company's prospects for the future.

118.    Specifically, SEC Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K) among other things:

> (i) **Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.**  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> (ii) **Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.** If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. §§229.303.

119.    Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on **material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.**"

120.    Defendants violated the affirmative disclosure duties imposed by Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose, among other things, the following material information in the Company's Form 10-Q filed with the SEC on May 9, 2011: (1) Walter's commitment to sell 706,000 tons of coal at 1Q11 prices that were well below the 2Q11 benchmark pricing that Walter represented would have a materially positive effect on its 2Q11 financial results; (2) Walter was experiencing production problems at its "flagship" Mine No. 7 in Alabama, including squeeze events that caused Mine No. 7 to shut down for extended periods of time beginning in March or April 2011; and (3) the production impairments resulting from the combination of the hauling limitations associated with the Connector Road that was purportedly "in service," and the failure to obtain the expansion permits for the Willow Creek processing facility that Defendants stated on April 21, 2011 were expected "soon" and "shortly."

121.    The foregoing concealed facts were required to be disclosed because they were, among other things:  (1) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (2) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and (3) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

### G.    Defendant Calder Resigns as Walter's Chief Executive Officer

122.    On June 30, 2011, Walter issued a press release announcing the resignation of Defendant Calder as Walter's CEO and Defendant Leonard as his replacement in such capacity

on an interim basis, stating, in pertinent part, as follows:

> Walter Energy (NYSE: WLT) (TSX: WLT), the world's leading, publicly traded "pure play" producer of metallurgical coal for the global steel industry, announced today that Keith Calder has tendered his resignation as Chief Executive Officer and a director, effective July 31, 2011.  The Board has named Board member Joseph B. Leonard to succeed Mr. Calder as Interim Chief Executive Officer at that time.

> Mr. Leonard served as Walter Energy's Interim Chief Executive Officer from March 2010 through March 2011.  The Board has engaged Spencer Stuart to initiate a search, within Walter Energy and externally, for a permanent Chief Executive Officer.

> **Mr. Calder informed the Board in his letter of resignation that he is resigning due to differences of opinion concerning management philosophy.**  Said Mr. Calder, "I do believe Walter Energy has immense potential and I am sure it will be realized.  That said, it is now time for me to move on and pursue other interests."

> Michael T. Tokarz, the non-executive Chairman of the Board, said, "We accept Keith's decision to resign and appreciate his desire to move on.  We thank him for helping us through the transition and integration of Walter Energy and Western Coal into one company -- the new Walter Energy.  Most important, we are confident that the company, under the direction of Joe Leonard, will continue its current momentum."

123.    On July 5, 2011, Walter filed a Form 8-K with the SEC announcing that, as previously disclosed in a Form 8-K that the Company filed with the SEC on February 4, 2011, Walter's Senior Vice President and Interim CFO Honnold, resigned from the Company effective as of the close of business on June 30, 2011.

## VI.       DEFENDANTS BEGIN TO DISCLOSE THE TRUTH

### A.       Defendants Report Walter's 2Q11 Results, but Continue to Misrepresent and Conceal Material Facts

124.    On or before July 10, 2011, CW-1 learned, by receiving and reviewing mine-by-mine production and financial information from Walter's Accounting Department, that Walter suffered a 2Q11 production shortfall that was approximately 500,000 tons below previous estimates for 2Q11.

125.     Upon learning of the approximately 500,000 ton production shortfall for 2Q11, CW-1 reviewed a press release that he prepared and that Walter issued on Form 8-K on September 2, 2010 alerting the market of an anticipated 200,000 ton production shortfall for 3Q10.

126.     The September 2, 2010 press release (issued prior to the Class Period) was entitled "Walter Energy Modifies Full-Year Coking Coal Sales Expectations."  In the September 2, 2010 press release, Walter advised that production delays at Mine No. 4 had "contributed to a production shortfall of approximately 200,000 tons through August [2010]."  According to CW-1, the September 2, 2010 press release was consistent with Walter's practice up to that time of alerting the market to significant production shortfalls when they became known.

127.     Upon reviewing the September 2, 2010 press release disclosing the then-anticipated 200,000 ton production shortfall, CW-1 concluded that immediate public disclosure of the far larger production shortfall for 2Q11 was required.

128.     Accordingly, on or about July 10, 2011, CW-1 contacted Defendant Scheller via telephone and informed Defendant Scheller that Walter should publicly disclose the 2Q11 production shortfall by issuing a press release.  After being provided with details on Walter's 2Q11 production results and the shortfall, Defendant Scheller revealed that he was already aware of the 2Q11 production shortfall at this time *and* that a decision had already been made at a higher level not to disclose the 2Q11 production shortfall.  Accordingly, no press release was issued at that time to alert the market of the 2Q11 production shortfall.

129.     Shortly thereafter, CW-1 brought the known and significant 2Q11 production shortfall to the attention of the Company's recently-appointed VP of Investor Relations, Mr.

Blalock.  Like Defendant Scheller, Mr. Blalock also did not determine to disclose the 2Q11 production shortfall publicly.

130.     Thereafter, CW-1 drafted a press release concerning Walter's 2Q11 results that was to be issued in early August 2011.  The draft press release included details about the Company's 2Q11 production shortfall due, in part, to squeeze events at Walter's mines.  CW-1 then e-mailed this draft press release to Walter's Board of Directors for review and approval. Walter's Board of Directors rejected the draft press release as too negative, however, and re-drafted the press release to de-emphasize the role that the squeeze events played in the production shortfall.

131.     On August 3, 2011, Walter issued the press release, as revised and approved by the Company's Board of Directors, announcing the operating results for its 2Q11, the period ended June 30, 2011.  For the quarter, the Company reported net income of $107.4 million, or $1.71 per diluted common share.  These results were significantly lower than Wall Street estimates, which were based upon the Company's bullish April 2011 misrepresentations and omissions.  In the August 3, 2011 press release, Defendant Leonard, commented on the results, stating, in part, that "difficult geology in Alabama" adversely affected the Company's production and sales results:

> Walter Energy continues to execute on its long-term strategic plan to grow its met coal production base, highlighted by the acquisition of Western in April and our execution of lease agreements on 68 million metric tons of Blue Creek coal reserves in May.  Those initiatives are beginning to show positive results as we increased met coal sales to a record 2.7 million metric tons in the quarter, and we expect to grow total met coal sales volumes by an additional 50 percent by the end of 2013.  In addition, we have further organic and bolt-on growth opportunities in our pipeline to continue increasing and diversifying our metallurgical coal production footprint over the course of this decade to carry on our outstanding track record of creating value for our shareholders.
>
> **During the quarter, we experienced difficult geology in Alabama and weather-related challenges at both our Alabama and Northeast British**

**Columbia operations, which adversely affected production and sales results. We are putting these production issues behind us and expect to finish 2011 with second half met coal sales of approximately 5.9 million metric tons.**

132.     The statements in Walter's August 3, 2011 press release were materially false and misleading because Defendants deliberately downplayed the negative impact that squeeze events at Mine No. 7 had upon the Company's production levels.  In this regard, CW-1 prepared a draft press release for the Company to issue announcing its results for 2Q11.  The draft that CW-1 prepared included information noting that the production shortfalls that Walter experienced in 2Q11 were attributable, in part, to squeeze events that the Company experienced at its mines. CW-1 e-mailed a copy of this draft press release to Walter's Board of Directors for review and approval.  After reviewing this draft press release, Walter's Board of Directors rejected it as too negative.  Thereafter, members of Walter's Board of Directors directly participated in redrafting the press release to downplay the discussion of the impact that the squeeze events had on Walter's 2Q11 coal production.

133.     Following the Company's fiscal second quarter earnings announcement, Walter held the August 4 Conference Call for investors and securities analysts.  In addition, Defendants provided investors and analysts conference call material indicating, among other things, that the longwalls on Walter's Mine No. 7 experienced ventilation issues and squeeze conditions in 2Q11:



**Key U.S. Operations**

■ Mine No. 7:
  – 'Raising the Bar' effort to improve continuous miner production has
    resulted in nearly 40% improvement versus 2010
      – Program now being deployed at longwalls
  – Year-over-year longwall production improved despite:
      – <mark>Longwall No. 1 – Ventilation issues,</mark> tornado impact
      – <mark>Longwall No. 2 – Geology (squeeze),</mark> tornado impact

■ Mine No. 4:
  – Longwall performed well in second quarter
  – New ventilation fan in place to better support mining operations
  – 'Raising the Bar' program that has proven successful at No. 7 mine
    deployed at No. 4 mine in the second quarter

134.    During the August 4 Conference Call, and in stark contrast to the Company's

August 3, 2011 press release, Defendant Scheller represented that squeeze conditions at Mine

No. 7, which began in April 2011 (but were concealed from investors throughout 2Q11), were

the primary cause of the decline in Walter's coal production during the quarter, stating, in

pertinent part:

> We had a couple issues that negatively impacted production this quarter. **First,
> and most significantly**, **we had two squeezes at the East long wall at the
> Number 7 Mine**. Typically in long wall mining, the shield supports the
> immediate roof. The shield advances as we extract the coal in the panel allowing
> the roof to fall safely behind the shield.
>
> However, at Mine Number 7, **beginning in April**, we encountered a massive
> section of sandstone above the immediate roof. The long wall shields we have on
> that panel are rated to 950 tons of support capacity. When the sandstone failed to
> brake, as expected, its effective weight increased to a point where it exceeded the
> working capacity of the shields.
>
> This additional load caused the shields to compress to their minimum height
> interrupting long wall production. The process to free the squeezed shield is
> difficult and time-consuming. As a result, we've made a number of changes to
> mining techniques and equipment.

And, we believe these changes give us the best chance to succeed as we continue in this panel and we have recently seen advance rates return to improved levels. These shields were scheduled for replacement at the end of this long wall panel, and new shields have recently arrived to replace the set as planned.  However, if we encounter further geological events, we will put these new shields into service early.  These shields are rated to 1,350 tons of capacity, and we have similar equipment installed on our other two long walls.  These have been operating without issue for some time.

135.    In addition, Defendant Scheller effectively acknowledged that the squeeze events that occurred throughout the quarter (but were concealed from investors), were the main cause of the production shortfall at Mine No. 7 when he conceded that Walter lost only "a couple" of days of production due to the tornados that hit Alabama during the quarter, stating, in pertinent part:

We also have experienced some impacts from the April 27 tornadoes in Alabama. Although, most of our facilities were spared the worst of the damage, **we did lose a couple days of production due to power outages** in the area and struggled to mine at capacity due to the impacts on our employees and the community.

136.    Defendants also disclosed the poor results at Walter's Canadian facilities, but misleadingly downplayed the impact on the Company's results of the inadequacy of the Connector Road to handle large transport vehicles, the lack of permits at the Willow Creek facility and the fact that the Connector Road project was not yet "substantially commissioned." For example, Defendant Winkelmann highlighted the spring season to explain why the Connector Road negatively impacted coal production and costs at Walter's Canadian operations, stating, in pertinent part, as follows:

Difficult road conditions on the new Falling Creek connector road to Willow Creek, **related to spring thaw and to the flooding events**, limited coal hauling during the quarter to an alternate longer and lower capacity route to Wolverine. **This negatively impacted clean coal output, mining costs and increased haulage costs**.

**Haulage on the Falling Creek connector road will recommence this week, and will thus lift the logistic constraints that affected the second quarter reported production.**  Mining costs were higher in the second quarter due to planned high waste volumes and the lower coal haulage volumes

- 49 -

137.     In contrast, during the August 4 Conference Call, Defendant Winkelmann merely alluded to the fact that the Company was unable to haul significant coal on the Connector Road due to its logistics, stating, in pertinent part:

> The risk -- the part there that's been effecting us, there, is the haulage for logistics up the hill and it is true they have not demonstrated the capacity of the whole significant coal down the Falling Creek Connector Road yet.  It reopens tomorrow is the schedule.  I've recently driven the road.  I've looked out and I understand the trucks and the plans there, and I'm confident that we will get that working and that logistics constraint will be lifted.

138.     Contrary to Defendants' April 21, 2011 representation that the permits for the Willow Creek facility were expected "soon" and "shortly," Defendant Winkelmann revealed:

> The Willow expansion project received the amended environmental permit after **several months of processing delays**.  These delays caused increased constraints on mine waste and call sequencing, which impacted production and costs for the quarter.

139.     Then, Walter's management admitted that a significant portion of the Company's 2Q11 coal sales were made at prices well below the 2Q11 benchmark prices that Defendants had previously disclosed in April, stating, in pertinent part:

> David Lipschitz - Credit Agricole Securities, Analyst:
>
> Yes.  And then my next question is the realization in the second quarter was relatively low, obviously, compared to benchmark, and I know you had some carry over tons.  But the last quarter, you talked about signing deals of 330 and 275 for PCI and things like that.  So, just wondering, then you only have carryover at 270 and 260.  I was just wondering what happened.  Did you have to take discounts for the benchmark, or what happened that your prices are well below what the benchmarks are, even in the carryover from second to third quarter?
>
> Mike Madden – Walter Energy Inc., SVP, Sales & Marketing:
>
> Hi, David.  This is Mike Madden.  In Q2 we had a little over 700,000 tons of carryover which was brought forward from Q1, and as you know, the pricing in Q1 was around 225 level benchmark.  And then **we had intermingled in the first 6 months of calendar year 2011, we had some 6-month deals which were booked in January, so we got the benefit of those in Q1 but we lost the benefit in Q2**.

140.     Demonstrating the inadequacy of Defendants' April 2011 disclosures, Defendant

Leonard detailed the effects that the 2Q11 carryover tonnage would have on Walter's 3Q11

results, stating, in pertinent part:

> Jim Rollyson - Raymond James & Associates, Analyst:
>
> Okay.  And, then Joe, last couple quarters you have a little bit of carryover
> tonnage just given some of the volume shortfalls.  I presume that might be the
> case going into the third quarter, just wanted some color on carryover tons,
> pricing, and what's open for Q3 and Q4.
>
> Joseph Leonard - Walter Energy Inc., Interim CEO:
>
> I can go ahead and take that.  It's -- we have 706 -- actually 600,000 tons at prices
> of $270 per ton carrying over from Q2 to Q3 and that's within the US.  And then
> within the Canada UK operations, we have approximately 300,000 tons at a
> carryover price of approximately $260 per ton.

141.     Market analysts expressed concern over the integrity of the Company's

disclosures and the adequacy of its financial controls during the August 4 Conference Call.  For

example, Mark Russo from Millennium Partners stated, in pertinent part:

> I was wondering if you could help me understand a few things.  I don't think
> anybody's asked the question.  **First is if we could get a real update on what
> happened with [respect to Keith Calder's resignation].**  The second I guess is a
> question for Joe [Leonard], and if there is [sic] any Board members on **how we
> are supposed to -- as shareholders have faith in your outlook in the business
> plan and financial controls when there was no update mid-quarter on
> anything that happened with this, when you were drastically different than
> what we heard on the call last time**?  And how we are supposed to have faith in
> your outlook on the tons when you haven't hit the tons going all the way back to
> 2008. Thanks.

142.     Defendant Scheller's response to Mr. Russo's questions concerning the

Company's failure to disclose the pricing and production issues that negatively impacted

Walter's 2Q11 results effectively conceded that Defendants were not as forthcoming as they

should have been during the Class Period.  Although Defendant Scheller and the Company's

Board of Directors knew of the 2Q11 production shortfall in July 2011 and determined not to disclose it, Defendant Scheller stated:

> **Yes, as far as the updates go, I think in retrospect we should have come out with a mid-quarter update. If we had, under my watch which started today, if we have misses or productions [sic], I can assure you we will do that.** You know, we've had some very tough mining conditions in both Canada and Alabama that were not predictable, so we've had to deal through that. I think if you look at our track record of shareholder value creation, we are the best in the industry. Both since 2007 and in the last 12 months. Though we have to deal with turmoil from time to time, our track record is unsurpassed and something we are very proud of.

*      *      *

> Mark Russo - Millennium Partners, Analyst:

> So, I guess going forward we should expect interim updates if there is [sic] any doubts that -- because while I understand what you're saying, outside of what happened with Keith [Calder] and a few other people, the senior leaders of the Company have been in place for a very long time. **They did not update us on any of this at all. Which is the responsibility of the Board, and Joe, you've been involved prior to this as well.**

> Walt Scheller - Walter Energy Inc., President - US Operations:

> **I can assure you on my shift we will make sure that there are not any surprises as we move forward.**

143.    In response to the Company's announcement of its 2Q11 results and the explanations for those disappointing results that Defendants provided during the August 4 Conference Call, the price of Walter common stock plummeted *30%*, from $110.48 per share on August 3, 2011 to close at $77.89 on August 4, 2011, removing a portion of the artificial inflation from the Company's stock price.

144.    While the Company's disclosures in ¶¶ 133, 140, 142 above revealed information that was concealed from investors during the Class Period, Defendants' statements were still materially misleading when made because, among other things, Defendants failed to disclose the extent to which the negative effects of production and operational problems experienced, but

- 52 -

concealed, in 2Q11 would impact Walter's performance and results for the remainder of the year. In particular, Walter concealed and failed to disclose the extent of the production setback at Mine No. 7 resulting from the squeeze events encountered during 2Q11 and likewise failed to disclose the magnitude of the production impact caused by the inadequacies of the Connector Road and delays in the expansion of the Willow Creek mine to process and off-load coal.

145.     Securities analysts who followed Walter universally expressed alarm over the Company's results, viewing Walter's disclosures as a complete surprise and expressing shock that Company management had not issued an update during 2Q11.  For example:

BB&T Capital Markets (August 4, 2011):

WLT: ABYSMAL QUARTER; DISCLOSURE LACKING

Key Points

- **TERRIBLE QUARTER; WORSE DISCLOSURE**.  We suspected it would be a challenging, below consensus quarter.  **What we got was something far worse**. Last night after the bell, WLT reported Q2 adjusted EPS of $2.36 versus our estimate of $3.90 and consensus of $3.98.  EBITDA was equally poor at $276.6M (BB&T=$400.8M; consensus=$424.4M).  **The miss was all over the place**, but we highlight the top line, where revenues of $773.0M compared to our forecast of $868.4M and consensus of $914.5M.  Production was challenged by a myriad of issues, including geological issues in Alabama and weather-related disruptions in both Alabama and Northeast British Columbia.  This affected costs, which appeared to blow out in Canada.  From our vantage point, neither the geological issues nor the weather-related disruptions were shocking.  **What was shocking was the magnitude of the miss**.  **Moreover, the complete revamping of how WLT discloses its financial results (i.e. no more Mine No. 4 and Mine No. 7 production and cost results) was a big surprise and a major disappointment from our perspective**.  We thought the company took a step backward in that regard.

- **COMPANY REDUCES 2H'11 SHIPMENT GUIDANCE**.  In conjunction with the Q2 release, management also lowered 2H'11 met coal shipment guidance. Total met sales for the back half of the year are now expected to be 5.9M metric tons.  We were modeling the equivalent of 7.8M metric tons.

Scotia Capital (August 4, 2011):

Q2/11 - Significant Miss Can Be Attributed to Carryover Tonnes

- Walter Energy reported adjusted Q2/11 earnings of EPS of US$2.46, well below both our estimate of US$4.21 and consensus at US$3.98/share.  Reported earnings of US$1.71 per share included a number of non-recurring items, mostly related to the Western Coal acquisition which closed early in the quarter.

- **Production was below estimates**, sales volumes were in line.  Walter reported production of 3.4Mt coal in the quarter, slightly below our estimate of 3.7 Mt.  Sales were 3.7Mt in Q2, in line with our expectations.

- **Selling prices were well below expected levels.**  Although Walter Energy typically sells hard coking coal at about the Australian prime hard coking coal benchmark price, **realized prices in the current quarter were well below the Q2/11 US$325/t benchmark**.

  - **U.S. Operations suffered from significant carryover tonnage at Q1 prices.  Hard coking coal from the Alabama Underground Operations sold at an average price of US$236/t, versus the benchmark of US$325/t and our estimate of US$308/t.  Management commented on the conference call that ~700,000 tonnes were brought forward from Q1/11, noting the benchmark price in Q1 was US$225/t.  As illustrated in Exhibit 2, Walter Energy U.S. Underground Operations realized prices have historically been at or near the benchmark price; the low realized prices in the current quarter are uncharacteristic for the operations.**

  - **Canadian and U.K. Operations were also weaker than expected.  Metallurgical coal** (hard coking coal + PCI coal) from the Canadian and U.K. Operations **sold at US$232/t, versus our estimate of US$288/t**.  We believe the variance to our estimates is likely attributable to both product mix (i.e., a higher percentage of sales were PCI coal) and due to carryover tonnage obligations.

KeyBanc Capital Markets (August 4, 2011):

WLT stated that it would issue business updates going forward if additional negative developments unfold at any of its core operations.  **This is likely in response to investors' frustration at the surprisingly poor results at the Canadian mines, about which no update was given ahead of the 2Q release**.  Analysts and investors were caught off-guard by the numerous and costly weather related challenges that were outlined in last night's release.

146.    On August 9, 2011, Walter filed its Form 10-Q for the quarter ended June 30, 2011 (the "2011 Q2 Form 10-Q") with the SEC, which was signed by Defendant Leonard.

147.    In its 2011 Q2 Form 10-Q, Walter made the following representation concerning the Company's anticipated metallurgical coal sales for the remainder of the year:

**2011 Full-Year Business Outlook**

We currently expect second half 2011 metallurgical coal sales of approximately 5.9 million metric tons. We expect annual metallurgical coal sales to grow by approximately 50% by the end of 2013.

148.    The statement in ¶ 147 above was materially misleading and lacked a reasonable basis when made because, among other things, it failed to disclose the extent to which the negative effects of production and operational problems experienced, but concealed, in 2Q11 would impact Walter's performance and results for the remainder of the year.  In particular, Walter concealed and failed to disclose the extent of the production setback at Mine No. 7 resulting from the squeeze events encountered during 2Q11 and likewise failed to disclose the magnitude of the production impact caused by the inadequacies of the Connector Road and delays in the expansion of the Willow Creek mine to process and off-load coal.  Based upon the then-present impact of these ongoing issues, Walter belatedly lowered its metallurgical coal sales guidance on September 21, 2011, as alleged below.

149.    The Company's 2011 Q2 Form 10-Q also failed to disclose material information required to be disclosed pursuant to controlling SEC rules and regulations.

150.    As alleged above in ¶¶ 117-119, Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K) discuss, among other things, "**material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition**."

151.    Defendants violated the affirmative disclosure duties imposed by Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose, among other things, the following material information in the Company's 2011 Q2 Form 10-Q:  (1) the continuing negative production impact resulting from squeeze events at its "flagship" Mine No. 7 in Alabama, which had caused the mine to shut down for extended periods of time beginning in March or April 2011; and (2) the continuing negative impact of production impairments resulting from the combination of the hauling limitations associated with the Connector Road that was purportedly "in service" and the failure to obtain the expansion permits for the Willow Creek processing facility that Defendants stated during the April 21 Conference Call were expected "soon" and "shortly."

152.    The foregoing concealed facts were required to be disclosed because they were, among other things:  (1) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (2) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and (3) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

**B.      Walter Belatedly Lowers Its Guidance For the Remainder of 2011
         Based Upon 2Q11 Coal Production Issues**

153.    On September 12, 2011, Walter issued a press release announcing that Defendant Scheller had been elected by the Company's Board of Directors to serve as Walter's CEO, replacing Defendant Leonard, stating, in pertinent part, as follows:

> Walter Energy, Inc. (NYSE: WLT) (TSX: WLT), the world's leading publicly traded "pure play" producer of metallurgical coal for the global steel industry,

announced today that it has named Walter J. "Walt" Scheller III chief executive officer and has elected him to its Board of Directors, effective immediately.

Scheller, 50, was previously President - U.S. Operations, and since joining the Company in June 2010 he has been a key member of the team instrumental in accomplishing a number of milestone initiatives, including the acquisition of Western Coal and the addition of an estimated 68 million metric tons of neighboring metallurgical coal reserves at the Company's Alabama operations.

154.    On September 21, 2011, Walter issued a press release announcing its "enhanced" disclosure of its 2Q11 results and 2011 second half sales expectations, stating, in pertinent part, as follows:

To help investors better understand Walter Energy, the Company has expanded its historical statistical disclosure and reformatted it to better describe its current business segments and to provide information by product for the second quarter forward. For the third and fourth quarters of 2011, the Company is also providing specific guidance for operating income, net income and earnings per share, on a one-time basis.

Walter Energy's consolidated operating income is expected to be between $125 million and $145 million for the third quarter of 2011 and between $255 million and $295 million for the fourth quarter. Consolidated net income is expected to be between $63 million and $73 million for the third quarter and between $165 million and $185 million for the fourth quarter of 2011. Earnings per share is expected to be between $1.00 and $1.16 in the third quarter and between $2.63 and $2.95 for the fourth quarter of 2011.

155.    The foregoing results and expectations were materially worse than those disclosed on August 3, 2011 due to the concealed and continuing effects of the production and operational problems experienced in 2Q11.

156.    The September 21, 2011 press release revealed additional information concerning the production problems experienced in Alabama and Canada during the Class Period and how those problems adversely impacted Walter's 2Q11 results and results going forward. For example, Defendant Scheller revealed that Walter would not begin to recover from the 2Q11 production problems until after the end of 2011, stating, in pertinent part:

Walter Energy is making solid operational progress despite a slower than expected recovery from the 100-year record rainfall experienced in Northeast British Columbia during the second quarter as well as recovery from the difficult geology at Mine No. 7 in Alabama. **These events will cause a delay in the Company's anticipated growth in production and associated improvement in costs.** However we see early recovery today and expect clear improvement beginning in 2012. Longer term, Walter continues to target strong growth in metallurgical production by the end of 2013.

In the first half of 2011, Walter Energy and Western Coal sold just under 5.2 million metric tons of metallurgical coal (including pre-acquisition sales of Western in the first quarter 2011) and, even with the delayed recovery, we still anticipate a similar level of metallurgical coal sales in the second half of the year of slightly over 5.2 million metric tons. The previous metallurgical coal sales guidance for the second half of 2011 was 5.9 million metric tons.

\*        \*        \*

**In Alabama at Mine No. 7 we are pleased that we continue to progress through the area of difficult geology, albeit at a slower pace than first anticipated, and we have not encountered further squeeze conditions.** However, our cutting rate over the last 30 days has only averaged approximately 20 feet per day, which is less than the 35 feet per day estimate we had previously assumed. We currently expect to advance through this area and return to normal cutting rates of 45-50 feet per day by mid-October. In addition, we are simultaneously installing a new set of 1,350 ton shields in the new E panel of the mine that are 50% stronger than the current shields in operation. This new E panel of the mine is now scheduled to add production beginning in November.

157.    In addition, Defendant Winkelmann revealed that the Connector Road was "now operational," but was experiencing ongoing, less than favorable hauling rates, notwithstanding the abatement of the adverse weather-related conditions to which Defendants previously attributed the Connector Road's poor hauling rates, stating, in pertinent part, as follows:

In Northeast British Columbia we continue to increase production, but at a rate below our previous expectations. The expansion of the shared wash plant facility that supports the Brule and Willow Creek mines is now scheduled to coincide with the Ridley Terminal rail-car dumping system upgrade. Therefore, we now expect slightly less production in the second half of 2011 than in our previous forecast. **We have also experienced a slower than anticipated improvement in hauling rates along the now operational Falling Creek Connector Road**. But, we expect to see further improvement in hauling rates over the remainder of the year.

158.    The Company also admitted that the Willow Creek mine improvements, which Defendants had previously represented would help drive results in 2Q11, would not take place until the fourth quarter of 2011 and would require a four-week shutdown of Willow Creek to implement:

> The Willow Creek preparation plant upgrade will be completed and commissioned.  This, however, requires a 4-week shutdown, delaying sales of coal from Willow Creek and some delay in sales of coal from Brule.

159.    In response to this announcement, which further revealed the materialization of the risk created by, among other things, the magnitude and effects of the squeeze events at Mine No. 7 and the inadequacies of the Connector Road, the price of Walter common stock declined *11.7%*, from $75.00 per share on September 20, 2011 to $66.25 on September 21, 2011.

160.    Reflecting the reality that the Company's August 3-4, 2011 disclosures concerning production problems at Mine No. 7 and in Canada did not reveal the true impact of those issues on Walter's 2011 performance and results, analysts expressed surprise and concern over the Company's September 21, 2011 announcement.  For example on September 21, 2011, KeyBanc issued a report, stating, in pertinent part:

> **This morning, Walter Energy, Inc. (WLT-NYSE) issued 3Q11 EPS guidance of $1.00-$1.16, dramatically below our 3Q11 estimate of $3.20 and consensus of $3.23.**  Progress resolving its Alabama mines geological issues has been much slower than expected, resulting in much higher than expected mining costs in excess of $100/MT.
>
> We expect a negative reaction to the 3Q11 earnings shortfall, potentially exacerbated by weaker demand commentary from Alpha Natural Resources.
>
> **Specifically, the cutting rate at WLT's No. 7 Alabama mine has been just 20 feet/day over the last month, which compares to the Company's own expectations of 35 feet/day.**  Total 3Q11 expected met coal shipments appear 400,000 metric tons below 2Q11's 2.7 million metric tons. Expected hard coking coal pricing realizations also look a bit lighter than our expectations.
>
> WLT's recently acquired Canadian operations also remain more execution constrained (logistics, capital upgrades, high overburden ratios) than we had

expected, limiting production upside visibility over the next several quarters after several already disappointing quarters.

Accordingly, updated 2H11 met coal sales volume guidance was lowered to 5.2 million from 5.9 million. WLT also indicated 4Q11 EPS guidance of $2.63-$2.95, within our $2.80 estimate and below current consensus of $3.16; the sequential upside implies better hard coking coal production, pricing and lower cash costs across its Alabama footprint.

On the plus side, the Company appears more proactive, issuing updated operational guidance, the lack of which was a sore subject with investors last quarter.  The Company will also enhance operational disclosures more in line with pre-Western reporting practices.  This should play well with long-term investors, who (like us) were disappointed with the opaque reporting style chosen following the Western acquisition that made it more difficult to track performance at individual mining complexes.

161.    Similarly, a report issued by BB&T Capital markets on September 22, 2011

stated:

Due to production delays at both the Alabama underground and Canadian operations, Walter lowered 2H met coal shipment guidance from 5.9M to 5.2M metric tons.  At Mine No. 7 in Alabama, the company had been expecting cut rates of 35 feet/day.  However, recent cut rates have averaged only 20 feet/day.  In Western Canada, the company cited lower than expected hauling rates along the Falling Creek Connector Road and timing issues related to the expansion of the shared wash plant facility that supports the Brule and Willow Creek Mines.  WLT was optimistic with regard to these issues, with new CEO Walt Scheller expecting cut rates at Mine No. 7 to reach 45-50 feet/day by mid- October and for hauling rates to improve in Western Canada throughout the remainder of the year. Nonetheless, **the net effect of lower production is higher costs.  As such, we lower our estimates for 2011.  We also reduce our expectations for 2012 and 2013 to more conservatively forecast production and cost levels.**

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

162.    As alleged herein, Defendants acted with scienter in that Defendants knew, or

recklessly disregarded, that the public documents and statements issued or disseminated in the

name of the Company (or in their own name) were materially false and misleading; knew or

recklessly disregarded that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Walter, their control over, and/or receipt and/or modification of Walter's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

163.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public.  The misrepresentations and omissions of material fact described herein could not have been made during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

164.    Individual Defendants, because of their positions with Walter, controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with, or had access to, copies of the documents alleged herein to be false and/or misleading prior to or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were false and misleading.  As a result, each of these Defendants is responsible for the accuracy of Walter's corporate statements, and each is therefore responsible and liable for the representations contained therein.

165.    In connection with the preparation and dissemination of each of Walter's quarterly earnings releases, the Company's Accounting Department typically prepared and disseminated in Excel format:  (1) a "Flash Report," which contained an overview of the

quarter's preliminary results; (2) preliminary production and financial data; and (3) additional information setting forth the key drivers of the quarter's results.  Based upon this data, which was housed on Walter's computer system in a file called "PR Share," Company Investor Relations personnel prepared drafts of the Company's quarterly earnings releases.  The draft earnings releases were provided to, among other people, the Company's CEO (during the Class Period, Defendants Calder, Leonard, and Scheller) for approval prior to dissemination.

166.    Additionally, Walter's Board of Directors and the president of each Walter subsidiary received draft 10-K and 10-Q filings and had to approve them before they were filed. Furthermore, a group of senior executives also typically met and/or spoke one to two days before the quarterly financial reporting press releases were issued in order to discuss and finalize them. Participants in these meetings and discussions normally included Defendants Leonard and Scheller; VP of Investor Relations Mark Tubb; Director of Forecasting and Planning Carey Reed; Corporate Communications Director Michael Monahan; Treasurer Miles Dearden; Interim CFO Honnold; and General Counsel Cathy Bona.

167.    As alleged herein, during the Class Period, Defendants were aware of the ongoing adverse conditions associated with Mine No. 7 and the Connector Road and that the Company's prior contractual commitments to sell a large volume of coal at substantially lower prices would have a material adverse effect on Walter's operating results during the Class Period.

168.    Prior to and during the Class Period, Walter received numerous citations from the MSHA, including those designated as being significant and substantial, which put the Company on notice of various unsafe roof and ventilation conditions at Mine No. 7.  Defendants chose not to disclose such adverse information and the risks associated with them, and instead proclaimed on April 21, 2011 that Walter remained "on track" for "record production at our No. 7 mine."

169.    The Company also held bi-weekly senior management meetings offsite at a hotel beginning in approximately February 2011.  Participants in these meetings included Defendants Scheller and Winkelmann; Defendant Winkelmann's assistant Melodie Chant; Michael Heller, head of Information Technology; Tina Langford, the acting global head of the Legal Department; and other department heads.  The purpose of the meetings was to discuss general operational updates, such as any difficulties a department was experiencing.

170.    In addition, Defendant Winkelmann participated on weekly conference calls where general operational issues of each Canadian mine were discussed.  Furthermore, the status of Walter's Canadian mine projects, including the permit delays that impacted the Willow Creek mine during the Class Period, were discussed at weekly meetings attended by department heads during the Class Period.  After each meeting, Defendant Winkelmann's assistant, Ms. Chant, would update a task log for each Canadian mine that addressed the ongoing projects at each mine.  The task logs were kept on a shared drive.

171.    Moreover, because the fraud alleged herein relates to the core business of Walter, knowledge of the fraud may be imputed to Defendants.  Given Defendants' knowledge of the Company's prior contractual commitments to sell coal at prices substantially below the 2Q11 benchmark price, the ongoing adverse conditions affecting coal production at Mine No. 7, and the delays in realizing benefits from the Connector Road and the Willow Creek facility, Defendants' positive statements during the Class period alleged herein were made contemporaneously with that knowledge and were materially false and/or misleading when made.

172.    Defendants no doubt knew of the production problems at Mine No. 7 given the importance of the mine to Walter's operations.  For example, the Company refers to Mine No. 7

- 63 -

as "our flagship operation" and states that "[s]lightly more than one-third of [Walter's 2012]

growth is anticipated to come from Mine No. 7 in Alabama" in its 2011 Annual Report to

Shareholders.

173.     Pursuant to the Sarbanes-Oxley Act of 2002, Walter's 2011 Q1 Form 10-Q

included the following representations about the Company's disclosure controls and Defendant

Calder's certification thereon:

> I, Keith Calder, certify that:
>
> 1.     I have reviewed this quarterly report on Form 10-Q of Walter Energy, Inc.;
>
> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of

the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

174.     Walter's 2011 Q2 Form 10-Q included the same representations about the Company's disclosure controls that were made in the Company's 2011 Q1 Form 10-Q, and Defendant Leonard's certification thereon was substantially identical to the certification that Defendant Calder signed in the Company's 2011 Q1 Form 10-Q.

175.     The scienter of the Defendants is further underscored by the Sarbanes-Oxley mandated certifications of Defendant Calder and Defendant Leonard, in which each acknowledged his responsibility to investors for establishing and maintaining controls to ensure that material information about Walter was made known to him and that the Company's disclosure-related controls were operating effectively.

VIII.        LOSS CAUSATION

176.    As described herein, during the Class Period, Defendants engaged in the fraudulent scheme, and made or caused to be made a series of materially false and misleading statements about Walter and its operating performance.

177.    The scheme, including the material misstatements and omissions alleged herein, had the cause and effect of creating in the market an unrealistically positive assessment of Walter's business and its financial performance, thus causing Walter's common stock to be overvalued and artificially inflated during the Class Period.  Defendants' scheme, including the alleged materially false and misleading statements during the Class Period, resulted in Lead Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices.

178.    As alleged above, the declines in the price of Walter's common stock on August 4, 2011 and September 21, 2011, after the adverse disclosures and materialization of concealed risks associated with Walter's prior contractual commitments, production issues at Mine No. 7, and inefficiencies of the Connector Road came to light, were the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.

179.    On August 3, 2011, Walter issued a press release setting forth its results for the second quarter of 2011, which Defendants discussed on the August 4 Conference Call.  As alleged herein, the Company disclosed reported net income of $107.4 million, or $1.71 per diluted common share, which was significantly less than Wall Street estimates, based upon the significant volume of coal sold at lower 1Q11 prices, production issues plaguing Mine No. 7, and production issues arising from problems with the Connector Road and the delays in obtaining permits for the expansion of the Company's Willow Creek mine.  In response to these announcements of previously misrepresented and concealed material facts, the price of Walter

common stock declined by *30%*, from $110.48 per share on August 3, 2011 to $77.89 on August 4, 2011, removing a portion of the artificial inflation from the Company's stock price.

180.    On September 21, 2011, the Company issued a press release lowering its guidance for the remainder of 2011 based upon the same issues that had negatively affected the Company's 2Q11 results, namely production issues plaguing Mine No. 7, and production issues arising from problems with the Connector Road and the delays in the expansion of the Company's Willow Creek mine.  In response to this announcement of previously misrepresented and concealed material facts, the price of Walter common stock declined *11.7%*, from $75.00 per share on September 20, 2011 to $66.25 on September 21, 2011.

181.    The timing and magnitude of the price decline in Walter's common stock negates any inference that the losses suffered by Lead Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Walter's common stock and the subsequent significant decline in the value of Walter's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

182.    As a result of these revelations, and the corresponding drops in the price of Walter's common stock, Lead Plaintiffs and other Class members have suffered economic loss.

## IX.        THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE APPLIES

183.    At all relevant times, the market for Walter common stock was an efficient market for the following reasons, among others:

> (a)     Walter common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient electronic stock market;

(b)     as a regulated issuer, Walter filed periodic public reports with the SEC and the NYSE;

(c)     Walter regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Walter was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

184.    As a result of the foregoing, the market for Walter common stock promptly digested current information regarding Walter from all publicly available sources and the prices of Walter common stock reflected such information.  Based upon the materially false and misleading statements and omissions of material fact alleged herein, Walter common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and other members of the Class purchased Walter common stock relying upon the integrity of the market price of Walter common stock and market information relating to Walter.

185.    Under these circumstances, all purchasers of Walter common stock during the Class Period suffered similar injuries through their purchases of Walter common stock at artificially inflated prices, and a presumption of reliance applies.

## X.      THE STATUTORY SAFE HARBOR IS INAPPLICABLE

186.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Walter who knew that those statements were false when made.

## XI.        CLASS ACTION ALLEGATIONS

187.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all those who purchased Walter common stock during the Class Period.  Excluded from the Class are Defendants, members of Defendants' immediate families, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

188.    The members of the Class are so numerous that joinder of all members is impracticable.  At the end of the Class Period, approximately 62 million shares of Walter common stock were outstanding and actively traded on the NYSE.  The precise number of Class members is unknown to Lead Plaintiffs at this time, but is believed to be in the tens of thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Walter or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

189.    Lead Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Lead Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

190.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by, or chargeable to, Defendants. Lead Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

191.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged.  Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

192.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to members of the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants' statements issued during the Class Period were materially false and misleading; and

(c)    the extent of injuries sustained by members of the Class and the appropriate measure of damages.

**XII.      CAUSES OF ACTION**

## COUNT I

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

193.     Lead Plaintiffs incorporate by reference and reallege all preceding paragraphs as fully set forth herein.  This claim is asserted against all Defendants.

194.     During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges to make the materially false and misleading statements and omissions of material fact alleged herein to:  (1) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (2) artificially inflate and maintain the market price of Walter common stock; and (3) cause Lead Plaintiffs and other members of the Class to purchase Walter common stock at artificially inflated prices that did not reflect their true value.  In furtherance of their unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

195.     While in possession of material adverse, non-public information, Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges:  (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Walter common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued as primary participants in the wrongful conduct alleged herein.

196.     By virtue of their high-level positions at the Company during the Class Period, each Individual Defendant was authorized to make public statements, and made public statements during the Class Period on Walter's behalf.  Each Individual Defendant was privy to and participated in the creation, development and issuance of the materially false and misleading statements alleged herein, and/or was aware of the Company's and other Defendants' dissemination of information to the investing public he either knew, or recklessly disregarded, was materially false and misleading.

197.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01 et seq.) and Regulation S-K (17 C.F.R. Section 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations so that the market price of the Company's common stock would be based on truthful, complete and accurate information.  Defendant Calder and Leonard also had duties under the Sarbanes-Oxley Act of 2002 to ensure that Walter's Forms 10-Q filed with the SEC did not misrepresent or omit any material facts.

198.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were done knowingly or recklessly, and for the purpose and effect of concealing the truth with respect to Walter's operations, business,

performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

199.     The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Walter's common stock during the Class Period.  In ignorance of the fact that the market prices of Walter's common stock were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, and on the integrity of the market in which the Company's common stock trades, or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and other members of the Class purchased Walter's common stock during the Class Period at artificially inflated prices. As the truth eventually emerged, the price of Walter's common stock declined.

200.     At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and other members of the Class and the marketplace known the truth with respect to the business, operations, performance and prospects of Walter, which was concealed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased Walter's common stock, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

201.     By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

202. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

203. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Claim is asserted against each of the Individual Defendants.

204. During the Class Period, each of the Individual Defendants was a senior executive officer and/or director of Walter and was privy to confidential and proprietary information concerning Walter and its business, operations, performance and prospects, including its compliance with applicable federal, state and local laws and regulations.

205. Defendant Calder served as Walter Energy's CEO between April 12 and July 31, 2011. Defendant Scheller served as the President of Walter's U.S. Operations until September 12, 2011, when he was appointed as Walter's CEO and elected to the Company's Board of Directors. Defendant Winkelmann, at all relevant times, served as the President of Walter's Canadian and European operations. Defendant Leonard served as a member of Walter's Board at all relevant times and became Walter's interim CEO between July 31, 2011 and September 12, 2011.

206. Because of their high-level positions at Walter, the Individual Defendants had regular access to non-public information about its business, operations, performance and prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings

- 74 -

and meetings of the Company's Board of Directors and committees thereof, and reports and other information provided to them in connection therewith.

207.    Each of the Individual Defendants acted as a controlling person of Walter within the meaning of §20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the various statements Lead Plaintiffs allege were materially false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

208.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

209.    As set forth above, Walter and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, and their participation in the underlying violation of §10(b) and Rule 10b-5, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs

and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**XIII.      PRAYER FOR RELIEF**

       **WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

       A.      Declaring this action to be a class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

       B.      Awarding Lead Plaintiffs and other members of the Class damages together with interest thereon;

       C.      Awarding Lead Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

       D.      Awarding Lead Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

**XIV.      JURY TRIAL DEMANDED**

       Lead Plaintiffs hereby demand a trial by jury.

DATED:  August 20, 2012          KESSLER TOPAZ MELTZER
                                                     & CHECK, LLP
                                         ANDREW L. ZIVITZ
                                         JOHNSTON de F. WHITMAN, JR.
                                         JOHN J. GROSS
                                         MEREDITH L. LAMBERT

                                         <u>   s/ JOHNSTON de F. WHITMAN, JR.   </u>
                                           JOHNSTON de F. WHITMAN, JR.

                                         280 King of Prussia Road
                                         Radnor, PA 19087
                                         Telephone: 610/667-7706
                                         610/667-7056 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ANDREW J. BROWN
X. JAY ALVAREZ
MATTHEW I. ALPERT
JENNIFER L. GMITRO
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

*Co-Lead Counsel for Lead Plaintiffs*

WARD & WILSON, LLC
PATRICK C. COOPER (ASB-4959-077P)
2100 Southbridge Parkway, Suite 580
Birmingham, Alabama 35209
Telephone:  205/871-5404
205/871-5758 (fax)

*Liaison Counsel for Lead Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document via the United States Postal service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 20, 2012.

s/Johnston de F. Whitman, Jr.
JOHNSTON DE F. WHITMAN, JR.
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jwhitman@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs*

# Mailing Information for a Case 2:12-cv-00281-VEH

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Bruce D Angiolillo**
  bangiolillo@stblaw.com

- **Jeffrey A Berens**
  jeff@dyerberens.com

- **Patrick C Cooper**
  patrickccooper@yahoo.com

- **Diandra S Debrosse**
  ddebrosse@gtandslaw.com

- **Jay M Ezelle**
  JEzelle@starneslaw.com

- **Michael I Fistel , Jr**
  mfistel@holzerlaw.com

- **Michael Anthony Florie**
  MFlorie@starneslaw.com

- **John J Gross**
  jgross@ktmc.com

- **Meredith L Lambert**
  mlambert@ktmc.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com

- **Stephen A Sistrunk**
  sas@starneslaw.com

- **James S Ward**
  jward@wardwilsonlaw.com

- **Johnston De F Whitman , Jr**
  jwhitman@ktmc.com

- **Alfred G Yates , Jr**
  yateslaw@aol.com

- **Andrew L Zivitz**

azivitz@ktmc.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Shannon P Torres**
SIMPSON THACHER AND BARTLETT LLP
425 Lexington Avenue
New York, NY 10017

**George S Wang**
SIMPSON THACHER AND BARTLETT LLP
425 Lexington Avenue
New York, NY 10017