FILED

2012 Oct-04  PM 05:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| In re WALTER ENERGY, INC. SECURITIES LITIGATION | Master File No. 2:12-cv-00281-VEH |
| This Document Relates To: ALL ACTIONS. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Michael A. Florie (ASB-7356-I53M)
Jay M. Ezelle (ASB-4744-Z72J)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, Seventh Floor
Birmingham, Alabama 35209
Telephone: (205) 868-6000
Fax: (205) 868-6099

Bruce D. Angiolillo (pro hac vice)
George S. Wang (pro hac vice)
Shannon P. Torres (pro hac vice)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone: (212) 455-2000
Fax: (212) 455-2502

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT................................................................1

STATEMENT OF FACTS ...................................................................3

    A.    Walter's Business ...............................................3

    B.    Summary of Plaintiffs' Allegations ..................................4

ARGUMENT ...........................................................................10

I.    Plaintiffs' Section 10(b) Claim Should Be Dismissed Because The Complaint Fails To Allege With Particularity Any Material Misstatement Or Omission ........................................................11

    A.    None Of The Challenged Statements In The Complaint Contains A Material Misstatement Or Omission..............................11

    B.    The Alleged Misstatements Are Inactionable Because They Are Forward-Looking Statements Protected By The PSLRA Safe Harbor And The Common Law "Bespeaks Caution" Doctrine ........16

II.    Plaintiffs' Section 10(b) Claim Should Be Dismissed Because The Complaint Fails To Allege Facts Sufficient To Create A Strong Inference Of Scienter..................................................19

III.    Plaintiffs' Section 10(b) Claim Should Be Dismissed Because The Complaint Fails To Plead Loss Causation...................................23

IV.    Plaintiffs' Section 20(a) Claim Fails Because It Depends On Their Faulty Section 10(b) Claim.........................................25

CONCLUSION ..................................................................25

# TABLE OF AUTHORITIES

## Cases

*AAL High Yield Bond Fund v. Ruttenberg*, 2001 WL 34372980 (N.D. Ala. Sept. 30, 2001) ................................................................22

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (U.S. 2009).......................................................13

*City of Phila. v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001) ............................20

*Davis v. Williams Commc'ns., Inc.*, 258 F. Supp. 2d 1348 (N.D. Ga. 2003).......................................................................................................2, 3

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978)........................................................20

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .................................. 10, 23, 24

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783 (11th Cir. 2010)............................................................ 19, 25

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253 (M.D. Fla. 2009) ...........................................................23

*Ehlert v. Singer*, 245 F.3d 1313 (11th Cir. 2001) ..................................................18

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ..................................................2

*FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011) .................................................................................... 21, 24, 25

*Garfield v. NDC Health*, 466 F.3d 1255 (11th Cir. 2006) ......................... 11, 14, 21

*Harris v. IVA Corp.*, 182 F.3d 799 (11th Cir. 1999) .................................. 3, 17, 18

*Higginbotham v. Baxter*, 495 F.3d 753 (7th Cir. 2007) .........................................22

*Hoffman v. Comshare, Inc.*, 183 F.3d 542 (6th Cir. 1999) ....................................14

*In re AFC Enterp., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363 (N.D. Ga. 2004)..............................................................................................23

*In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009 (C.D. Cal. 2008) .............................................................................................................5

*In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 531 (D.N.J. 1999) ................................................................................23

*In re Century Aluminum Co. Sec. Litig.*, No. C 09-1001 SI, 2011 WL 830174 (N.D. Cal. Mar. 3, 2011) ........................5

*In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897(HB), 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009)...................23

*In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336 (N.D. Ga. 2010)...........................................................20

*In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566 (S.D.N.Y. 2010) ................................................................................5

*In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512 (S.D.N.Y. 2012)........................................3, 5

*In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) .................................................15, 23

*In re Nuvelo, Inc., Sec. Litig.*, No. C 07-4056 VRW, 2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) .................................3

*In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009) ...............................................................21

*In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339 (N. D. Ga. 2010)....................................................9, 18

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)....................................21

*Kavowras v. New York Times Co.*, 328 F.3d 50 (2d Cir. 2003) ...........................2, 3

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)...............................24

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008)................. 20, 21, 22

*Novak v. Kasaks*, 261 F.3d 300 (2d Cir. 2000)....................................20

*Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004) ................................................................................22

*S.E.C. v. Merchant Cap.*, 483 F.3d 747 (11th Cir. 2007) ......................17

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co. Inc.*, 75 F.3d 801 (2nd Cir. 1996)........................................15

*Skubella v. Checkfree Corp.*, No. Civ. A.1:07-CV-796 (TWT), 2008 WL 1902118 (N.D. Ga. Apr. 25, 2008)....................................18

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008) ........................................................................................10

*Stransky v. Cummins Engine Co.*, 51 F.3d 1329 (7th Cir. 1995) ...........................15

*Teachers' Retirement System of LA v. Hunter*, 477 F.3d 162 (4th Cir. 2007) ....................................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)..........................................................................................3, 10, 19

*Thompson v. RelationServe Media, Inc.*, 610 F.3d 628 (11th Cir. 2010) ....................................................................................19, 22, 25

## Statutes

15 U.S.C. § 78u-4(b) ...................................................................1, 10, 11

15 U.S.C. § 78u-5 .........................................................................2, 9, 17

30 C.F.R. 70.207 ...................................................................................6

Fed. R. Civ. P. 12(b)(6) ........................................................................1

Fed. R. Civ. P. 9(b)...........................................................................1, 10

Defendants Walter Energy, Inc. ("Walter" or the "Company") and Keith Calder, Joseph Leonard, Walter Scheller and Neil Winkelmann (collectively, the "Individual Defendants") respectfully submit this memorandum, together with the Declaration of Jay M. Ezelle and the exhibits annexed thereto, in support of their motion to dismiss the Consolidated Amended Class Action Complaint (the "Complaint") pursuant to Rule 12(b)(6), Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

Plaintiffs have failed to allege any viable securities claim. Their Complaint theorizes that Walter Energy, Inc. misled the market principally by making misleading forward-looking statements in mid-April 2011 about what coal prices and production were expected to be in the second quarter 2011 ending June 30, 2011 (Q2 2011). The Complaint also takes issue with the Company's statements about when it anticipated Canadian governmental permits to be issued and when a Canadian road connecting two mines would be fully up and running. None of Plaintiffs' claims is well-pleaded.

*First*, each of the statements was in fact true at the time it was made. Plaintiffs focus on the Company's statements that it had settled Q2 2011 coal prices in line with markets at record levels. *See, e.g.*, Compl. ¶ 40. But they are unable to identify anything false about these statements. Plaintiffs also claim that

Walter's projections for coal production were overstated, principally because of undisclosed squeeze events ongoing at the Company's Mine No. 7 as of the Company's April 20 and 21 statements.[1]  *See, e.g.*, *id.* ¶ 51.  But that allegation too is demonstrably false because publicly available Mine Safety and Health Administration ("MSHA") documents[2] show that Mine No. 7 was fully operational as of April 21 and the squeeze events did not begin until later.

*Second*, most of these statements were forward-looking statements and, thus, are inactionable under the PSLRA's safe harbor.  *See* 15 U.S.C. § 78u-5(c)(1).

*Third*, the Complaint fails to plead scienter – *i.e.* a "mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  This element of intent is what distinguishes securities fraud from non-actionable "fraud by hindsight."  Companies are managed by humans, not clairvoyants.  Here, there is no allegation of insider sales, the quintessential scienter allegation.  Plaintiffs allege no facts showing that any of the Defendants knew or should have known that any statement was false or misleading when made.  They cannot because the events that caused Walter's operating results for Q2 2011 to be lower than expected occurred ***after*** the statements at issue.

---

[1]     A "squeeze" event is an underground mining condition whereby the weight over the roof of a mine becomes too great for the support structures (also referred to as shields), causing the support structures to compress.   *See* Compl. ¶ 134.

[2]     A court may take judicial notice and properly consider upon a motion to dismiss filings with a government agency.  *See Davis v. Williams Commc'ns., Inc.*, 258 F. Supp. 2d 1348, 1352 (N.D. Ga. 2003); *Kavowras v. New York Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003).

*Fourth*, Plaintiffs fail as a matter of law to allege loss causation – *i.e.* that their losses were caused by a corrective disclosure.  They point to drops in Walter's stock price on two dates, August 4 and September 21, 2011.  But those stock price drops were not attributable to disclosures correcting prior statements, but to new information released on those days about Walter's worse-than-expected performance in Q2 2011 and Q3 2011, respectively.

*Finally*, Plaintiffs' Section 20(a) claim fails as a matter of law because it is entirely derivative of their defective Section 10(b) claim.

For all these reasons, this Court should dismiss the Complaint in its entirety.

## STATEMENT OF FACTS[3]

### A.    Walter's Business

Walter is a leading producer of metallurgical coal ("met" or "hard coking" coal) for the steel industry.  Compl. ¶¶ 2, 30.  Walter produces most of its met coal from two underground mines in Alabama, Mines No. 4 and 7.  *Id.* ¶¶ 43, 45.

---

[3]    Plaintiffs' factual allegations are assumed to be true for purposes of this motion except where those allegations are contradicted by documents incorporated in the Complaint or documents in the public record of which this Court may take judicial notice.  In a securities class action, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Harris v. IVA Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).  Matters of which a court may take judicial notice include filings with a government agency, *see, e.g.*, *Davis*, 258 F. Supp. 2d at 1352; *Kavowras*, 328 F.3d at 57, and news and analyst reports to the extent offered for the purposes of demonstrating the existence of information in the market, *see, e.g.*, *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 526 n.4 (S.D.N.Y. 2012); *In re Nuvelo, Inc., Sec. Litig.*, No. C 07-4056 VRW, 2008 WL 5114325, at *2 (N.D. Cal. Dec. 4, 2008)

Walter sells most of its coal on the seaborne met coal market, in which coal is generally priced on a quarterly basis.  Compl. ¶ 91.  Though many of Walter's contracts to sell coal are annual or semi-annual, prices for the contracted amount are generally "settled" the month before the quarter in question – *e.g.*, Q2 coal pricing (April-June) is set in March.  *Id.*  Realized pricing in any given quarter will routinely differ from settled pricing because tonnage priced and settled for a specific quarter is often not fully delivered during that quarter and results in "carryover" tonnage delivered in a later quarter at prices set in the earlier quarter.  *Id.* ¶ 87.  Walter publicly reported the existence of carryover tonnage in each and every earnings call from at least Q2 2010 through Q4 2011.[4]

### B.   Summary of Plaintiffs' Allegations

On April 20, 2011, Walter issued a press release announcing its first quarter 2011 (Q1 2011) financial results.  Compl. ¶ 40.  On April 21, 2011, Walter held a conference call with analysts and investors.  *Id.*  Plaintiffs allege that investors and analysts were misled about three things:

### 1.   Coal Pricing

Plaintiffs allege that the Company's statements about coal prices in the second quarter 2011 (Q2 2011) were false and misleading.  *See, e.g.*, Compl. ¶ 40.  Specifically, Plaintiffs take issue with the Company's statements that it had settled

---

[4]      *See* Ex. A-1 at 6; Ex. A-2 at 2; Ex. A-3 at 5; Ex. A-4 at 3; Ex. A-5 at 8; Ex. A-6 at 4; Ex. A-7 at 9.  All references to "Ex. __" refer to the exhibits attached to the Ezelle Declaration.

Q2 2011 coal prices in line with markets at record levels nearly 50% higher than the previous quarter.  *Id.*  But Plaintiffs cite nothing that even suggests that Walter's Q2 2011 coal was settled at any other price.  Nor could they.

Plaintiffs claim that the Company's statements about Q2 2011 ***settlement*** prices somehow misled the market into believing that actual ***realized*** pricing would be the same as settlement prices.  *See, e.g.*, *id.* ¶ 93.  In fact, the Company expressly disclosed during the same conference call that Q1 2011 coal pricing was substantially lower than Q2 2011 pricing.  *Id.* ¶ 89.  It was also disclosed and well known that Walter had carryover tonnage from quarter to quarter.  *Id.* ¶ 91.  The market was aware – and analysts expressly reported – that Walter's Q2 2011 ***realized*** prices would fall between Q1 and Q2 ***settlement*** prices.  *See*, *e.g.*, Ex. H at 1 ("***[T]o the extent management provided any pricing guidance on the call, it was only to suggest that Q2 realized prices should be somewhere between the $225/mt Q1 and $330/mt Q2 benchmarks***.");[5] Ex. I at 1 (reporting that Walter's Alabama met coal production for the first half of 2011 "was essentially fully sold out" at the

---

[5]     All emphasis in this brief is supplied, unless otherwise indicated.  As permitted upon a motion to dismiss, Defendants are citing these analyst reports only to demonstrate the existence of information in the market, which is a matter of which the Court can take judicial notice.  *See In re Century Aluminum Co. Sec. Litig.*, No. C 09-1001 SI, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3, 2011) ("[C]ourts routinely take judicial notice of analyst reports, not in order to take notice of the truth of the matters asserted therein, but in order to determine what may or may not have been disclosed to the public."); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 576 (S.D.N.Y. 2010) ("The Court will also take judicial notice, only for the fact of their publication, of statements in MBIA's required SEC disclosures and in news publications and analyst reports that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.") (internal quotation marks omitted); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023-24 (C.D. Cal. 2008); *Merrill Lynch.*, 851 F. Supp. 2d at 526.

start of the year, thus not allowing Walter "*to sell a significant amount of met coal at current benchmark levels of $330/metric ton.*").  In its April 2011 disclosures, Walter never made any predictions on what it anticipated *realized* prices in Q2 2011 would turn out to be.  *See generally* Ex. A-4; Ex. B.

### 2.  Coal Production

Plaintiffs allege that the Company's April 20 and 21 forward-looking statements about projected coal production and about having resolved Q1 2011 production problems were false and misleading because the Q2 squeeze events had already begun and were ongoing.  Compl.  ¶ 102.  Although the Company did encounter two squeeze events at Longwall 2 in Mine No. 7 that resulted in a complete shutdown for several weeks, the squeeze events were *not* ongoing or anticipated at the time of the Company's April 20 and April 21 statements.  Contemporaneously prepared reports filed with and available on MSHA's web site confirm that Mine No. 7 was operating normally as of April 21.  Ex. J.[6]  As the first squeeze event did not begin until the month after the April 20 and 21 statements, no amount of repleading can salvage this allegation.

---

[6]     Entity No. 0190 is Mine No. 7's Longwall 2 (a/k/a East Longwall), where the squeeze conditions occurred as alleged in the Complaint (¶¶ 53, 55).  As shown on www.msha.gov, Walter submitted respirable dust samples for April 10, 11, 13, 14 and 21, 2011.  *See* Ex. J, Operator Dust Sample Results for No. 7 Mine from April 10-21, 2011.  Had Walter already been experiencing squeeze events as of its April 20 and April 21 disclosures, it could not have filed respirable dust samples for those dates because *they could only be taken*, *by federal regulation, during a "normal production shift*."  30 C.F.R. 70.207(a), (d).  Notably, there are no dust samples submitted for Longwall 2 in May or June.

### 3.    Canadian Production

Plaintiffs allege the Company falsely stated on April 21 that (i) its Falling Creek Connector Road (the "Connector Road") was "newly commissioned" and "in service" and that (ii) it expected to receive governmental permits to expand at its Willow Creek facility "shortly." Compl. ¶¶ 103-105.  The very earnings call transcript and materials that the Complaint references demonstrate that the Connector Road was newly commissioned and in service in Q1 2011.  Ex. A-4 at 5; Ex. C at 21.  Further, Plaintiffs do not (and cannot) dispute that weather conditions – including a 100-year rainfall and severe flooding – inhibited the full operation along the Connector Road during Q2 2011.  Ex. A-5 at 5;[7] Ex. E at 1. The Connector Road was later "substantially commissioned" in Q3 2011.  Compl. ¶ 108; Ex. A-6 at 3.  While the Willow Creek permits took longer than expected for the Canadian government to issue, that circumstance was obviously outside of Defendants' control.  Ex. G at 61.  Plaintiffs do not (and cannot) allege that Defendants lacked a good faith belief in April 2011 that the permits would be issued shortly, or that they had not been informed by the government of the same.

---

[7]    The Company explained that:  "The weather issues were particularly severe this year because the road was brand-new.  These roads when you put them in, in this region require a season or two to bed them in and to get the drainage 100% right, to get your maintenance regime on them correct."  *Id.*; *see also* Ex. K at 1 ("The B.C. government says it will take weeks to repair extensive road damage caused by torrential rains in the northeast of the province.  Bridges were washed away, roadbeds crumbled, railway lines were washed out and sinkholes opened in highways across the Peace Region after the deluge . . . .").

4.     **Walter's Cautionary Statements About Forward-Looking Statements**

All of the forward-looking statements cited by Plaintiffs were made during the April 21, 2011 earnings call.  At the outset of that call, *see* Ex. A-4 at 1, Walter expressly incorporated the following explicit warnings in the Company's SEC filings about risk factors that could cause actual results to differ from predictions:

> Coal mining is subject to inherent risks and is dependent upon a number of conditions beyond our control that can affect our costs and production schedules at particular mines.  These risks and conditions include, but are not limited to:
>
> - variations in geological conditions, such as the thickness of the coal seam and amount of rock embedded in the coal deposit;
>
> - mining, process and equipment or mechanical failures;
>
> - adverse weather and natural disasters, such as heavy rains and flooding; . . .
>
> - delays and difficulties in acquiring, maintaining or renewing necessary permits or mining rights . . . .
>
> *        *        *
>
> These forward-looking statements are made based on expectations and beliefs concerning future events affecting us and are subject to uncertainties and factors relating to our operations and business environment, all of which are difficult to predict and many of which are beyond our control, that could cause our actual results to differ materially from those matters expressed in or implied by these forward-looking statements.  These risks and uncertainties include, but are not limited to:
>
> *        *        *
>
> - Concentration of our coal and gas producing properties in one area subjects us to risk . . .

8

- Unavailability of cost-effective transportation for our coal . . . .[8]

### 5.    Scienter Allegations

Plaintiffs rely entirely on broad, conclusory allegations that Defendants, as a group, "knew and/or recklessly disregarded" the alleged misstatements or omissions, *see, e.g.*, Compl. ¶ 163, and that the Individual Defendants' high-level positions within the Company gave them access to material, non-public information through meetings and conference calls. *See, e.g.*, *id*. ¶¶ 27-28.  The only scienter allegations specific to any of the Individual Defendants are:

- Messrs. Calder and Leonard certified certain controls in Walter's Form 10-Q's for Q1 and Q2 2011.  *Id*. ¶¶ 173-75.  But this does nothing to show scienter – *i.e.* intent to deceive Walter's shareholders.

- Defendant Scheller was supposedly notified in July 2011 by an unidentified person, about a shortfall in Q2 2011 production relative to prior projections and the Company decided not to pre-announce this shortfall prior to its regularly scheduled Q2 2011 earnings call held in early August 2011.  *Id*. ¶¶ 7, 63, 128.  As a matter of law, Walter had no duty to update its forward-looking statements about projected production figures before its next end of quarter earnings call.  *See* Point I.A.4, I.B, *infra*.

### 6.    Walter's August and September 2011 Disclosures

On August 3, 2011, Walter issued its Q2 2011 earnings release.  *Id.* ¶ 131.  It held a conference call with analysts the next day.  *Id.* ¶ 133.  In these disclosures,

---

[8]    Ex. F at 1, 25.  For oral statements, "the PSLRA does not require that the cautionary language physically accompany the statement;" rather, the statute permits cautionary language to be incorporated by reference so long as it is "'contained in a readily available written document, or portion thereof,' such as SEC filings . . . ." *In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1350 (N. D. Ga. 2010) (quoting 15 U.S.C. § 78u-5(c)(2)(B)).

Walter discussed the geological and weather challenges that the Company faced in Q2 2011 and reported substantially worse-than-expected financial and operating results for that quarter.  Ex. D; Ex. A-5 at 2-5, 8, 14.

A month and half later, on September 21, 2011, the Company issued a mid-quarter update on Q3 2011 performance, pre-warning the market of worse-than-expected performance in Q3 2011 and Q4 2011.  Compl. ¶ 154; Ex. E.

## ARGUMENT

To state a claim under Section 10(b), Plaintiffs must allege facts sufficient to show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

The PSLRA and Rule 9(b) require Plaintiffs to plead their claims with particularity.  *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 314 (2007). The PSLRA requires, in particular, that "[s]ecurities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15

U.S.C. §§ 78u-4(b)(1), (2)).  Because Plaintiffs have failed to allege several

necessary elements with the requisite specificity required by the PSLRA and Rule

9(b), their claims must be dismissed.

**I.      Plaintiffs' Section 10(b) Claim Should Be Dismissed Because The Complaint Fails To Allege With Particularity Any Material Misstatement Or Omission**

A Section 10(b) complaint must "specify each statement alleged to have

been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief,

the complaint shall state with particularity all facts on which that belief is formed."

*Garfield v. NDC Health*, 466 F.3d 1255, 1262 (11th Cir. 2006) (quoting 15 U.S.C.

§78u-4(b)(1)).  Plaintiffs' Section 10(b) claim fails because (i) the Complaint fails

to allege any material misstatement or omission, and (ii) the alleged misstatements

are forward-looking statements protected by the PSLRA safe harbor and the

common law "bespeaks caution" doctrine.

**A.      None Of The Challenged Statements In The Complaint Contains A Material Misstatement Or Omission**

**1.      The Complaint Fails To Allege Any Material Misstatement Or Omission About Q2 2011 Coal Prices**

Plaintiffs allege that the Company's statement that it had settled Q2 2011

coal prices in line with markets at $326-$330 was false and misleading because it

misled the market into thinking that $326-330 would be the Company's realized

11

prices in Q2 2011 and did not take into account the existence of carryover tonnage from Q1 to Q2 2011.  *See, e.g.*, Compl. ¶ 93.

However, Walter did not offer any predictions on what anticipated realized pricing would be in Q2.  Ex. A-4.  Moreover, Walter ***did*** inform the market that there would be carryover tonnage sold during Q2 at Q1 2011 prices.  *Id.* ¶ 91.  This was a well-known fact for the market because Walter discussed carryover tonnage in each and every quarter between Q2 2010 and Q4 2011.  *See* page 4 & n.4, *supra*.  The market was also informed and aware that realized prices in Q2 2011 would be brought down by carryover sales and would be somewhere between Q1 and Q2 settlement prices, as evidenced by multiple analyst reports.  *See* pages 5-6, *supra*.

Based on the information disclosed by the Company, multiple analysts reported that (i) Walter had disclosed Q2 settlement prices; (ii) "there was ***no disclosure*** around expected 2Q realizations," Ex. H at 1; and (iii) as a result, all that was known was that realized prices would fall somewhere between Q1 and Q2 prices.  *See* pages 5-6, *supra*.  No one was misled.

### 2.    The Complaint Fails To Allege Any Material Misstatement Or Omission About Q2 2011 Coal Production Projections

Plaintiffs allege that the Company made misleading statements about anticipated coal production for the full year 2011 and falsely stated that it was no longer experiencing difficult geological conditions in its Alabama mines.  Compl. ¶¶ 95, 97-101.  Plaintiffs claim these statements were false because they failed to

12

disclose existing and ongoing squeeze conditions.  *Id.* ¶ 102.  These claims rest on Plaintiffs' conclusory (and demonstrably false) assertion that the squeeze conditions experienced at Mine No. 7 had already begun and were ongoing as of April 21.  *Id.*  However, publicly available MSHA records show that Mine No. 7 was operating under normal conditions on April 21.  *See* page 6, *supra*.  In support of Plaintiffs' conclusory assertion about timing, they reference Mr. Scheller's later statement on August 4, 2011.  Compl. ¶ 134.  But Mr. Scheller did ***not*** say that a squeeze event had begun in April:

> However, at Mine Number 7, **beginning in April**, we encountered a massive section of sandstone above the immediate roof.  The long wall shields we have on that panel are rated to 950 tons of support capacity.  When the sandstone failed to break, as expected, its effective weight increased to a point where it exceeded the working capacity of the shields.  *Id.* (emphasis added by Plaintiffs).

As Mr. Scheller explained in the above quote, Walter encountered a massive section of sandstone beginning in April.  *Id.*  It expected the sandstone to break, as stone over a roof typically does, thereby reducing the weight on the support structures.  But, that sandstone later failed to break as expected.  *Id.*  Instead, its weight increased to a point that the shields compressed, *i.e.* causing a squeeze event (in May, which was after the April 21 disclosures).  *Id.*  Thus, there was nothing untrue about any of the statements at the time they were made.[9]

---

[9]  Plaintiffs cannot rest their Section 10(b) claim on conclusory pleadings to the contrary.  *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1953 (U.S. 2009) ("[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.")

### 3. The Complaint Fails To Allege Any Material Misstatement Or Omission About Q2 2011 Canadian Coal Production

Plaintiffs allege that Walter falsely stated in April 2011 that the Connector Road was "in service" and "newly commissioned," when it was not.  Compl. ¶¶ 70, 75, 103-106.  However, Plaintiffs allege no facts to support these allegations.  They point to Walter's 2011 10-K, filed on February 29, 2012, which stated that the road was "substantially commissioned" in the third quarter of 2011.  *Id.* ¶ 108.  But, as explained above on page 7, the fact that the Connector Road was "substantially commissioned" in Q3 2011 does not change the fact that it was, in fact, newly commissioned and in service as of April 2011.[10]

Plaintiffs also make conclusory allegations that Walter falsely stated that permits enabling expansion of production at Willow Creek would be issued "soon"

(quoting *Hoffman v. Comshare, Inc.*, 183 F.3d 542, 553 (6th Cir. 1999)); *Garfield*, 466 F.3d at 1265 ("[C]laims of securities fraud cannot rest on speculation and conclusory allegations."). Plaintiffs also allege that Walter's representations about production at Mine No. 7 were misleading because Walter had been "sanctioned by MSHA for unsafe roof and ventilation conditions at Mine No. 7." Compl. ¶ 60.  However, Plaintiffs do not allege that any of these citations was in any way related to the production shortfall experienced in Q2 2011.  In fact, Plaintiffs themselves plead to the contrary – *i.e.*, that the squeeze events were the cause of the worse-than-expected production at Mine No. 7 in 2Q 2011.  *Id.* at ¶¶ 134-135.

[10]     Plaintiffs also allege that Defendants' statements that the Connector Road would reduce transportation costs and increase production rates were false and misleading because the Connector Road cannot accommodate large 110-ton trucks with 55-ton trailers.  Compl. ¶¶ 71-72, 106.  But Plaintiffs allege no facts to support this bald conclusion.  Notwithstanding that the road supports the larger 110-ton trucks, the lower production figures in Q2 2011 were, as Defendants disclosed in August and September 2011, attributable to flooding caused by the "100-year record rainfall experienced in Northeast British Columbia during the second quarter." *Id.* ¶ 136; Ex. E at 1.  Even if the road did not support 110-ton trucks, that would not logically lead to the conclusion that the Connector Road does not decrease transportation costs.  The road is, in fact, 25 miles shorter (Compl. ¶ 106) and there is no dispute of this efficiency created independent of the size of the trucks that traverse it.

or "shortly."  Compl. ¶¶ 77-79; 105-106.  Plaintiffs, however, offer no particularized facts that Defendants did not believe what was said at the time.

### 4.    The Complaint Fails To Allege Any Statement That Triggered A Duty To Update

Plaintiffs make a passing reference to a duty to update in one paragraph of their Complaint.  Compl. ¶ 110.  As a matter of law, however, Walter had no duty to update its forward-looking statements.  They are inactionable under the PSLRA safe harbor, for the reasons outlined below in Point I.B.[11]  This is doubly so where, as here, Walter expressly informed the public that:  "We have no duty to, and do not intend to, update or revise the forward-looking statements in this release, except as may be required by law."  Ex. B at 3; *see also* Ex. C at 1 (similar statement); Ex. F at 2 (similar statement).

Plaintiffs highlight an alleged statement by Mr. Scheller during the August 4, 2011 earnings call that:  "Yeah, as far as the updates go, I think in retrospect we should have come out with a mid-quarter update if we have them.  Under my watch, which started today, if we have misses or projections, I can assure you we

---

[11]        *See also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co. Inc.*, 75 F.3d 801, 811 (2nd Cir. 1996) (rejecting plaintiffs' argument that defendants' statements projecting continued growth and profitability gave rise to a duty to disclose or update); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 n.9 (7th Cir. 1995) ("A company has no duty to update forward-looking statements merely because changing circumstances have proven them wrong."); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) (timing of updated disclosure is a matter of business judgment).

will do that."[12]  Ex. A-5 at 16; *see* Compl. ¶¶ 9, 62, 80.  This is a statement of a new management's approach to investor relations, not an admission of legal wrongdoing.  The fact that new management decided, from an investor relations perspective, to make additional voluntary disclosures does not mean that there was any legal obligation to provide mid-quarter updates.

> **5.    The Complaint Fails To Allege That August 2011 Statements Were False And Misleading**

Plaintiffs also make conclusory allegations that Walter's August 2011 statements were false and misleading because they failed to foretell that Walter's performance in Q3 and Q4 2011 would be worse than then anticipated.  Compl. ¶¶ 132, 144.  However, the Company fully disclosed all of the information Plaintiffs say was withheld about coal pricing, Mine No. 7 squeeze events, the Connector Road and the Willow Creek permits.  Ex. D; Ex. A-5 at 2-5, 8, 14.  Failure to predict future operating performance does not constitute securities fraud.

> **B.    The Alleged Misstatements Are Inactionable Because They Are Forward-Looking Statements Protected By The PSLRA Safe Harbor And The Common Law "Bespeaks Caution" Doctrine**

Plaintiffs' claims are based on inactionable forward-looking statements.  Forward-looking statements include management's plans and objectives for future operations, statements of future economic performance, and assumptions

---

[12]    Although for purposes of this motion, this statement was attributed to Mr. Scheller, the statement was in fact made by Mr. Leonard, who had recently taken over as CEO.  Compl. ¶ 122.

underlying both.  15 U.S.C. § 78u-5(i)(1).  Here, Plaintiffs allege that Walter's April 2011 statements misled the market about (i) what anticipated *realized* prices would be in Q2 2011, (ii) what Q2 and full-year 2011 coal production would be, and (iii) when the Canadian government would issue governmental permits.  *See, e.g.*, Compl. ¶¶ 93, 102, 106.  These statements were all forward-looking because they related to *future* operations and *future* economic performance and could not be verified at the time that they were made.  *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999).

The PSLRA created a "safe harbor" for forward-looking statements.  15 U.S.C. § 78u-5.  Under this statutory safe harbor, a forward-looking statement cannot give rise to liability under the securities laws if it is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, (ii) immaterial *or* (iii) made without knowledge that the statement is false or misleading.  *Id.* § 78u-5(c)(1).  The "bespeaks caution" doctrine provides the same relief under the common law.  *S.E.C. v. Merchant Cap.*, 483 F.3d 747, 767 n.18 (11th Cir. 2007).

Here, Walter's April 2011 statements were all identified as forward-looking and accompanied by meaningful cautionary language, as identified at pages 8-9 above.  Because this cautionary language conveyed substantive information and

identified the facts that could cause actual results to differ materially from those in the forward-looking statements, the challenged statements are protected under the PSLRA's statutory safe harbor and the bespeaks caution doctrine.

These warnings "t[old] the reader in detail what kind of misfortunes could befall the company and what the effect could be," and constituted meaningful cautionary language, not "mere boilerplate." *Harris*, 182 F.3d at 807. Moreover, "the warnings actually given were not only of a similar significance to the risks actually realized, but were also closely related" to the events that ultimately befell the Company. *Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001) (holding that the PSLRA "does not require that the prospectus list *all* factors that might influence the company's financial future"); *see also Harris*, 182 F.3d at 807 (an investor only need be "warned of risks of a significance similar to that actually realized"). Eleventh Circuit courts have found similar cautionary language to be sufficient under the PSLRA.[13]

These forward-looking statements are also each independently inactionable because the Complaint fails to plead that they were made with actual knowledge

---

[13]     *E.g.*, *Scientific Atlanta*, 754 F. Supp. 2d at 1352 (finding defendant's descriptions of risks such as "uncertainties related to economic conditions, uncertainties related to customer plans and commitments, [and] changes in customer order patterns" to be significant and meaningful where these warnings addressed the general type of risks that were eventually realized – declining demand – as well as the effects of those risks if realized); *Skubella v. Checkfree Corp.*, No. Civ. A.1:07-CV-796 (TWT), 2008 WL 1902118, 8 (N.D. Ga. Apr. 25, 2008) (finding a press release to be sufficiently cautionary when it warned that "the risks and uncertainties in the company's periodic reports 'could cause actual results to differ materially from plans and projections'").

that they were misleading.  *See Goodman Life Income Trust v. Jabil Circuit*, 594 F.3d 783, 795 (11th Cir. 2010) ("allegation of actual knowledge of falsity will not deprive a defendant of protection by the statutory safe harbor if his forward-looking statements are accompanied by meaningful cautionary language").

## II.   Plaintiffs' Section 10(b) Claim Should Be Dismissed Because The Complaint Fails To Allege Facts Sufficient To Create A Strong Inference Of Scienter

The Complaint is devoid of facts sufficient to draw the required strong inference of scienter, a central element of Plaintiffs' Section 10(b) claim.  The PLSRA requires a Section 10(b) plaintiff to "plead ***with particularity*** facts giving rise to a ***strong inference*** that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements."  *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010).[14]  In evaluating scienter pleadings, courts must consider "***all*** of the facts alleged, taken collectively," and must also "take into account plausible opposing inferences."  *Tellabs*, 551 U.S. at 323 (emphasis in original).  To survive a motion to dismiss, the "inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  *Id.* at 314.  Furthermore, a "complaint must

---

[14]      "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Goodman*, 594 F.3d at 790.

allege facts supporting a strong inference of scienter for each defendant with respect to each violation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (internal quotations omitted).

Here, the Complaint does not establish the required "strong inference" of scienter because it does not allege conscious misbehavior or recklessness and improperly relies on pleading fraud by hindsight and group pleading.

Plaintiffs allege little more than that Walter's Q2 2011 results turned out not to be as strong as anticipated in April 2011. But the Company's alleged failure to have predicted this earlier is not fraud. The law does not impose a duty of clairvoyance on management, nor does it permit the pleading of fraud by hindsight. *See In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1360 (N.D. Ga. 2010) ("Plaintiff's reliance upon after-the-fact events (*i.e.*, HomeBanc's ultimate demise) to support an inference that these and other earlier statements must have been intentionally misleading and made with scienter amounts to little more than fraud by hindsight, which is not actionable.").[15]

That some of the Defendants had access to information through regularly scheduled weekly meetings or conference calls and through the Company's shared

---

[15]    *See also City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001) ("Plaintiffs should not be allowed to proceed with allegations of 'fraud by hindsight' . . . . Thus, allegations that defendant should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud") (internal quotations omitted); *Novak v. Kasaks*, 261 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are responsible for revealing those material facts reasonably available to them.") (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)).

electronic files, does not support scienter.  Compl. ¶ 166.  Plaintiffs must plead

with particularity how each defendant was directly informed of information

contradicting the challenged public statements.  *See Garfield*, 466 F.3d at 1265

(concluding that allegations about what was said at a meeting involving senior

executives were insufficiently particularized where the complaint "failed to allege

what was said at the meeting, to whom it was said, or in what context"); *FindWhat*

*Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1303 (11th Cir. 2011); *Mizzaro*,

544 F.3d at 1250; *In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 538

(S.D.N.Y. 2009); *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  The fact that

management held weekly informational meetings and calls simply shows that

Walter had good management practices.  These are not particularized facts giving

rise to a strong inference of scienter.  *See Garfield*, 466 F.3d at 1265 ("[C]laims of

securities fraud cannot rest on speculation and conclusory allegations.").

        Plaintiffs' allegations amount to boilerplate that Defendants "must have

known" what was being said was untrue.  These allegations are legally insufficient

and cannot mask the fact that Plaintiffs are unable to allege any particularized facts

that any of the Defendants actually knew or believed anything being said was false.

*See Mizzaro*, 544 F.3d at 1250 (dismissing Section 10(b) claim where plaintiff

cited "no documentation, communication, or conversation suggesting that the high-

ranking defendants knew anything about the alleged fraud," and argued instead

that "the individual defendants *must have known about it*.") (emphasis in original); *Thompson*, 610 F.3d at 635.

Plaintiffs' general references to the collective "Defendants" underscore their failure to plead scienter because the Complaint does not allege scienter for each Defendant individually.  The Eleventh Circuit requires scienter to be pled "for each defendant with respect to each violation." *Mizzaro*, 544 F.3d at 1255.  "Group pleading" cannot satisfy the rigorous scienter pleading standard because it does not allege particularized facts regarding each specific individual.[16]  The Complaint fails to specify which of the Defendants, if any, had actual knowledge of or was severely reckless with respect to the alleged misrepresentations.[17]

In fact, the Complaint lacks any of the typical allegations of scienter, namely, insider sales and accounting restatements.  "A plaintiff typically alleges scienter by showing an unusual trading pattern by the defendant." *Edward J.*

---

[16]    *See, e.g.*, *AAL High Yield Bond Fund v. Ruttenberg*, 2001 WL 34372980, at *4 (N.D. Ala. Sept. 30, 2001) ("'[G]roup pleadings' are insufficient under the Reform Act; each defendant is entitled to notice of his/her *own* alleged fraudulent statements and/or omissions.") (emphasis in original); *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017-18 (11th Cir. 2004) ("We hold that scienter must be found with respect to each defendant and with respect to each alleged violation of the statute.").

[17]    The Complaint's reliance on an unnamed source (CW-1) purported to be a former Walter employee demonstrates the weakness of Plaintiffs' scienter allegations.  Any allegations from an unnamed source must be discounted because "it is hard to see how information from anonymous sources could be deemed compelling or how [a court] could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying." *Higginbotham v. Baxter*, 495 F.3d 753, 757 (7th Cir. 2007).  In any event, for the reasons discussed above, Defendants had no duty to update. *See* Point I.A.4, I.B, *supra*.  And whatever CW-1 thought about what should or should not have been disclosed in July 2011 has no bearing on, and does not undermine in any way, the truth of the Company's statements made in April 2011.

*Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253,

1288 (M.D. Fla. 2009), *aff'd* 594 F.3d 783 (11th Cir. 2010). Here, there are no

allegations of stock sales or unusual trading by any of the Individual Defendants.

"The absence of stock sales by insiders, or any other evidence of pecuniary gain by

company insiders at shareholders' expense, is inconsistent with an intent to defraud

shareholders." *N. Telecom*, 116 F. Supp. 2d at 462-63. Nor are Plaintiffs able to

allege any accounting restatement here, another way of pleading scienter.[18]

Despite *Tellabs*' clear instruction to "consider plausible nonculpable

explanations for defendant's conduct," Plaintiffs ignore the most obvious, plausible

explanation for why Walter did not disclose the squeeze conditions, Canadian

flooding problems or permitting delays in April 2011 – these events did not occur

until later in time. *See* pages 6-7, *supra*. Plaintiffs' scienter allegations utterly fail

to demonstrate the "strong inference" mandated by the PSLRA.

## III.    Plaintiffs' Section 10(b) Claim Should Be Dismissed Because The Complaint Fails To Plead Loss Causation

To plead a claim under Section 10(b), a complaint must allege a direct

causal connection between a defendant's alleged actionable statements and a

plaintiff's alleged damages. *See Dura*, 544 U.S. 346-47. An "'artificially inflated

purchase price' is not itself a relevant economic loss." *Id.* at 347. This is because

---

[18]     *E.g.*, *In re AFC Enterp., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004); *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897(HB), 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009); *In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 531, 536-38 (D.N.J. 1999).

a decline in stock price can reflect a number of factors other than an alleged prior misrepresentation.  "When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Id.* at 342-43.  Rather, a plaintiff must allege that a decline in share price occurred "after the truth became known" and as a result of that corrective disclosure.  *Id.* at 347.

        To establish such causal relationship, Plaintiffs must plead specific facts showing that other factors did not account for the decline in share price:  "The plaintiff must show that the defendant's fraud—as opposed to some other factor—proximately caused his claimed losses."  *FindWhat*, 658 F.3d at 1309.  Plaintiffs fail to do so here.[19]  Plaintiffs identify the Company's August 3-4, 2011 and September 21, 2011 disclosures that preceded drops in Walter's stock price.  Compl. ¶¶ 143, 159.  Because neither connected any prior Company disclosures, Plaintiffs do not (and cannot) plead loss causation.  Rather, the August 4 stock price drop followed the disclosure of worse-than-expected second quarter

---

[19]     Plaintiffs must plead loss causation with sufficient specificity to enable the court to evaluate whether the necessary causal link exists.  *Teachers' Retirement System of LA v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007) ("[T]o allege a securities fraud claim [plaintiff] must not only prove loss causation . . . but he must also plead it with sufficient specificity to enable the court to evaluate whether the necessary causal link exists.") (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).

operating results, necessarily precluding Plaintiffs from "eliminating other possible explanations for this price drop" as required by the Eleventh Circuit. *FindWhat*, 658 F.3d at 1312. And it cannot be disputed that the September 21 press release was not a corrective disclosure about squeeze events, carryover tonnage, the Connector Road, or the Willow Creek permitting process. What it provided was a new report on the worse-than-expected operating results in the then-ongoing calendar quarter and adjusted the guidance for the next quarter. Ex. E. Plaintiffs have failed to plead loss causation as a matter of law.

## IV. Plaintiffs' Section 20(a) Claim Fails Because It Depends On Their Faulty Section 10(b) Claim

Plaintiffs also allege a claim under Section 20(a). Their Section 20(a) claim rests upon their establishing a primary violation under Section 10(b). *See Thompson*, 610 F.3d at 635-36. Plaintiffs' inability to plead a claim under Section 10(b) compels the dismissal of their derivative Section 20(a) claim. *See Goodman*, 594 F.3d at 797.

## CONCLUSION

For all of these reasons, this Court should dismiss Plaintiffs' Complaint in its entirety. Because Plaintiffs will not be able to cure any of the legal deficiencies in their Complaint, this dismissal should be with prejudice.

Dated:  October 4, 2012                    By: /s/  Jay M. Ezelle

Michael A. Florie (ASB-7356-I53M)
Jay M. Ezelle (ASB-4744-Z72J)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, Seventh Floor
Birmingham, Alabama 35209
(205) 868-6000
(205) 868-6099 (fax)
E-mail: mflorie@starneslaw.com
         jezelle@starneslaw.com
         ssistrunk@starneslaw.com

Bruce D. Angiolillo (admitted *pro hac vice*)
George S. Wang (admitted *pro hac vice*)
Shannon P. Torres (admitted *pro hac vice*)
SIMPSON, THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
(212) 455-2000
(212) 455-2502 (fax)
E-mail:  bangiolillo@stblaw.com
         gwang@stblaw.com
         storres@stblaw.com

**Attorneys for All Defendants**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 4th day of October 2012, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing, to the following:

Patrick C. Cooper
WARD & WILSON, LLC
2100 Southbridge Parkway, Suite 580
Birmingham, AL 35209
patrickccooper@yahoo.com

Alfred G. Yates, Jr.
Gerald L. Rutledge
LAW OFFICE OF ALFRED G. YATES, JR., P.C.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
yateslaw@aol.com

Andrew L. Zivitz
John J. Gross
Johnston De F. Whitman, Jr.
Meredith L. Lambert
KESSLER TOPAZ MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, PA  19087
azivitz@ktmc.com
jgross@ktmc.com
jwhitman@ktmc.com
mlambert@ktmc.com

James S. Ward
WARD & WILSON LLC
2100 Southbridge Parkway, Suite 580
Birmingham, AL  35209
jward@wardwilsonlaw.com

Jeffrey A. Berens
DYER & BERENS LLP
303 East 17th Avenue, Suite 300
Denver, CO  80203
jeff@dyerberens.com

Michael I. Fistel, Jr.
HOLZER HOLZER & FISTEL LLC
200 Ashford Center North, Suite 300
Atlanta, GA  30338
mfistel@holzerlaw.com

Samuel H. Rudman
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
srudman@rgrdlaw.com

Diandra S. Debrosse
GENTLE TURNER SEXTON DEBROSSE & HARBISON
501 Riverchase Parkway East
Suite 100
Hoover, AL  35244
ddebrosse@gtandslaw.com

/s/ Jay M. Ezelle
Jay M. Ezelle (ASB-4744-Z72J)
STARNES DAVIS FLORIE LLP
Seventh Floor, 100 Brookwood Place
P.O. Box 598512
Birmingham, Alabama 35259-8512
Telephone: (205) 868-6000
Fax: (205) 868-6099
E-mail: jme@starneslaw.com