FILED
2012 Nov-19  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE WALTER ENERGY, INC. SECURITIES LITIGATION | ) ) ) | MASTER FILE NO. 2:12-CV-00281-VEH |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS. | ) ) ) | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................1

FACTUAL BACKGROUND ...................................................................3

    A.    Walter and Its Operations ...............................................3

    B.    Defendants Misrepresented Walter's 2Q11 Coal Pricing and Production ..................................................................4

    C.    Walter's Newly-Appointed CEO Resigns and Walter Refuses to Disclose Its 2Q11 U.S. Production Shortfall......................5

    D.    Walter Belatedly Reveals Misrepresented and Concealed Facts .....................................................................5

ARGUMENT ..........................................................................................6

I.    LEGAL STANDARDS ..................................................................6

II.    THE CAC PLEADS ACTIONABLE MISSTATEMENTS ...........................7

    A.    Walter Misrepresented Its 2Q11 Coal Pricing .....................7

    B.    Walter Misrepresented Its 2Q11 U.S. Coal Production .....................10

    C.    Walter Misrepresented Its 2Q11 Canadian Coal Operations .................................................................14

    D.    Defendants' August 2011 Disclosures Concealed the Impact of 2Q11 Production Issues on Walter's 2011 Performance.........................................................16

    E.    Defendants' Statements Are Not Protected Under the PSLRA Safe Harbor or the Bespeaks Caution Doctrine.....................16

III.    THE CAC ADEQUATELY ALLEGES SCIENTER ...................................18

    A.    Defendants Knew of Walter's 2Q11 Carryover Tonnage Obligation .................................................................19

B.  Defendants Knew of or Recklessly Disregarded Ongoing Squeeze and Related Events Impacting U.S. Production.................20

C.  Defendants Knew of or Recklessly Disregarded Canadian Coal Production Problems.................22

D.  Calder's Resignation and Leonard's Concession that Walter Should Have Provided a "Mid-Quarter Update" Support Scienter .................23

IV.  THE CAC ADEQUATELY PLEADS LOSS CAUSATION.................23

V.  THE CAC ADEQUATELY ALLEGES SECTION 20(a) CLAIMS .................25

CONCLUSION .................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Asher v. Baxter Int'l Inc.*
377 F.3d 727 (7th Cir. 2004) ...............................................................................10

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) .....................................................................6, 18

*City of St. Clair Shores Gen. Emps.' Ret. Sys. v. Lender Processing Servs.,
Inc.*,
2012 WL 1080953 (M.D. Fla. Mar. 30, 2012) ..................................................14

*Clay v. Riverwood Int'l Corp.*,
157 F.3d 1259 (11th Cir. 1998) .........................................................................14

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ...........................................................................................23

*FindWhat Investor Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ...................................................................*passim*

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) .............................................................20, 22, 23

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) .........................................................................9, 10

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ...........................................................................17

*In re 21st Century Holding Co. Sec. Litig.*,
2008 WL 5749572 (S.D. Fla. Nov. 7, 2008) ..............................................16, 18

*In re Jiangbo Pharms., Inc., Sec. Litig.*,
2012 WL 3150085 (S.D. Fla. Aug. 1, 2012) .....................................................25

*In re MBIA, Inc. Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010) ...............................................................10

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ........................................................... 6

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ............................................................... 13

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin.
  Corp.*,
  2011 U.S. Dist. LEXIS 60761 (N.D. Ala. June 7, 2011) ......................... *passim*

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin.
  Corp.*,
  2011 U.S. Dist. LEXIS 93873 (N.D. Ala. Aug. 23, 2011) ........................ 19

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ............................................................... 11

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ............................................................... 20

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011) ......................................................................... 8

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ........................................................... 21

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W.
  Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ............................................................... 21

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ........................................................... 21, 23

*RBC Bank (USA) v. Holiday Isle, LLC*,
  2009 WL 3031182 (S.D. Ala. Sept. 14, 2009) ...................................... 13

*Rubinstein v. Collins*,
  20 F.3d 60 (5th Cir. 1994) ................................................................... 15

*SEC v. Merchant Capital, LLC*,
  483 F.3d 747 (11th Cir. 2007) .................................................. 15, 16, 18

*Speaker v. U.S. HHS CDC & Prevention,*
   623 F.3d 1371 (11th Cir. 2010) ........................................................................... 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007) ...................................................................................... 6, 19

**STATUTES**

30 C.F.R. 70.207(a) ............................................................................................ 12

30 C.F.R. 70.207(d) ........................................................................................... 13

15 U.S.C. §78u-5(c)(2)(A)(i) .............................................................................. 18

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8 ........................................................................................... 23, 24

Fed. R. Civ. P. 9(b) ............................................................................................. 6

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 6

Fed. R. Civ. P. 12(d) ........................................................................................... 7

Fed. R. Civ. P. 15(a)(2) ...................................................................................... 25

Fed. R. Civ. P. 56 ................................................................................................ 7

Lead Plaintiffs, the Government of Bermuda Contributory and Public Service Superannuation Pension Plans and Stephen C. Beaulieu, as Trustee of the Stephen C. Beaulieu Revocable Trust ("Lead Plaintiffs" or "Plaintiffs"),[1] respectfully submit this Memorandum of Law, together with the Declaration of Andrew L. Zivitz ("Zivitz Decl.") and the Exhibits attached thereto, in opposition to Defendants'[2] Motion to Dismiss (the "Motion") the Consolidated Amended Class Action Complaint.

## PRELIMINARY STATEMENT

Defendants seek to dismiss Plaintiffs' claims by mischaracterizing or ignoring the CAC's well-pled allegations, often resorting to matters outside the pleading to dispute certain facts. These efforts fail. The CAC adequately alleges that Defendants violated the federal securities laws by misrepresenting and omitting material facts concerning Walter's 2Q11 coal pricing and production – the most critical aspects of the Company's performance – during the period from April 20, 2011 through September 21, 2011 (the "Class Period").

---

[1] Unless otherwise defined herein, capitalized terms have the meanings attributed to them in the Consolidated Amended Class Action Complaint (the "CAC"). Additionally, all emphasis is added and all citations and quotations are omitted unless otherwise noted.

[2] The Defendants are: Walter Energy, Inc. ("Walter" or the "Company"); Keith Calder ("Calder"); Walter Scheller ("Scheller"); Joseph Leonard ("Leonard"); and Neil Winkelmann ("Winkelmann") (collectively, the "Defendants").

Indeed, during Walter's April 21 Conference Call with investors and analysts, Defendants represented that "record" 2Q11 coal prices – "nearly 50% higher" than 1Q11 prices – would drive the Company's performance upward. Defendants concealed, however, that Walter was already committed to sell ***more than one-third*** of its 2Q11 met coal at the substantially lower 1Q11 prices. Defendants also represented that Walter was "***on track***" for record coal production in 2Q11 and that past issues were "***behind***" the Company, while failing to disclose known and ongoing problems materially depressing its coal production, including: (i) squeeze events and ventilation problems at Walter's flagship Mine No. 7 in Alabama, for which Walter had received numerous unsafe mine citations from the MSHA; and (ii) logistical constraints at Walter's celebrated Connector Road that rendered its promised benefits impossible.  Defendants likewise failed to disclose these known problems and their impact in the Form 10-Q that Walter filed on May 9, 2011, violating Defendants' disclosure duties under SEC Regulation S-K.  *See* Point II, *infra*.

In addressing the CAC's scienter allegations, Defendants essentially concede that they *knew* of Walter's commitment to sell 706,000 tons of coal during 2Q11 at substantially lower 1Q11 prices at the time they made the alleged false statements. Defendants, however, argue that the CAC does not plead scienter for their misrepresentations regarding U.S. and Canadian coal production because extrinsic

2

documents suggest that the production problems arose after Defendants spoke.

Not so.  The CAC pleads *contemporaneous* facts that Defendants knew, but failed

to disclose, rendering their coal production statements materially misleading,

plainly satisfying the requirements for pleading scienter.  *See* Point III, *infra*.

The truth hurt.  When Defendants revealed the previously misrepresented

and concealed facts about Walter's 2Q11 coal pricing and production and the

associated risks materialized on August 4, 2011 and September 21, 2011, Walter's

common stock price ***plunged by 30% and 11.7%***, respectively, causing Plaintiffs

and other class members to suffer damages.  *See* Point IV, *infra*.

For all of the reasons set forth above and herein, Lead Plaintiffs respectfully

request that the Court deny Defendants' Motion in its entirety.

## FACTUAL BACKGROUND

### A.    Walter and Its Operations

Walter produces and exports metallurgical coal ("met" or "hard coking"

coal) for the global steel industry.  ¶¶2, 20, 30.[3]  The successful operation of

Walter's "flagship" Mine No. 7 in Alabama, which accounted for more than 47%

of the Company's entire coal production in 2010, is critical to the Company.  ¶45.

Walter's quarterly coal prices are the key to Walter's prosperity, and are generally

established during the month preceding the commencement of each quarter.  ¶¶39-

---

[3] References to "¶ __" are to the CAC.

41, 81, 84-86, 91.  At the beginning of each quarter, Walter also knows whether it has any "carryover tonnage" obligations resulting from Walter's failure to complete delivery of met coal pursuant to sales contracts at prices established during preceding quarters.  ¶¶38, 41, 92-93.  A substantial carryover tonnage obligation at lower prices will reduce Walter's average sales price and net income during the subsequent quarter.  ¶¶87, 131, 139-40, 145.

### B.   Defendants Misrepresented Walter's 2Q11 Coal Pricing and Production

At the beginning of the Class Period, Defendants knew or recklessly disregarded the following facts concerning Walter's 2Q11 coal pricing and production:  (i) the Company was obligated to sell 706,000 tons of its coal during 2Q11 at far lower 1Q11 prices (¶¶91-93); (ii) production at Mine No.7 was suffering from ongoing squeeze events and ventilation problems (¶¶51-61, 102); and (iii) logistical problems at the Connector Road and delays in obtaining permits for the Willow Creek mine expansion were impairing production in Canada (¶¶71-79, 106-07).  Defendants omitted these facts when speaking on April 21, rendering their statements concerning the following core aspects of Walter's business for 2Q11 materially false and misleading:  (i) met coal prices (¶¶40-42, 88-91); (ii) U.S. coal production (¶¶49-50, 95, 97-101); and (iii) Canadian coal production (¶¶70-71, 77, 103-05).  Defendants' materially false and misleading statements artificially inflated the price of Walter common stock.  ¶¶143, 177-79.

## C.   Walter's Newly-Appointed CEO Resigns and Walter Refuses to Disclose Its 2Q11 U.S. Production Shortfall

On June 30, 2011, Walter issued a press release announcing that – just a few months into his tenure – Calder would resign as CEO, effective July 31, 2011, due to "differences of opinion concerning management philosophy." ¶¶5, 21, 122-23. Well before Calder left the Company, it was known internally that Walter had a 500,000 ton 2Q11 coal production shortfall largely attributable to squeeze events, and that a decision *had already been made* to conceal these material facts from investors. ¶¶7, 63, 128.

## D.   Walter Belatedly Reveals Misrepresented and Concealed Facts

During Walter's August 4 Conference Call, Defendants finally disclosed that: (i) Walter was obligated to sell 706,000 tons of met coal during 2Q11 at far lower 1Q11 prices (¶¶139-40); (ii) production at Mine No. 7 was severely hampered by squeeze events that began in April 2011 (¶¶134-35); and (iii) production in Canada suffered from logistical problems with the Connector Road and from "several months" of delays in receiving the permits required to expand production at Willow Creek (¶¶137-38).  Analysts were shocked, reporting, among other things, that "selling prices were well below expected levels" and that the "[s]ignificant miss can be attributed to carryover tonnes." ¶¶11, 145.

In direct response to Walter's announcement of previously misrepresented and concealed material facts, the price of Walter's common stock declined by 30%

on August 4.  ¶¶12, 143, 179.  In its September 21 Press Release, Walter again surprised the market by lowering its guidance for the remainder of 2011, revealing the previously concealed impact of the production issues plaguing Mine No. 7 and the logistical problems with the Connector Road.  ¶¶14, 156-57, 180.  In response, the price of Walter common stock declined an additional 11.7%.  ¶¶14, 159, 180.

## ARGUMENT

### I.   LEGAL STANDARDS

When reviewing a federal securities fraud complaint pursuant to Rule 12(b)(6) and Rule 9(b), a court must "accept all factual allegations in the complaint as true" and construe them in the light most favorable to the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  It is inappropriate for courts to attempt to resolve factual disputes at the motion to dismiss stage.  *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010).

Here, Defendants use materials outside the CAC (the "Extrinsic Documents") attached to the Declaration of Jay M. Ezelle ("Ezelle Decl.") (Doc. No. 44)[4] to challenge certain of the CAC's factual allegations.[5]  *See* Zivitz Decl.,

---

[4] References to "D. Ex. __" are to Exhibits to the Ezelle Decl.  References to "D. Br. __" are to Defendants' Memorandum of Law in Support of their Motion to Dismiss.

[5] Courts may take judicial notice of extrinsic documents to establish the fact of their existence. Courts may not consider such materials, as Defendants request, "to prove the truth of their contents."  *Bryant v. Avado Brands, Inc*., 187 F.3d 1271, 1278 (11th Cir. 1999).

Ex. A.  Plaintiffs respectfully submit that Rule 12(d) requires the Court to either:

(i) disregard the Extrinsic Documents and the arguments Defendants base upon

them; or (ii) convert Defendants' Motion to a Rule 56 motion, and provide the

parties with a reasonable opportunity to take discovery.  *See, e.g.*, *Speaker v. U.S.*

*HHS CDC & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

To state a claim for a violation of §10(b) and Rule 10b-5, a plaintiff must

allege, as the CAC does here:  (i) a material misrepresentation (or omission); (ii)

made with scienter; (iii) in connection with the purchase or sale of a security; (iv)

on which the plaintiff relied; and (v) which was causally connected to the

plaintiff's economic loss.  *See FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d

1282, 1295 (11th Cir. 2011).

## II.   THE CAC PLEADS ACTIONABLE MISSTATEMENTS

### A.   Walter Misrepresented Its 2Q11 Coal Pricing

During the April 21, 2011 Conference Call, Calder represented that met coal

pricing for 2Q11 was "very strong," at "record levels," and that Walter had

established prices for its 2Q11 met coal of approximately "$326 to $330 per ton"

that were "***nearly 50% higher***" than 1Q11 prices.  ¶¶88-91.  Regarding Walter's

2Q11 coal pricing, Calder further stated, "obviously through the second quarter,

our [coal] production *is priced and sold*" and that the "[l]ast month in the quarter is

when we establish the pricing for the next quarter."  ¶91.

At the time of these statements, Walter had an undisclosed, pre-existing commitment to sell 706,000 tons of coal during 2Q11 (***more than 30%*** of its entire coal production for each of 1Q11 and 2Q11) at prices around $225 per ton – ***30% less*** than the $326 to $330 per ton benchmark prices Calder celebrated during the April 21 Conference Call.  ¶¶41, 93, 139.  Defendants' concealment of this massive commitment at far lower 1Q11 prices, while touting that Walter had locked in "record level" 2Q11 prices, rendered their statements materially false and misleading and actionable.  *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011) (disclosure under 10b-5 required when necessary in order "to make . . .  statements made, in light of the circumstances under which they were made, not misleading"); *see also FindWhat*, 658 F.3d at 1299.

Defendants' attempts to refute this patent falsity fail.  *First*, Defendants contend that their representations were not misleading because they did not promise that 2Q11 "realized" pricing would equal the "record level" "settled" prices.  D. Br. 5, 11-12.  Defendants misstate the CAC's allegations.  The CAC does not allege that Defendants represented that *all* of Walter's coal would be sold at 2Q11 settled prices.  Rather, the CAC alleges that Defendants promoted the benefits that "record level" 2Q11 settled pricing ($326 to $330 per ton) would have on Walter while failing to disclose that ***more than 30%*** of Walter's production would be sold at lower 1Q11 prices (approximately $225 per ton).  ¶¶41, 88-91,

8

139.  The securities laws flatly prohibit such selective disclosure.  *See FindWhat*, 658 F.3d at 1305 ("[E]ven absent a duty to speak, a party who discloses material facts . . . assumes a duty to speak fully and truthfully . . . .").

*Second*, Defendants contend that Walter's carryover tonnage commitments were entirely disclosed to the market during the April 21 Conference Call when Calder stated there would be "a little carryover" in 2Q11.  D. Br. 5, 12.  This argument falls flat, as Calder's vague reference to "a little carryover" in 2Q11 was itself a materially false and misleading statement because the actual obligation ***covered more than 30%*** of Walter's entire coal production for each of 1Q11 and 2Q11 – an amount that cannot be characterized as "a little carryover."  *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("[C]orrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.").

*Third*, Defendants' "truth on the market" defense – that "[n]o one was misled" by Walter's April 21 statements regarding 2Q11 coal pricing (D. Br. 12) – (i) is belied by the facts; (ii) improperly relies upon Extrinsic Documents; and (iii) is a fact-intensive inquiry that should not be resolved at the pleading stage.  *See Ganino*, 228 F.3d at 167 ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint . . .");

*see also Asher v. Baxter Int'l Inc.* 377 F.3d 727, 735 (7th Cir. 2004) ("A 'truth-on-the-market' defense is available in principle . . . but not at the pleading stage."). Nothing in Defendants' April 21 statements came close to revealing that Walter was committed to sell 706,000 tons of coal during 2Q11 at prices 30% lower than those Defendants touted.  ¶¶89, 139-40.  Furthermore, analyst reaction and the 30% drop in Walter's stock price in response to Walter's August 4 disclosure of the truth demonstrate that investors *were misled*.  ¶¶10-12, 143, 145, 179.  *See, e.g.*, *Asher*, 377 F.3d at 735 (rejecting defendants' argument that "the full truth had reached the market" because "[i]f this is so . . . it is hard to understand the sharp drop in the price of its stock.").[6]

### B.    Walter Misrepresented Its 2Q11 U.S. Coal Production

During the April 21 Conference Call, Calder stated that "[w]e remain on track with our production profile with our first quarter run rate on pace for record production at our [No. 7] mine," and Scheller claimed that Walter had

---

[6] Ignoring the analyst shock alleged in the CAC, Defendants proffer two analyst reports that are outside the pleadings to argue that the market was not surprised. D. Br. 5-6, 12 (referencing D. Ex. H and I).  At best, the observations that the analysts made in these Extrinsic Documents raise factual arguments because there is no dispute that Walter's 2Q11 fell well short of analysts' consensus estimates and that other analysts were shocked when Walter belatedly disclosed its massive 2Q11 carryover tonnage obligation on August 4.  ¶¶10, 143, 145.  *See, e.g.*, Zivitz Decl., Ex. B at 2; *see also In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) ("Faced with these conflicting [analyst] reports, the Court cannot decide the fact intensive issue of truth-on-the-market on a motion to dismiss.").  Likewise, the numerous extrinsic quarterly earnings call transcripts that Defendants submit (D. Br. 4, 12 (referencing D. Ex. A 1-7)) did not disclose to investors Walter's material obligation to sell approximately 1/3 of its 2Q11 coal production at substantially lower 1Q11 prices.  *See Ganino*, 228 F.3d at 167.

"establish[ed] a foundation to moving forward at production [sic] at improved rates."  ¶¶97-98.  Scheller also represented that prior issues impacting production, including roof and ventilation problems and squeeze conditions, were "***behind***" the Company, and that Walter was presently "***on track***" to produce 7.5 to 8 million short tons of met coal from its Alabama underground operations for the remainder of 2011.  ¶¶49, 95, 97-101.

Unbeknownst to investors, as Scheller admitted on August 4, there were squeeze events materially affecting production at Mine No. 7 "***beginning in April***" (¶134), not May as Defendants baldly conclude.  D. Br. 13.  Scheller's admission confirms Plaintiffs' allegations that the east longwall of Mine No. 7 experienced numerous shutdowns in production lasting days, weeks and then an entire month beginning in either March or April 2011 that were prior to, and contemporaneous with, Defendants' April 21 representation that Walter was "on track" for record production in 2Q11.  ¶¶54-55.  Such allegations properly plead falsity.  *See, e.g., FindWhat*, 658 F.3d at 1296.[7]

---

[7] Even if Calder and Scheller's April 21 statements could be considered statements of opinion, they are still actionable because the CAC pleads "many facts showing that the defendants had information that did not support defendants' opinions."  *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 60761, at *20 (N.D. Ala. June 7, 2011); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 n.13 (5th Cir. 2009) "[a]n opinion or prediction is actionable if there is a gross disparity between prediction and fact.").  *See* Point III, *infra*.

Defendants challenge the falsity of their April 21 statements regarding U.S. coal production by referring improperly to an Extrinsic Document that fails to substantiate their arguments.  D. Br. 6, 13; D. Ex. J.  Specifically, Defendants claim that a "MSHA Operator Dust Sample Report" "show[s] that Mine No. 7 was operating under normal conditions on April 21."  D. Br. 13.  While the Court should disregard this report and Defendants' arguments (*see* Point I, *infra*), the putative fact that a dust sample was collected at some point on April 21 does not address the CAC's allegations that squeeze events and ventilation problems were *ongoing and adversely affecting production as of April 21.*  ¶¶51-61, 102.[8]  Furthermore, a less limited version of the MSHA Operator Dust Sample Report (Zivitz Decl., Ex. C), indicates that for Mine No. 7's Longwall 2 (Entity No. 190), Walter:  (i) did not provide any dust samples for March, May or June 2011; and (ii) was unable to furnish the required five valid dust samples on consecutive days or shifts during the March 1-April 30 bimonthly period, as is required under 30 C.F.R. 70.207(a), reflecting operational problems at Mine No. 7 at that time.[9]

---

[8] The CAC also alleges that Defendants' April 21 U.S. coal production statements were misleading because Defendants failed to disclose ongoing ventilation problems at Mine No. 7 – for which Walter had received *fourteen MSHA safety citations* since the beginning of 2011. ¶¶60-61.  While Defendants now suggest that the ventilation problems at Mine No. 7 did not contribute to the 2Q11 production shortfall (D. Br. 13 n.9), Defendants admitted on August 4 that "ventilation issues" were a contributing factor.  ¶¶58, 133.

[9] In fact, Walter only produced samples for two consecutive shifts.  The "Void cd" column of the chart reflects that the MSHA voided the April 6-7 samples as "PRO," which means "invalid

Thus, Defendants' extrinsic information is wholly consistent with the intermittent, but regular, production disruptions that Plaintiffs allege were concealed. ¶¶54-55.

Defendants, nevertheless, concede that Mine No. 7 was experiencing squeeze events as of May 2011 (D. Br. 6), admitting that Walter made false statements in its May 9, 2011 Form 10-Q, in which Defendants reaffirmed their April 21 statements regarding coal pricing and production, but failed to disclose either Walter's 706,000 ton carryover commitment or the ongoing squeeze events affecting production at Mine No. 7. ¶¶113-21. *See, e.g.*, *FindWhat*, 658 F.3d at 1317 (securities laws do not protect knowing dissemination of "materially false or misleading information simply because their fraud concerns false information already believed by the market"). Defendants ignore the statements they made in this SEC filing, and cannot raise them on reply. *See, e.g.*, *RBC Bank (USA) v. Holiday Isle, LLC*, 2009 WL 3031182, at *4 (S.D. Ala. Sept. 14, 2009).[10]

---

production." Moreover, the putative April 21 dust sample does not even establish that Mine No. 7 was operating under normal conditions that day. D. Br. 6 n.6. Contrary to Defendants' representation that 30 C.F.R. 70.207 (a), (d) requires that dust samples be taken "during a normal production shift," the regulation **explicitly contemplates that samples may be obtained when "a normal production shift is not achieved."** *See* 30 C.F.R. 70.207(d). Zivitz Decl., Ex. D.

[10] Defendants' failure to disclose the pricing and production issues in the 1Q11 Form 10-Q violated their obligations under Item 303 of SEC Regulation S-K. ¶¶116-21. *See, e.g.*, *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 722 (2d Cir. 2011) (failure to disclose "adverse trends concerning a segment that constituted nearly a quarter of Blackstone's assets under management" violated disclosure requirements of Item 303). Moreover, if the Court considers the extrinsic MSHA documents and credits Defendants' arguments based upon them, Defendants nevertheless had a duty to update the market regarding the impact of the admitted May squeeze

### C.     Walter Misrepresented Its 2Q11 Canadian Coal Operations

During the April 21 Conference Call, Winkelmann boasted about Walter's "newly commissioned" and "in service" Connector Road: "[w]ith the newly commissioned road, the majority of the coal from Brule *can go* directly to Willow Creek's production and loadout facilities without highway travel, *thus reducing* transportation costs *and enabling* Brule to increase production to the targeted 2 million metric tons per year run rate by middle of this year." ¶¶103-04.[11]

Winkelmann's April 21 statements concerning the Connector Road and its increased efficiencies were materially misleading when made. *As of 2010*, it was known that the Connector Road's design forced Walter to use smaller than intended trucks to haul coal from the Brule mine, preventing the significant

---

event, which rendered the April 21 production statements materially misleading. *See Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259, 1268 (11th Cir. 1998) (*rev'd on other grounds*) (duty to update arises when subsequent events render prior statements misleading).  As Leonard conceded on August 4, Walter had the facts needed to provide a "mid-quarter update" on the issues impacting coal production, but failed to do so.  ¶142.  Though the transcript of the August 4 Conference Call relied upon in preparing the CAC attributes this statement to Sheller (Zivitz Decl., Ex. E at 21), Plaintiffs' accept Defendants' representation that Leonard made the statement.  D. Br. 16 n.12.

[11] Defendants misperceive the CAC's allegations when contending that their statements were not misleading because the Connector Road was, in fact, "newly commissioned" and "in service" as of April 21.  D. Br. 7, 14.  These statements were misleading because they failed to disclose any limitations on the Connector Road, creating the false impression that it was fully operational. ¶108.  *See, e.g.*, *City of St. Clair Shores Gen. Emps.' Ret. Sys. v. Lender Processing Servs., Inc.*, 2012 WL 1080953, at *3 (M.D. Fla. Mar. 30, 2012) ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers").

increase in the volume of coal that Walter represented it could produce from this mine.  ¶¶71-76.  *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 768 (11th Cir. 2007) (citing *Rubinstein v. Collins*, 20 F.3d 60, 170 (5th Cir. 1994)) ("optimistic statements that omit known substantial adverse facts are actionable under the antifraud provisions").  As Winkelmann acknowledged on August 4, the logistics of the Connector Road impaired Canadian coal production in 2Q11.  ¶137.[12]

During the April 21 Conference Call, Walter and Winkelmann also represented that permits enabling the increased run rate at Willow Creek were expected "shortly" and "soon" when, in fact, the permits were subject to protracted delays (¶¶103, 105, 138), which were regularly discussed at weekly meetings and conference calls in which Winkelmann participated, depriving him of a good faith basis for his statements.  ¶¶77-79.  Indeed, as Winkelmann stated on August 4, the permits were not obtained until "after several months of processing delays . . . which impacted production and costs for the quarter."  ¶138.  The April 21 statements concerning the Willow Creek permits were false and misleading for omitting the known, ongoing delays.  *See FindWhat*, 658 F.3d at 1299.[13]

---

[12] While Defendants now argue that rainfall may also have impacted operations along the Connector Road (D. Br. 7 n.7), Winkelmann himself did not suggest that weather issues were the sole cause of the hauling capacity constraints that negatively impacted production.  ¶137.

[13] Even if the Court determines that Winkelmann's statements regarding permits were not materially misleading when made, he failed to provide the required update to his statements when he learned that the permits were not forthcoming "shortly."  *See* n. 10, *supra*.

**D.    Defendants' August 2011 Disclosures Concealed the Impact of 2Q11 Production Issues on Walter's 2011 Performance**

When announcing Walter's disappointing 2Q11 financial results in August 2011, Defendants withheld material information concerning the known and ongoing negative impact that the squeeze events at Mine No. 7 and the production issues in Canada were having on Walter's 2011 performance.  ¶¶132, 144.  Though ignored by Defendants, these issues also were omitted from Walter's 2011 Q2 Form 10-Q, violating the disclosure requirements of SEC Regulation S-K.  ¶¶146-52.  At the time of each of these statements, Defendants knew that the impact of the 2Q11 production issues was not limited to 2Q11, yet failed to inform investors. *See, e.g.*, *FindWhat*, 658 F.3d at 1299; *Merchant Capital*, 483 F.3d at 768.

**E.    Defendants' Statements Are Not Protected Under the PSLRA Safe Harbor or the Bespeaks Caution Doctrine**

The PSLRA safe harbor provides no shelter for Defendants' statements regarding 2Q11 coal pricing and production because "the safe harbor of the PSLRA only applies to forward-looking statements *and not misstatements or omissions of historical or contemporaneous facts*."  *In re 21st Century Holding Co. Sec. Litig.*, 2008 WL 5749572, at *12 (S.D. Fla. Nov. 7, 2008); *see also FindWhat*, 658 F.3d at 1299.  Defendants omitted the following known contemporaneous material facts from their statements regarding 2Q11 coal pricing and production, rendering each of those statements materially false and misleading:  (i) Walter's

commitment to sell 706,000 tons of coal during 2Q11 at far lower 1Q11 prices (¶¶91-93); (ii) ongoing squeeze events and ventilation problems disrupting production at Mine No. 7 (¶¶51-61, 102); and (iii) production problems in Canada resulting from design flaws at the Connector Road and ongoing delays in obtaining the Willow Creek permits (¶¶71-79, 106-07, 138).  Because Defendants' statements omitted contemporaneous material facts, they were not forward-looking and are not entitled to safe harbor protection.  *Id*.

Defendants' statements were also not forward-looking because they were firmly rooted in the past and present, and their truth was discernible at the time they were made.  *See Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999).  For example, regarding 2Q11 coal pricing, Calder stated, "[l]ooking at the . . . second quarter 2011, hard coking coal prices, *we settled* in line with markets – $326 to $330 per ton."  ¶89.  The truth of Defendants' statements regarding coal production in the U.S. and Canada was also discernible at the time those statements were made.  *See, e.g.*, ¶97 ("*we are positioned* to expand production for an 8 million ton annual run rate as we move forward"); ¶104 ("[w]ith the *newly commissioned* road, the majority of the coal from Brule *can go* directly to Willow Creek's production and loadout facilities without highway travel, *thus reducing* transportation costs *and enabling* Brule to increase production to the targeted 2 million metric tons per year run rate by middle of this year.").

Yet, even assuming *arguendo* that any of the alleged false and misleading statements may be forward-looking, Walter's putative cautionary language (D. Br. 8-9, 17-18) was neither meaningful nor adequate because the "risks" rendering Defendants' statements materially misleading had *already occurred*. The law is clear that "even if statements are forward-looking, cautionary language of future risks does not protect defendants if the risks warned against had already occurred." *Regions*, 2011 U.S. Dist. LEXIS 60761, at *21; *see also Merchant Capital,* 483 F.3d at 769 ("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"); *21st Century*, 2008 WL 5749572, at *13 ("Cautionary language can never be 'meaningful' if it warns of risks that have already materialized."). Because Defendants omitted ***known adverse*** facts from their statements regarding coal pricing and production, Walter's cautionary language does not insulate Defendants from liability. *Id.*[14]

## III.   THE CAC ADEQUATELY ALLEGES SCIENTER

Allegations demonstrating that Defendants:  (i) knew that their statements were misleading; or (ii) were severely reckless in not knowing, satisfy the requirements for pleading scienter. *See Bryant*, 187 F.3d at 1282.  To determine

---

[14] Cautionary language must also warn "that the *particular oral statement* is a forward-looking statement." 15 U.S.C. §78u-5(c)(2)(A)(i).  Defendants did not identify any "particular" oral statement as forward-looking, and said only that they "***may***" make "forward-looking statements on today's call."  D. Ex A-1 at 1.

whether a complaint adequately pleads scienter, a court must undertake a

"comparative assessment of plausible inferences, *while constantly assuming the*

*plaintiff's allegations to be true*."  *Tellabs*, 551 U.S. at 326-27 (footnote omitted).

The inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a

strong inference of scienter, not whether any individual allegation, scrutinized in

isolation, meets that standard."  *Id*. at 323 (emphasis in original).  A complaint

adequately pleads scienter if the collective allegations would lead a reasonable

person to conclude that "the inference of scienter [is] at least as strong as any

opposing inference . . . ."  *Id.* at 326.  The CAC readily satisfies this standard.[15]

## A.    Defendants Knew of Walter's 2Q11 Carryover Tonnage Obligation

Defendants do not challenge Plaintiffs' allegations that, by April 21, 2011,

Defendants knew that the Company was obligated to sell more than 700,000 tons

of met coal during 2Q11 at substantially lower 1Q11 prices.  ¶¶40-42, 88-91.  In

fact, Defendants claim the opposite in proffering their unsupportable "truth on the

market" defense.  *See* Point II.A, *supra*.

---

[15] Allegations of insider stock sales and/or a restatement of financial results are not required to plead scienter.  D. Br. 2, 22-23.  *See Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 93873, at *4 (N.D. Ala. Aug. 23, 2011) (rejecting argument that "an inference of scienter is particularly weak where the complaint does not allege inside stock sales or that financial restatements took place").

**B.     Defendants Knew of or Recklessly Disregarded Ongoing Squeeze and Related Events Impacting U.S. Production**

The CAC alleges particularized facts demonstrating that Calder and Scheller knew (or were severely reckless in not knowing) about the ongoing squeeze events at Mine No. 7 during the Class Period.  Mine No. 7 was Walter's largest producer of met coal in the United States, accounting for more than 47% of the Company's entire coal production during 2010.  ¶45.  Indeed, Walter identified Mine No. 7 as its "flagship mine," and stated in the Company's 2011 Annual Report that "[s]lightly more than one-third of [Walter's 2012] growth is anticipated to come from Mine No. 7."  ¶172.  These Defendants also made numerous statements demonstrating their close monitoring of Mine No. 7's production and performance.  ¶¶97-101, 111, 113, 131, 134-35.  As such, the Court may impute knowledge of the debilitating problems at Mine No. 7 to Calder and Scheller.  *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) ("[I]t is exceedingly unlikely" that a CEO "was unaware of the problems of his company's two major products.").  The Company also held bi-weekly senior management meetings beginning in approximately February 2011, attended by Scheller, Winkelmann and others, to discuss operational issues, such as any difficulties a department was experiencing.  ¶169.  Attendance at meetings where the problems at issue are discussed evidences scienter.  *See Frank v. Dana Corp.*, 646 F.3d 954, 962 (6th Cir. 2011) ("It is difficult to grasp the thought that [the CEO and CFO]

20

really had no idea that Dana was on the road to bankruptcy" where company's

financial status was discussed is internal meetings and reports).[16]

Furthermore, Defendants now concede that they knew of the squeeze event at

Mine No. 7 as of the filing of Walter's 1Q 2011 Form 10-Q (D. Br. 6), confirming

the CAC's allegations and supporting a strong inference that Defendants also knew

of the problems at Mine No. 7 as of the beginning of the Class Period.  ¶¶7, 63,

124-30.  When CW-1 contacted Scheller on or about July 10, 2011 to discuss the

500,000 ton 2Q11 production shortfall, Scheller revealed that *he was already*

*aware* of the shortfall and that a decision not to disclose the 2Q11 production

shortfall *had already been made at a higher level* of the Company.  *Id.*  CW-1 also

confirmed that Walter generated mine-by-mine production and financial

information during the Class Period, and the CAC's allegations give rise to a

strong inference that (at least) Scheller had access to this information.  *Id.*[17]  *See,*

*e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("securities fraud claims

---

[16] Moreover, the repeated sanctions that Walter received from the MSHA for unsafe roof
conditions at Mine No. 7, including eight roof-related citations between January 1, 2011 and
April 21, 2011 alone (¶¶60-61, 168), support an inference of scienter.  *See, e.g.*, *No. 84
Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920,
942 (9th Cir. 2003) (Federal Aviation Administration reports and letters contributed "strong
inference that Defendants knew that the maintenance problems were ongoing and, thus, that the
statements made by America West officers were false.").

[17] Using confidential witnesses to support scienter allegations is completely proper "so long as
the complaint unambiguously provides in a cognizable and detailed way the basis of the
whistleblower's knowledge."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1239-40 (11th Cir.
2008).  The CAC provides the information that the Eleventh Circuit requires.  ¶7.

typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements").

### C.   Defendants Knew of or Recklessly Disregarded Canadian Coal Production Problems

The CAC's allegations raise a strong inference that Defendants knew of the problems with the Connector Road and the ongoing permit delays negatively affecting Walter's 2Q11 coal production in Canada.  For example, information from the Ministry of Forests indicates the Road's logistical problems were known *as of 2010*.  ¶¶71-76.  Thus, well before the Class Period began, the Connector Road had the very logistical problems that Defendants admitted on August 4 impaired Canadian production in 2Q11 and prevented the Connector Road from even being "substantially commissioned" until the end of 3Q11.  ¶¶108, 137.

Moreover, the Connector Road problems, and the ongoing delays in obtaining the Willow Creek permits, were discussed at weekly meetings attended by department heads.  ¶78.  After each meeting, Winkelmann's assistant would update a task log maintained on a shared drive concerning the ongoing projects at each Canadian mine.  *Id.*  Additionally, Winkelmann participated on weekly conference calls to discuss operational issues, including the use of small trucks on the Connector Road to haul coal from the Brule mine.  ¶79.  These allegations support a strong inference of scienter.  *See, e.g.*, *Dana Corp.*, 646 F.3d at 962.

**D.    Calder's Resignation and Leonard's Concession that Walter Should Have Provided a "Mid-Quarter Update" Support Scienter**

On June 30, 2011, Walter issued an unexpected press release announcing that – just a few months into his tenure as CEO – Calder would resign effective July 31, 2011 due to "differences of opinion concerning management philosophy." ¶¶5, 21, 122-23.  High-level corporate resignations under unusual circumstances like these support an inference of scienter.  *See, e.g.*, *Dana Corp.*, 646 F.3d at 960 (retirement of CFO within months of discovery of accounting errors and at same time as company bankruptcy filing supported inference of scienter).  Moreover, Leonard admitted on August 4 that management knew of the issues that were materially affecting Walter's coal production during the Class Period when he conceded that Walter should have disclosed these problems in "a *mid-quarter update*." ¶142.  While the CAC adequately alleges that Defendants knew of these issues at the beginning of the Class Period, Walter clearly could not have made the mid-quarter update that Leonard conceded was required without access to the very information that Defendants failed to disclose.  *See, e.g.*, *Novak*, 216 F.3d at 308.

## IV.    THE CAC ADEQUATELY PLEADS LOSS CAUSATION

To plead loss causation, a plaintiff must "provide [the] defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *see also Regions*, 2011 U.S. Dist. LEXIS 60761, at *32 (Rule 8 applies to loss causation allegations).

23

Here, the price of Walter common stock declined by 30% on August 4, 2011 in direct response to Walter's August 3-4 disclosures of previously misrepresented and concealed material facts, namely:  (i) Walter's obligation to sell 706,000 tons of met coal during 2Q11 at far lower 1Q11 prices; (ii) the production shortfalls based upon squeeze events and ventilation issues at Mine No. 7; and (iii) production shortfalls in Canada arising from inadequacies in the Connector Road and delays in obtaining necessary expansion permits.  ¶179.  In response to the Company's September 21 press release announcing that Walter was lowering its guidance for the remainder of 2011 due to the same production issues at Mine No. 7 and in Canada, Walter's stock price declined an additional 11.7%.  ¶180.  These allegations adequately plead loss causation under Rule 8 by providing Defendants with notice of the losses alleged and the causal nexus.  *See Regions*, 2011 U.S. Dist. LEXIS 60761, at *33.

Defendants challenge the CAC's loss causation allegations based upon a standard that does not apply at the pleading stage.  D. Br. 24-25.[18]  The "disaggregation" – *i.e.*, isolating the portion of the identified stock drops attributable to corrective disclosures – that Defendants claim is required is plainly

---

[18] Defendants' putative authority for this position actually instructs that, even at the summary judgment stage, "the plaintiff need **not** show that the defendant's misconduct was the sole and exclusive cause of his injury."  *FindWhat*, 658 F.3d at 1309.

a matter of proof at trial, not pleading.  *See, e.g., In re Jiangbo Pharms., Inc., Sec. Litig.*, 2012 WL 3150085, at \*21 (S.D. Fla. Aug. 1, 2012) (whether losses resulted from other factors is a fact issue not properly resolved at pleading stage).

Defendants' argument that loss causation cannot be alleged as to the September 21 Press Release because it was a new report addressing new issues also fails.  D. Br. 25.  The CAC properly alleges that this press release disclosed the materialization of the risk created by the previously concealed ongoing impact of the squeeze events at Mine No. 7 and the inadequacies of the Connector Road. ¶¶154-59.  *Jiangbo Pharms.,* 2012 WL 3150085, at \*17 ("[i]t is sufficient to show that a risk defendants allegedly concealed materialized and arguably caused the plaintiffs' losses").

## V.    THE CAC ADEQUATELY ALLEGES SECTION 20(a) CLAIMS

As the CAC adequately alleges that Walter violated §10(b), there is no basis to dismiss the §20(a) claim.  *See Regions*, 2011 U.S. Dist. LEXIS 60761, at \*34.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Lead Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.  If the Court perceives any portion of the CAC to be insufficient, Lead Plaintiffs respectfully request leave to amend to cure any noted deficiencies.  *See* Rule 15(a)(2).

Dated: November 19, 2012

By: */s/ Andrew L. Zivitz.*
Andrew L. Zivitz
Johnston de F. Whitman, Jr.
John J. Gross
Meredith L. Lambert
**KESSLER TOPAZ MELTZER
& CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
Email: azivitz@ktmc.com
          jwhitman@ktmc.com
          jgross@ktmc.com
          mlambert@ktmc.com

By: */s/ Andrew J. Brown*
Andrew J. Brown
Matthew I. Alpert
**ROBBINS GELLER RUDMAN
& DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
Email: andrewb@rgrdlaw.com
          jaya@rgrdlaw.com
          malpert@rgrdlaw.com

Samuel H. Rudman
**ROBBINS GELLER RUDMAN
& DOWD LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
Email: srudman@rgrdlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

Patrick C. Cooper (ASB-4959-077P)
**WARD & WILSON, LLC**
2100 Southbridge Parkway, Suite 580
Birmingham, AL 35209
Telephone: (205) 871-5404
Facsimile: (205) 871-5758
Email: patrickccooper@yahoo.com

*Liaison Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing, to the following:

Michael A. Florie
Jay M. Ezelle
STARNES DAVIS FLORIE LLP
100 Brookwood Place, Seventh Floor
Birmingham, AL 35209
mflorie@starneslaw.com
jezelle@starneslaw.com

Bruce D. Angiolillo
George S. Wang
Shannon P. Torres
SIMPSON, THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
bangiolillo@stblaw.com
gwang@stblaw.com
storres@stblaw.com

Alfred G. Yates, Jr.
Gerald L. Rutledge
LAW OFFICE OF ALFRED G. YATES, JR., P.C.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
yateslaw@aol.com

Jeffrey A. Berens
DYER & BERENS LLP
303 East 17th Avenue, Suite 300
Denver, CO 80203
jeff@dyerberens.com

Michael I. Fistel, Jr.
HOLZER HOLZER & FISTEL LLC
200 Ashford Center North, Suite 300
Atlanta, GA 30338
mfistel@holzerlaw.com

Diandra S. Debrosse
GENTLE TURNER SEXTON DEBROSSE & HARBISON
501 Riverchase Parkway East
Suite 100
Hoover, AL 35244
ddebrosse@gtandslaw.com

Respectfully submitted,

*/s/ Andrew L. Zivitz*

Andrew L. Zivitz
KESSLER TOPAZ MELTZER
  & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
Email: jwhitman@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs*